IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE GEORGIA ADVOCACY OFFICE;     :
THE ARC OF THE UNITED STATES;     :
R.F, by and through his mother, B.F.;     :
C.S., by and through his mother, M.S.,     :
and Q.H., by and through his mother,     :
V.H., on behalf of themselves and others     :
similarly situated,     :
                                         :
          Plaintiffs,     :
                                         :
v.                                       :   CIVIL ACTION NO. :
                                         :
STATE OF GEORGIA; NATHAN DEAL,     :
in his official capacity as Governor of the     :
State of Georgia; GEORGIA BOARD     :
OF EDUCATION; GEORGIA     :
DEPARTMENT OF EDUCATION;     :
RICHARD WOODS, in his official     :
capacity as State School Superintendent     :
of Georgia; GEORGIA DEPARTMENT     :
OF BEHAVIORAL HEALTH and     :
DEVELOPMENTAL DISABILITIES;     :
JUDY FITZGERALD, in her official     :
capacity as Commissioner of the     :
Georgia Department of Behavioral Health     :
and Developmental Disabilities;     :
DEPARTMENT OF COMMUNITY     :
HEALTH; and FRANK BERRY, in his     :
official capacity as Commissioner of the     :
Georgia Department of Community Health,     :
                                         :
          Defendants.     :
_____

## CLASS ACTION COMPLAINT

Plaintiffs The Georgia Advocacy Office, The Arc of the United States, R.F,

by and through his mother, B.F., C.S., by and through his mother, M.S., and Q.H.,

by and through his mother, V.H., hereby file this Class Action Complaint on behalf

of themselves and others similarly situated, against Defendants the State of

Georgia, Nathan Deal, in his official capacity as Governor of the State of Georgia,

Georgia Board of Education, Georgia Department of Education, Richard Woods, in

his official capacity as State School Superintendent of Georgia, Georgia

Department of Behavioral Health and Developmental Disabilities, Judy Fitzgerald,

in her official capacity as Commissioner of the Georgia Department of Behavioral

Health and Developmental Disabilities, Department of Community Health, and

Frank Berry, in his official capacity as Commissioner of the Georgia Department

of Community Health, stating as follows:

## INTRODUCTION

1.      The State of Georgia (the "State") discriminates against thousands of

Georgia public school students with disabilities in violation of the Americans with

Disabilities Act (the "ADA"), Section 504 of the Rehabilitation Act of 1973

("Section 504"), and the Fourteenth Amendment to the United States Constitution

(the "Fourteenth Amendment"), by segregating them in a network of unequal and

2

separate institutions and classrooms known as the Georgia Network for

Educational and Therapeutic Support ("GNETS") program.  Many other students

with disabilities are at serious risk of the same fate.

2.     GNETS was designed over 40 years ago as a statewide special

education program for students ages three to twenty-one who have been identified

as having behavioral needs due to their disabilities.

3.     In the 2016 school year, approximately 5,256 students with

disabilities, including mental health and developmental disabilities, were in

GNETS.  The majority of these students are African American.

4.     Under rules established by the State, a student is placed in GNETS if,

after being referred by his or her local school system, GNETS determines the

student meets the criteria for placement.

5.     GNETS are segregated programs, housed in entirely separate

buildings or in separate wings of zoned schools.  A zoned school is a local or

neighborhood school that a student would normally attend based on where the

student lives.  Thus, GNETS students are denied the opportunity to be educated in

classrooms with their non-disabled peers.

6.     GNETS students receive a low-quality education.  Academic

instruction is poor, and GNETS students do not have access to courses and

extracurricular activities routinely available to their non-disabled peers.  Because of the lack of core courses and poor academic instruction, it is hard to earn a regular school diploma, and very few GNETS students graduate with one.

7.     Even though GNETS are sometimes housed within separate wings in zoned schools, GNETS do not operate like schools and are not treated like other educational settings for reporting or accountability purposes.  Instead, records show that GNETS are exempted from reporting and additional requirements imposed on other schools.

8.     Although advertised as "therapeutic," GNETS are anything but.  At GNETS, students do not receive the services they need to improve their behavior.  Often, their behavior worsens when placed in GNETS because of the harsh and punitive atmosphere that prevails.  Staff routinely use physical restraints and otherwise rely on harsh and ineffective methods of discipline.

9.     Tragically, the students placed in GNETS do not need to be there.  If they were provided the services they need, they could remain in their zoned schools and receive a far better education than they are receiving in GNETS.

10.     GNETS' very existence causes this problem.  By maintaining and funding GNETS separate and apart from local school districts, the State has created

a system in which a GNETS referral is the most convenient, and, in many school districts, the only option for students with disability-related behavioral needs.

11.    The State does not provide local school districts necessary funding to provide needed disability-related behavioral services in zoned schools.  As a result of the State's decision to consolidate the majority of its funding for these services in GNETS, local school districts have little incentive and few resources to provide the services necessary to educate children with disability-related behavioral needs in their zoned schools.

12.    Plaintiffs seek a declaration that Defendants' denial of equal educational opportunity to, and needless segregation of, students in GNETS violates the ADA, Section 504, and the Fourteenth Amendment, as well as an order directing Defendants to take all steps necessary to desegregate GNETS by ensuring that students in or at serious risk of placement in GNETS have access to the services they need to be educated in their zoned schools in classrooms with their non-disabled peers.

13.    GNETS is also the subject of an action captioned *United States v. Georgia*, Civ. No. 1:16-CV-03088-ELR, pending in this Court.  The United States Department of Justice ("DOJ") filed that litigation after its extensive investigation found that, in violation of the ADA, students in GNETS are unjustifiably

segregated and denied equal educational opportunity, including the opportunity to be educated in their zoned schools in classrooms with their non-disabled peers. *See* Letter from Principal Deputy Assistant Attorney General Vanita Gupta to Governor Nathan Deal and Attorney General Sam Olens (dated July 15, 2015).

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action under 28 U.S.C. § 1331, Title II of the ADA, 42 U.S.C. §§ 12131-12133, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a)(2), and 42 U.S.C. § 1983.  Declaratory relief is available pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by 28 U.S.C. § 2202 and Rule 65 of the Federal Rules of Civil Procedure.

15.    Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(2), since a substantial part of the acts and omissions giving rise to these claims occurred in the Northern District of Georgia.  Venue is proper in the Atlanta Division since one or all of the Defendants reside in that Division, and a substantial part of the acts and omissions giving rise to these claims occurred in the Atlanta Division.  *See* N.D. Ga. Local R. 3.1.

## PARTIES

### A.    Individual Named Plaintiffs

16.    All the Individual Named Plaintiffs reside in Georgia.  Each has been identified by GNETS and/or their school as having a disability that results in behaviors in school that impede their learning.

17.    Each Individual Named Plaintiff is a minor and, via a motion filed simultaneously with this Complaint, seeks leave to proceed using a pseudonym. Each Individual Named Plaintiff brings this action by and through his parent, as permitted by Federal Rule of Civil Procedure 17(c).

18.    The Individual Named Plaintiffs and the Class, as defined *infra* at Paragraph 56 of this Complaint, seek systemic, class-based relief under the ADA, Section 504, and the Equal Protection Clause, and such relief cannot be provided using the administrative procedures authorized by the Individuals with Disabilities Education Act ("IDEA").  The Individual Named Plaintiffs and the Class do not seek relief related to any failure to provide them with a free appropriate public education ("FAPE").  Therefore, any effort to exhaust claims through the administrative process is unnecessary and/or futile.

**B.    Organizational Plaintiffs**

*i.    The Georgia Advocacy Office*

19.    Plaintiff the Georgia Advocacy Office ("GAO") is the statewide protection and advocacy system ("P&A") for Georgia, serving individuals in Georgia with disabilities.  Founded in 1977, GAO is a private, non-profit organization.  GAO maintains its primary office at 1 West Court Square, Suite #625, Decatur, Georgia 30030.

20.    In 1977, the State designated GAO to be Georgia's P&A.  As a P&A, GAO is mandated to protect the rights of Georgians with disabilities by the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15001 et seq., the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801 et seq., and the Protection and Advocacy for Individual Rights Act, 29 U.S.C. § 794e, and their implementing regulations.

21.    Under federal law, GAO has the authority and the obligation to pursue such legal remedies as may be necessary to protect the rights of individuals with disabilities, including students with disability-related behavioral needs in Georgia public schools.  *See* 42 U.S.C. §§ 15041 et seq., 10801 et seq., 29 U.S.C. § 794e.

22.    GAO uses a broad range of strategies to fulfill its mission, including systems advocacy, individual advocacy, outreach, support to individuals to become self-advocates, citizen advocacy, litigation, training, and education.

23.    GAO's constituents include students with disability-related behavioral needs in Georgia public schools who are, or are at serious risk of being, enrolled in GNETS, and their families.  The Individual Named Plaintiffs and members of the Class are constituents of GAO.

24.    As required by federal law, 42 U.S.C. §§ 10805 and 15044, GAO has a multi-member governing board, which is responsible for the planning, design, implementation, and functioning of the protection and advocacy system.  This Board of Directors annually establishes GAO's advocacy priorities.

25.    Eighty-eight percent of GAO's Board of Directors are individuals with disabilities, including, for example, intellectual and developmental disabilities, autism, and mental health disabilities, and family members of individuals with disabilities.

26.    In accordance with federal law, GAO has an Advisory Council for its advocacy activities under the PAIMI Act.  The PAIMI Advisory Council is chaired by a person who has received or is receiving mental health services, and all of the members of the PAIMI Advisory Council also are individuals who have received

or are receiving mental health services, or who are family members of such individuals.

27.     Each year, the Advisory Council solicits comments and suggestions from GAO's constituents and the public about PAIMI priorities.  The Advisory Council annually convenes one or more public hearings for that purpose.

28.     GAO's Board of Directors and PAIMI Advisory Council include members who as children received disability-related services from Georgia public schools or who now have children who receive or have received such services.  The Board of Directors and PAIMI Advisory Council jointly develop GAO's policies and priorities for protecting and advocating for individuals with disabilities, including students with disabilities who have been referred to or who are at risk of being referred to GNETS.  *See* 42 U.S.C. §§ 10805(a)(6) & (8).

29.     GAO maintains a grievance procedure for clients or prospective clients to ensure that individuals with mental illness and other disabilities have full access to the services that it provides.

30.     For years, GAO has identified as a priority and dedicated substantial resources to advocacy regarding GNETS.

31.     In 2015, GAO helped form, and continues to lead, the Georgia Coalition for Equity in Education ("GCEE").  GCEE is a broad coalition of

Georgia stakeholders that joined together to voice their shared concerns about GNETS.  GCEE members include more than 20 disability, educational, mental health, child welfare, juvenile justice, civil rights, and parent and youth advocacy groups from across the state.  Among other things, GAO has led dozens of meetings and phone calls with GCEE coalition members and other stakeholders; provided outreach and education to GCEE members and other stakeholders, including families of students with disability-related behavioral needs; helped develop educational materials about GNETS and the DOJ's investigation and findings letter; and engaged and educated GCEE coalition members about Georgia's rulemaking effort concerning GNETS and opportunities for stakeholder input.  GCEE also sent several letters regarding GNETS to Governor Deal and responsible state administrators, including letters dated November 25, 2015, May 11, 2016, July 12, 2016, and August 1, 2016.  These letters identified actions GCEE believed that Georgia needed to take to remedy the discrimination found by DOJ.  Despite GAO's and GCEE's extensive efforts, the problems they identified at GNETS persist.

### ii.   *The Arc of the United States*

32.    Plaintiff The Arc of the United States ("The Arc") is a private, non-profit organization, founded in 1950 to promote and protect the human rights of

people with intellectual and developmental disabilities ("I/DD"), including autism. The Arc engages in public policy advocacy and develops programs to support people with I/DD to learn, live, and work inclusively in their communities. Inclusive education, where children with I/DD learn in classrooms alongside their non-disabled peers, has been a priority of The Arc for 65 years. Many of the students in GNETS have been identified as having I/DD, including autism.

33.     The Arc has an office in Georgia, known as The Arc of Georgia, which serves individuals with I/DD and their families through a central office in East Point, Georgia, and through 15 locally affiliated chapters across the state. The local affiliated chapters are membership organizations and dues-paying affiliates of The Arc of the United States.

34.     The Arc's constituents and members in Georgia include students with disability-related behavioral needs who are, or are at serious risk of being, enrolled in GNETS, and their families. The Individual Named Plaintiffs and each of their mothers are members of The Arc.

35.     The By-Laws of The Arc require that a majority of the Board of Directors be individuals with disabilities and/or family members of individuals with disabilities. The Board of Directors develops the policies and priorities for the organization, including for The Arc of Georgia. Through its Georgia office,

The Arc has identified as a priority providing education, advocacy, and assistance to families related to GNETS.

36.     Through its Georgia office, The Arc participates in GCEE.  The Arc has participated in dozens of GCEE coalition meetings and phone calls; provided outreach and education to families of students with disability-related behavioral needs; and educated and engaged its constituents about Georgia's rulemaking effort concerning GNETS and opportunities for stakeholder input.

## C.    Defendants

37.     Defendant State of Georgia has created, funded, and, through its agencies, administered the GNETS program.

38.     Defendant Governor Nathan Deal is the chief executive of the Defendant State of Georgia.  GA. CONST. art. V, § 2, para. I.  Defendant Governor Deal appoints the members of and provides policy leadership to Georgia's State Board of Education.  He also appoints and provides policy leadership to Defendant Frank Berry, Commissioner of the Georgia Department of Community Health, and Defendant Judy Fitzgerald, Commissioner of the Georgia Department of Behavioral Health and Developmental Disabilities, both of whom report to the Governor and may be removed by the Governor from office.  Defendant Governor

Deal is responsible for, among other things, ensuring that the State of Georgia complies with federal law, including the ADA and Section 504.

39.     Defendant Governor Deal establishes budget priorities and has specifically endorsed funding for GNETS, a segregated educational program, rather than ensuring funding for necessary services in zoned schools.

40.     Defendant Georgia Board of Education ("GBOE") operates GNETS by providing financial support, facilities, staff training, and other resources. Defendant GBOE enters into agreements with state and local agencies to provide educational and other services to GNETS students.

41.     Defendant Georgia Department of Education ("GDOE") oversees public education throughout the State of Georgia, ensures that laws and regulations pertaining to education are followed, and allocates state and federal funds appropriated for education to local school systems.

42.     Defendant Richard Woods is the State School Superintendent.  As State School Superintendent, he is the chief executive officer of Defendant GBOE and Defendant GDOE. O.C.G.A. § 20-2-241.  Defendants GBOE and GDOE together are responsible for ensuring the provision of public education in Georgia, including GNETS.  Defendant Woods is responsible for, among other things, receiving and disbursing "funds appropriated by the Georgia General Assembly to

support GNETS services;" developing "rules and procedures regulating the operation of the GNETS grant;" and monitoring "GNETS to ensure compliance with Federal and state policies, procedures, rules, and the delivery of appropriate instructional and therapeutic services."  Ga. Comp. R. & Regs. § 160-4-7.15(5)(a). He supervises the Regional Educational Services Agencies ("RESAs"), which, as required by Defendant GBOE and Defendant GDOE regulations and policy, provide facilities and support for GNETS.   He has the power and the duty to issue "such instructions as he deems necessary for the faithful and efficient execution of school laws," O.C.G.A. § 20-2-30, including those pertaining to the education of students with disabilities.  He is responsible for collaborating with the other Defendants to ensure that students receive needed mental health services and behavioral supports while in school.

43.     Defendant Woods' business office is located at 205 Jesse Hill Jr. Drive S.E., Atlanta, Georgia 30334.

44.     At the direction of Defendant Woods, Defendants GBOE and GDOE provide funding for services within GNETS that they do not provide to local school districts so that such districts could provide the same or similar services in zoned schools.

45.     Defendant Department of Behavioral Health and Developmental Disabilities ("DBHDD") has the statutory responsibility for "planning, developing, and implementing the coordinated system of care for [children with severe emotional disabilities]," including students in GNETS.  O.C.G.A. § 49-5-220(b). State law also requires Defendant DBHDD to work with Defendant GDOE to provide an appropriate education for youth with severe emotional disturbances.

46.     Defendant DBHDD is responsible for providing services for adults and children with mental illness, I/DD, or substance abuse disorders, including community services to students who have psychiatric and/or developmental disabilities.

47.     Defendant Judy Fitzgerald is the Commissioner of DBHDD.  She is appointed by and reports to Defendant Governor Deal.

48.     At the direction of Defendant Fitzgerald, Defendant DBHDD provides funding for services within GNETS that it does not provide to local school districts so that such districts could provide the same or similar services in zoned schools.

49.     Defendant Fitzgerald's business office is located at 2 Peachtree Street, N.W., 24th Floor, Atlanta, Georgia 30303.

50.     Defendants Woods and Fitzgerald are responsible for overseeing implementation of Defendant State of Georgia's Strategic Plan for GNETS.

51.     Defendant Department of Community Health ("DCH") administers Georgia's Medicaid and Peach Care for Kids programs, which provide funding to and are integral to the coordinated system of care for children with significant mental health needs required by Georgia law.  These programs are also a substantial source of funding for services provided through GNETS.

52.     Defendant Frank Berry is the Commissioner of Defendant DCH.  He is appointed by and reports to Defendant Governor Deal.

53.     At the direction of Defendant Berry, Defendant DCH provides funding for services within GNETS that it does not provide to local school districts so that such districts could provide the same or similar services in zoned schools.

54.     Defendant Berry's business office is located at 2 Peachtree Street, N.W., Atlanta, Georgia 30303.

55.     Each of the individual Defendants is sued in his or her official capacity only.

## CLASS ACTION ALLEGATIONS

56.     Pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the Individual Named Plaintiffs bring this suit on their own behalf and on behalf of the following class:  "All students who are now or in the future will be in GNETS or at serious risk of being placed in GNETS" ("Plaintiff Class" or

"Class"). A student is considered "at serious risk" of being placed in GNETS, for purposes of this Complaint, if the student has been referred to GNETS or the student's school district is considering referring the student to GNETS.

57.    The Class is so numerous that joinder of all members is impracticable. Georgia reported that, for the 2016 school year, it served approximately 5,256 students pre-kindergarten through high school in GNETS.

58.    Joinder is also impracticable because the Plaintiff Class is ever changing since Georgia places new students in GNETS on an ongoing basis throughout the school year. Furthermore, most class members lack the means to maintain individual actions.

59.    There are questions of law and fact common to the claims of the Plaintiff Class, including whether Defendants, through practices that affect all class members, are violating the ADA, Section 504, and the Fourteenth Amendment by:

    a.    Denying the opportunity to participate in and benefit from educational services that are equal to those afforded students without disabilities;

    b.    Denying educational services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as those provided for other students;

c. Denying the opportunity to receive education and other services in the most integrated setting appropriate to their needs;

d. Failing to reasonably modify the State's programs and activities as needed to avoid discrimination;

e. Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' programs and activities with respect to the Plaintiff Class.

60.    The claims of the Individual Named Plaintiffs are typical of the claims of the Plaintiff Class.

61.    The Individual Named Plaintiffs will fairly and adequately represent and protect the interests of the Class.  There is no conflict between the interests of the Individual Named Plaintiffs and the Plaintiff Class.

62.    Defendants have acted and continue to act on grounds generally applicable to the Plaintiff Class, thereby making appropriate injunctive and declaratory relief with respect to the Class as a whole.

63.    All the members of the Plaintiff Class are constituents of GAO.

64.    The Individual Named Plaintiffs are members of The Arc.

## LEGAL BACKGROUND

65.     Congress enacted the ADA, 42 U.S.C. § 12101 *et seq*., to provide a clear and comprehensive mandate for the elimination of discrimination against adults and children with disabilities and to provide strong and consistent standards for identifying and addressing such discrimination.  42 U.S.C. § 12101(b)(1) & (2).

66.     The ADA is based on Congress's findings that, *inter alia*:

a. "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem," 42 U.S.C. § 12101(a)(2);

b.  "[I]ndividuals with disabilities continually encounter various forms of discrimination, including . . .  relegation to lesser services, programs, activities, benefits, jobs, or other opportunities," 42 U.S.C. § 12101(a)(5); and

c.  "[D]iscrimination against individuals with disabilities persists in such critical areas as . . . education."  42 U.S.C. § 12101(a)(3).

67.     Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or

20

be subjected to discrimination by any such entity."  42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130.

68.    The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  The ADA defines "major life activities" as including "learning, reading, concentrating, thinking, [and] communicating." 42 U.S.C. § 12102(2)(A).  The Individual Named Plaintiffs and the members of the Plaintiff Class have a disability, as that term is defined in the ADA, and are entitled to the protections of the ADA.

69.    Title II of the ADA applies to all services, programs, and activities of public entities, including providing education.  42 U.S.C. § 12132.  The State of Georgia and each of its boards, departments, and agencies must comply with Title II of the ADA.

70.    The ADA directed the Attorney General of the United States to promulgate regulations enforcing Title II of the ADA and provide guidance on their content.  42 U.S.C. § 12134.  The regulations that the Attorney General promulgated require public entities to "make reasonable modifications" to their programs and activities "when the modifications are necessary to avoid

discrimination."  28 C.F.R. § 35.130(b)(7).  The regulations also specify that it is

unlawful discrimination for a public entity to:

    a.  "Afford a qualified individual with a disability an opportunity to

          participate in or benefit from the aid, benefit, or service that is not equal

          to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii);

    b.  "Provide a qualified individual with a disability with an aid, benefit, or

          service that is not as effective in affording equal opportunity to obtain the

          same result, to gain the same benefit, or to reach the same level of

          achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii);

    c.  Fail to "administer services, programs, and activities in the most

          integrated setting appropriate to the needs of qualified individuals with

          disabilities," 28 C.F.R. § 35.130(d), which the Attorney General has

          defined as "a setting that enables individuals with disabilities to interact

          with nondisabled persons to the fullest extent possible," 28 C.F.R. pt. 35,

          App. A, p. 450; or

    d.  "[U]tilize criteria or methods of administration . . . [t]hat have the

          purpose or effect of defeating or substantially impairing accomplishment

          of the objectives of the public entity's program with respect to

          individuals with disabilities."  28 C.F.R. § 35.130(b)(3)(ii).

71.     The Supreme Court has held that discrimination prohibited under Title II of the ADA includes the needless isolation or segregation of persons with disabilities. *Olmstead v. L.C.,* 527 U.S. 581, 600 (1999) (holding that "unjustified institutional isolation of persons with disabilities is a form of discrimination").  As the Supreme Court found, separating individuals with disabilities from their peers "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and "severely diminishes life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-601.

72.     Congress specifically authorized individuals who believe their Title II ADA rights are being violated to bring an action in a United States District Court. 42 U.S.C. § 12133 (incorporating the remedies and enforcement procedures available under Title VI of the Civil Rights Act, which includes a private right of action).

73.     Section 504 of the Rehabilitation Act provides:  "No otherwise qualified individual with a disability in the United States, as defined in section 760(2) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance." 87 Stat. 394, as amended, 29 U.S.C. § 794(a).

74.    An "individual with a disability" who is "otherwise qualified" is eligible for relief under Section 504.  An individual with a disability is any person who has a disability as defined in § 12102 of the ADA, as described above.  29 U.S.C § 705.  Defendants' programs, services, and activities receive Federal financial assistance.  Accordingly, Defendants are subject to the non-discrimination requirements of Section 504.

75.    Every student enrolled in GNETS is an individual with a disability and is a qualified individual within the meaning of the ADA and the Rehabilitation Act.

76.    As the Supreme Court has held, "separate educational facilities are inherently unequal," and students subject to segregation are "deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment." *Brown v. Bd. of Ed.*, 347 U.S. 483, 495 (1954).

## FACTUAL ALLEGATIONS

### A.   The Georgia Network For Educational And Therapeutic Supports ("GNETS")

77.     The State created GNETS in 1970, twenty years before the enactment of the ADA.  During the 2016 school year, GNETS served approximately 5,256 students from school districts across Georgia.

78.     GNETS is administered by the State through regional organizations.

79.     The State funds, maintains, coordinates, and is generally responsible for the operations of GNETS.

80.     State employees provide services to students in GNETS.

81.     Fifty-one percent of GNETS students are African American, compared to 37 percent of students in Georgia's zoned schools.  In many areas of the state, the percentage of African American students in GNETS exceeds 60 percent.  In some areas, the percentage is as high as 89 percent.  In Fall 2015, every one of the 77 students placed in GNETS by the Atlanta Public Schools was African American.  *See* Alan Judd, *Georgia 'psychoeducational' students segregated by disability, race,* THE ATLANTA JOURNAL-CONSTITUTION, April 28, 2016.

82.     Most GNETS students are eligible for Medicaid.  In November 2013, approximately 83 percent of students in GNETS were enrolled in Medicaid.  In Georgia, school districts may access Medicaid dollars to provide and pay for

25

services an eligible child receives in school, including the services the Plaintiff

Class needs.  Ga. Comp. R. & Regs § 160-4-7-.02 (3)(d).

83.     On information and belief, Medicaid funding supports GNETS.  In

addition, GNETS is funded by an earmarked appropriation of state and federal

funds separate from the funds appropriated for local school districts.  Ga. Comp. R.

& Regs. § 160-4-7-.15(5)(a)(1).

84.     The regulations governing GNETS were last updated in July 2017.

The revised regulations, however, have not remedied Defendants' discrimination

against students with disabilities by segregating them into GNETS.

**B.     GNETS Operates As A Separate, Segregated, And Unequal School
System**

85.     The State establishes the criteria for placing students in GNETS.

GNETS was originally designed to be exclusively for students eligible for special

education under a category known as "emotional and behavioral disorder" or

"EBD."  Ga. Comp. R. & Regs. § 160-4-7-.15(2)(a) (amended 2017).

86.     But, in actuality, the State has expanded the types of students served

in GNETS beyond those identified as EBD.  Students not identified as EBD but

who are perceived as having similar behavioral needs now are placed at GNETS,

including students with autism or other disabilities. The expansion of GNETS to

encompass students beyond those identified as EBD is reflected in the revised

26

regulation, adopted on July 5, 2017.  The new regulation states that GNETS will serve "students with disabilities" who "exhibit intense social, emotional and/or behavioral challenges with a severity, frequency or duration such that the provision of education and related services in the general education environment has not enabled him or her to benefit educationally based on the IEP [Individualized Education Program]."  Ga. Comp. R. Regs. §160-4-7-.15(2)(a).

87.    Students identified as displaying the characteristics described in Paragraph 86, even to a significant degree, can be, and in states other than Georgia are, educated (with necessary services and supports) in their zoned schools.

88.    According to regulations governing GNETS, before a student can be placed in a GNETS program, the student's IEP Team must document that less restrictive placements have been tried and that the student did not receive a FAPE in such placements.  Ga. Comp. R. & Regs. § 160-4-7-.15(3)(c).  This requirement is frequently not met.  GNETS are not placements of the last resort but instead are "dumping grounds" used by the State and local school districts for students whom local school districts do not want to educate.

### i.     The State Segregates GNETS Students From Their Peers

89.     GNETS students attend either a GNETS "center" or a satellite classroom.   The centers and satellite classrooms are exclusively for GNETS students.   There are no students without disabilities in these locations.

90.     Students are isolated and stigmatized by their placement in GNETS.

91.     By creating and maintaining segregated educational placements, the State has allowed and encouraged local school districts to avoid educating and supporting students with disabilities.

92.     Typically, GNETS centers and satellite classrooms serve students from a number of different school districts.   Students are transported to the centers and satellite classrooms, often over long distances, in buses ridden by GNETS students only.

93.     Approximately two-thirds of GNETS students attend GNETS centers. These centers are located in buildings separate and isolated from a zoned school.

94.     Many centers have no library, cafeteria, gym, science lab, music room, or playground.

95.     In 2015, after the DOJ began investigating GNETS, GDOE did a review of GNETS's physical facilities and concluded some centers should no longer be used.   In July 2016, based on safety concerns, GBOE directed that

28

GNETS close particular centers and move their operations to other sites, which also are completely segregated and isolated from zoned schools. Some of the GNETS centers closed were in buildings used by African American students during the era of racial segregation in Georgia's schools.

96. Approximately one-third of GNETS students are served in satellite classrooms. The satellite classrooms often are in schools other than a student's zoned school.

97. Typically, GNETS satellite classrooms are isolated in trailers, basements, or locked wings, with separate entrances that are not used by students without disabilities. During school hours, GNETS students have little, if any, opportunity to interact with their non-disabled peers.

### ii. GNETS Students Receive Unequal Education Opportunity

98. In 2010, the Georgia Department of Audits and Accounts performed an audit of GNETS and concluded that the GDOE lacked data that would demonstrate that GNETS had "resulted in improvements to behavior or academic performance." Ga. Dep't of Audits & Accounts, *GNETS Performance Audit* 12 (Oct. 2010).

99.   GNETS students receive an inferior and unequal education compared to the education provided in zoned schools.  GNETS students are routinely denied educational opportunity afforded their non-disabled peers.

100.   Academic instruction in GNETS is far less rigorous than in zoned schools.

101.   Instruction in Georgia's local schools is based on a required statewide curriculum.  This is not true, however, of GNETS.  Instruction is not based on or aligned with Georgia's statewide curriculum.  As a result, GNETS students have difficulty earning the credits they need to advance from grade to grade and to graduate from high school.

102.   The teachers in GNETS often lack certification in the subject matter they are teaching.

103.   Instruction for GNETS students, particularly at the high school level, is often provided by computers rather than by teachers.  This instruction is not designed to help students become proficient in the subject matter and limits opportunities for social interaction and for improving social skills.

104.   Many GNETS students lack access to elective courses and extracurricular activities that are routinely available to students in zoned schools, including tutoring, leadership programs, gifted or honors programs, foreign

language instruction, vocational programs, art or music courses, physical education, social activities like dances and proms, and sports.

105.   The electives and extracurricular activities at GNETS centers are sparse, and usually it is not feasible for students at the centers to take electives or participate in extracurricular activities available to the students in zoned schools because of transportation barriers or because GNETS students are barred from doing so.  Even students in satellite classrooms may be barred from taking electives or participating in extracurricular activities at the zoned school in which a satellite classroom is located.

106.   GNETS students have lower test scores than non-GNETS students and other students with disabilities, and GNETS students drop out at twice the rate of students attending zoned schools.

107.   According to the most recent information available, only 10 percent of GNETS students graduate, compared with 78 percent of all students statewide.  Of those GNETS students who do graduate, nearly two-thirds receive a "special education diploma," indicating that they did not meet the standards of academic proficiency required to receive a regular high school diploma.

108.   GNETS are not treated like other educational settings for reporting and accountability purposes and are exempt from programs used to measure and

report the success of schools within Georgia, such as the College and Career Ready

Performance Index ("CCRPI") and Beating the Odds ("BTO").

109.   GNETS use harsh and ineffective techniques to manage student

behavior, including physical restraint.  A physical restraint is a restriction imposed

on a student that immobilizes or reduces the ability of the student to move his or

her torso, arms, legs, or head freely.  *See* Ga. Comp. R. & Regs. §160-5-1-.35.

110.   The Atlanta Journal-Constitution reported that, during the two years

prior to February 2016, GNETS students were physically restrained nearly 10,000

times.  That number is almost five times more than the number of restraints

occurring in 2,300 other Georgia schools combined during the same time period.

*See* Alan Judd, *Physical restraint common at psychoeducational schools*, THE

ATLANTA-JOURNAL CONSTITUTION, May 8, 2016.

111.   Since 2004, when a GNETS student died in a seclusion room, Georgia

has banned the use of seclusion rooms in GNETS.   Despite this ban, even now,

more than a dozen years later, GNETS is still reported to be using seclusion to

manage student behavior.

**C.    GNETS Students Could Be Educated By Their Local School Districts In Their Zoned Schools If Needed Services Were Available**

112.   Students in GNETS are needlessly removed from their zoned schools

and needlessly segregated from their non-disabled peers.  GNETS students are

denied the opportunity to be educated in the zoned, magnet, public charter, and other schools available to their non-disabled peers.

113.   Students in GNETS are denied the many positive benefits of being educated in classrooms with their non-disabled peers, including learning appropriate social skills and behaviors modeled by classmates, responding to higher educational expectations set by both teachers and peers, fewer disruptions to learning, and generally a better quality education.

114.   Families are often told that GNETS is the only setting in which their children can receive the services they need, often without any meaningful attempt to provide services at the zoned school in classrooms with non-disabled peers. Hence, many parents consent to their child's placement at GNETS.  Yet, after doing so, they are sadly disappointed.  Their child fails to receive services to help address their behavioral needs, and in many cases, the child's symptoms or behaviors worsen due to the harsh and punitive environment that prevails in GNETS.

115.   Students remain segregated in GNETS for long periods of time, with placements lasting multiple years not uncommon.  According to a 2010 audit report, the average length of stay in GNETS for a student at that time was four years.

116.   No other state has designed and funded a segregated state program, like GNETS, that operates statewide for students with disability-related behavioral needs.

117.   The Individual Named Plaintiffs and Class members could be educated in classrooms with their non-disabled peers in zoned schools if Defendants ensured that services that address these students' disability-related behavioral needs were available in zoned schools.

118.   The overall capacity to provide needed services to address disability-related behavioral needs in zoned schools is woefully inadequate to meet the demand.  Indeed, in many districts, children with disability-related behavioral needs will have no access to these services unless they enter the GNETS program.

**D.   Stakeholders In Georgia, Including The Organizational Plaintiffs, Have Tried To Address The Problems Of GNETS But Have Been Unsuccessful**

119.   The DOJ conducted a multi-year investigation of whether the State is violating the ADA by segregating children in GNETS.  On July 15, 2015, DOJ sent a 21-page Letter of Findings to Governor Deal concluding that "the State, in its operation and administration of the GNETS Program, violates Title II of the ADA."

120.   DOJ found that Georgia violates the ADA by "unnecessarily segregating students with disabilities from their peers" and by "provid[ing] opportunities to its students that are unequal to those provided to students … who are not in the GNETS Program."  Letter of Findings at 1.

121.   GCEE was formed to secure relief for GNETS students and those at risk of being placed in GNETS.  More than 20 organizations, including GAO and The Arc of Georgia, joined GCEE and together urged Defendants to implement systemic reforms to ensure that educational and school-based behavioral services are available to allow all students with disabilities to be educated in their zoned schools with their non-disabled peers.  Despite these efforts, the problems identified about GNETS have not been remedied.

**E.    The Individual Named Plaintiffs**

122.   As school-age residents of Georgia, the Individual Named Plaintiffs are eligible to receive educational services in Georgia, and, by virtue of their disabilities, are qualified for the protections of the ADA and Section 504.

### *i.    R.F.*

123.    Plaintiff R.F. is 13 years old.  He is affectionate and friendly.  He enjoys making new friends and learning new things.  R.F. is a strong math student and enjoys participating in classroom discussions when attending his zoned school.

R.F.'s teachers have described him as creative, kind, considerate, and a class leader who asks intelligent questions.  R.F. often seeks out opportunities to assist teachers and peers.  He enjoys working on art projects and Japanese origami.  He has a strong interest in technology and enjoys working with computers.  Like many other teenage children, Minecraft is his current video game of choice.

124.   R.F. is diagnosed with significant and complex mood disorders and other disabilities.  R.F.'s disabilities cause him at times to have behavioral needs that impact his ability to learn.  In order to be successful in the classroom, R.F. requires intensive, consistent, and effective behavioral services.

125.   R.F. was placed in GNETS in December 2014.  His placement in GNETS denied him educational services equal to and as effective as those provided to students without disabilities.

126.   While at GNETS, R.F. did not receive appropriate academic instruction based on approved Georgia curricula and standards.

127.   Defendants' labeling of R.F. as a student needing GNETS has stigmatized him and restricted the educational opportunities available to him.

128.   While at GNETS, R.F. was restrained and removed from class and instruction many times.  He was injured by GNETS staff during a restraint.  In

January 2015, R.F.'s mother withdrew him from GNETS rather than subject him to further unequal education, ineffective services, and cruel treatment at GNETS.

129.   No placement options other than GNETS were offered for R.F.  R.F. was told to either come to GNETS or not go to school.

130.   After declining to attend GNETS, R.F. was not permitted to attend his zoned school.  He attempted to access public educational services from virtual education (computer-based) programs and home-based instruction by enrolling in the Georgia Cyber Academy.  He returned to his zoned school at the end of the 2016-2017 school year when R.F.'s mother and the school district resolved their dispute, and the district agreed that R.F. would attend his zoned school.

131.   R.F. is at serious risk of returning to GNETS because he is not consistently receiving needed behavioral services at his zoned school.  With needed behavior services, R.F. can be educated successfully with his non-disabled peers at his zoned school.

132.   R.F. wants very much to continue to attend his zoned school.  He wants to go to school with his friends and have non-disabled classmates.  He does not want to be isolated and apart from his school community.

133.   R.F. has exhausted all administrative remedies available to him under the Individuals with Disabilities Education Act.

### ii.   C.S.

134.   C.S. is 13 years old and has been diagnosed with autism.  He is an energetic and engaging young man.  He loves to swim, socialize with his peers, and is a whiz at anything involving computers.  He is a great speller, is good at math, and enjoys teaching himself new things.

135.   When C.S. was in the second grade, his IEP Team told his parents that in order for C.S. to get the services he needed to succeed in school, C.S. would have to be placed in GNETS.  Accordingly, his parents agreed for him to be placed in GNETS.  C.S.'s parents have been consistently told by the IEP Team that the only placement option for C.S. is GNETS.

136.   C.S. has been in GNETS for five years and currently attends a satellite classroom located at the Haynes Bridge Middle School.  His placement in GNETS has denied him educational services equal to and as effective as those provided to students without disabilities.

137.   In his 6th grade year, C.S.'s assigned teacher quit about halfway through the school year.  He received little academic instruction, virtually all of which came via a computer. He spent significant portions of his day laying on the floor watching videos being supervised by a para-professional.  As a result, C.S. has fallen behind academically.

138.   Because he has not received needed behavioral supports, C.S.'s behaviors also have worsened while at GNETS.

139.   While at GNETS, C.S. has no opportunity to learn from or model his behavior on that of his non-disabled peers.

140.   C.S. has no access to elective offerings or after school programming. He cannot have lunch with his non-disabled peers.

141.   C.S.'s parents want him to have the opportunity to be educated with his non-disabled peers in an inclusive setting in his zoned school. C.S. can successfully attend his zoned school with needed supports and services.

### iii.    Q.H.

142.   Plaintiff Q.H. is a nine-year-old African American boy living in Newton County.  Q.H. is a friendly and hard-working child who is outgoing and enjoys giving high-fives to his teachers and sharing toys with his classmates.

143.   Q.H. participates in activities typical for a nine year old, such as playing computer and video games.  Q.H. likes to play outside with his twin brother.  He says he wants to become a fire fighter when he grows up so that he can help people.

144.   Q.H. has been diagnosed with autism, attention deficit hyperactivity disorder, and other developmental delays.  Q.H.'s disabilities cause him at times to

have behavioral needs that impact his ability to learn.  In order to be successful in the classroom, Q.H. requires intensive, consistent, and effective behavioral services.

145.   Q.H. currently attends GNETS Mainstay, where he was first placed in September 2015.  His placement in GNETS has denied and continues to deny him educational services equal to and as effective as those provided to students without disabilities.

146.   Defendants' labeling of Q.H. as a student needing GNETS has stigmatized him and restricted the educational opportunities available to him.

147.   GNETS personnel have repeatedly placed Q.H. in restraints and seclusion.  Q.H. has been injured as a result of these actions and has sought medical attention for his injuries.

148.   Q.H. can successfully attend his zoned school with needed supports and services.  Q.H. wants to attend his zoned school with his friends and have non-disabled classmates.  He does not want to be isolated and apart from his school community.

## F.    The Plaintiff Class

149.   The Individual Named Plaintiffs are not alone in their experiences in GNETS. These experiences are endured by thousands of students who also have

disability-related behavioral needs and are currently enrolled in GNETS or are at serious risk of being enrolled in GNETS. These students suffer, or will suffer, the same injuries and require the same relief as the Individual Named Plaintiffs.

150. Defendants are denying not only the Individual Named Plaintiffs but also the Plaintiff Class, constituents of GAO, and constituents and members of The Arc equal educational opportunity, including the opportunity to be educated in classrooms with their non-disabled peers in zoned schools.

151. As qualified experts agree, the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc can successfully attend zoned schools with their non-disabled peers if given needed supports and services.

152. Defendants have failed to reasonably modify Georgia's system of providing needed services to the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc to allow them to receive an equal educational opportunity in classrooms with their non-disabled peers in a zoned school.

153. Plaintiffs have no adequate remedy at law.

## COUNT I

**AGAINST INDIVIDUAL DEFENDANTS
IN THEIR OFFICIAL CAPACITIES**

**VIOLATION OF TITLE II OF THE AMERICANS
WITH DISABILITIES ACT
42 U.S.C. §§ 12131 et seq.**

154.   Plaintiffs re-allege the allegations in all preceding paragraphs as though fully set forth herein.

155.   The Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc are individuals with disabilities within the meaning of the ADA.  Their impairments substantially limit one or more major life activities, including learning, reading, concentrating, thinking, communicating, and developing and maintaining relationships.

156.   As school-age children and young adults, the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc are qualified to participate in Defendants' educational programs and services.  42 U.S.C. § 12131(2).

157.   The State of Georgia and the departmental Defendants are public entities as defined by Title II of the ADA, and individual Defendants Deal, Woods, Berry, and Fitzgerald are the state officials responsible for running these public entities and supervising their operations.  42 U.S.C. § 12131(1).

158.   Through the acts and omissions described above, Defendants are violating Title II of the ADA by:

i.   Denying the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc the opportunity to participate in and benefit from educational services that is equal to those afforded other students;

ii.   Denying the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students;

iii.   Denying the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc the opportunity to receive educational programs and services in the most integrated setting appropriate to their needs;

iv.   Failing to reasonably modify the State of Georgia's system to provide the services the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc need to avoid discrimination; and

v.   Utilizing methods of administration that have the effect of defeating or

substantially impairing the accomplishment of the objectives of

Defendants' educational programs with respect to the Individual Named

Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and

members of The Arc.

159.   Because there are some Georgia public school students with

disabilities already receiving needed services that enable them to succeed in

classrooms with their non-disabled peers in zoned schools, and for other reasons,

granting relief to Plaintiffs would not fundamentally alter the Defendants'

programs, services, and activities.

160.   The acts and omissions of Defendants, while acting under color of

law, have caused and will continue to cause the Individual Named Plaintiffs, the

Plaintiff Class, constituents of GAO, and constituents and members of The Arc

irreparable harm, and Plaintiffs have no adequate remedy at law.

## COUNT II

## AGAINST ALL DEFENDANTS

## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973
## 29 U.S.C. § 794(a)

161.   Plaintiffs re-allege the allegations in all preceding paragraphs as

though fully set forth herein.

162.   As described in Count I, the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc are "otherwise qualified individuals with a disability."  By reason of their disabilities, these students are being excluded from participation in and being denied the benefits of an educational opportunity that is equal to that afforded other students, and they are subjected to discrimination by Defendants.

163.   Departmental Defendants are recipients of Federal financial assistance and thus are subject to the requirements of the Rehabilitation Act, 29 U.S.C. § 794. Defendants Deal, Woods, Berry, and Fitzgerald are the state officials responsible for operating or administering these programs or activities and supervising their operations or administration.

164.   Defendants' actions and inactions constitute violations of Section 504 of the Rehabilitation Act of 1973.

165.   The acts and omissions of Defendants, while acting under color of law, have caused and will continue to cause the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc irreparable harm, and Plaintiffs have no adequate remedy at law.

## COUNT III

**AGAINST INDIVIDUAL DEFENDANTS
IN THEIR OFFICIAL CAPACITIES**

**VIOLATION OF EQUAL PROTECTION CLAUSE
OF FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983**

166.    Plaintiffs re-allege the allegations in all preceding paragraphs as though fully set forth herein.

167.    The educational opportunity provided by Defendants to the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc in the separate GNETS program is unequal to that provided to non-disabled students in zoned and other public schools.

168.    Denying the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc equal educational opportunity violates their right to equal protection of the law under the Fourteenth Amendment to the United States Constitution.

169.    The acts and omissions of Defendants, while acting under color of law, have caused and will continue to cause the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc irreparable harm, and Plaintiffs have no adequate remedy at law.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court:

A. Order that the Individual Named Plaintiffs  may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Order and declare that Defendants are violating the rights of the Individual Named Plaintiffs, the Plaintiff Class, constituents of GAO, and constituents and members of The Arc under (1) Title II of the ADA; (2) Section 504; and (3) the Fourteenth Amendment of the United States Constitution;

C. Issue a preliminary and permanent injunction requiring Defendants, their successors in office, agents, employees and assigns, and all persons acting in concert with them to provide to the Individual Named Plaintiffs and the Plaintiff Class the services necessary to ensure them equal educational opportunity in classrooms with their non-disabled peers;

D. Award Plaintiffs' attorneys' fees and costs as appropriate and permitted by law; and

E.  Grant any other relief as this Court finds just and proper.


Dated: October 11, 2017                    Respectfully submitted,

                                           */s/  Jessica C. Wilson*_____
                                           Jessica C. Wilson (GA #231406)
                                           DLA PIPER LLP (US)
                                           33 Arch Street, 26th Floor
                                           Boston, MA 02110
                                           617-406-6000
                                           jessica.wilson@dlapiper.com

                                           Matthew J. Iverson (*Pro Hac Vice* Pending)
                                           Melissa Whitney (*Pro Hac Vice* Pending)
                                           DLA PIPER LLP (US)
                                           33 Arch Street, 26th Floor
                                           Boston, MA 02110
                                           617-406-6000
                                           matthew.iverson@dlapiper.com
                                           melissa.whitney@dlapiper.com

                                           Christopher G. Campbell (GA #789533)
                                           DLA PIPER LLP (US)
                                           One Atlantic Center
                                           1201 West Peachtree Street, Suite 2800
                                           Atlanta, Georgia 30309-3450
                                           404-736-7800
                                           christopher.campbell@dlapiper.com

                                           Alison Barkoff (*Pro Hac Vice* Pending)
                                           Anna Krieger (*Pro Hac Vice* Pending)
                                           CENTER FOR PUBLIC REPRESENTATION
                                           1825 K Street, N.W. Suite 600
                                           Washington, D.C. 20006
                                           202-854-1270
                                           abarkoff@cpr-us.org
                                           akrieger@cpr-ma.org

Ira A. Burnim (*Pro Hac Vice* Pending)
Mark J. Murphy (*Pro Hac Vice* Pending)
Maura M. Klugman (*Pro Hac Vice* Pending)
BAZELON CENTER FOR MENTAL HEALTH
LAW
1101 15th Street, N.W., Suite 1212
Washington, D.C. 20005
202-467-5730
irabster@gmail.com
markm@bazelon.org
maurak@bazelon.org

Devon Orland (GA #554301)
Leslie Lipson (GA #648918)
GEORGIA ADVOCACY OFFICE
1 West Court Square
Decatur, GA 30030
404-885-1234
dorland@thegao.org
llipson@thegao.org

Craig Goodmark (GA #301428)
GOODMARK LAW FIRM
1 West Court Square
Decatur, GA 30030
404-719-4848
cgoodmark@gmail.com

*Counsel for Plaintiffs The Georgia
Advocacy Office, The Arc of the United
States, R.F., C.S., and Q.H.*

Shira Wakschlag (*Pro Hac Vice* Pending)
THE ARC OF THE UNITED STATES
1825 K Street, N.W., Suite 1200
Washington, D.C. 20006
202-534-3708

wakschlag@thearc.org

*Counsel for Plaintiff The Arc of the United States*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Class Action

Complaint with the Clerk of Court using the CM/ECF system on this the 11th day

of October, 2017, and will serve all Defendants of record.

*/s/  Jessica C. Wilson*_____