**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

The Georgia Advocacy Office, et al.,

Plaintiffs,

Case No. 1:17-cv-3999-MLB

v.

State of Georgia, et al.,

Defendants.

________________________________/

# ORDER

Advocacy organizations for individuals with disabilities sued the State of Georgia and public officials in Georgia for violating Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA"); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"); and the Equal Protection Clause of the Fourteenth Amendment. (Dkt. 1.) Plaintiffs move to consolidate this case into Civil Action No. 1:16-cv-3088-ELR ("US action"), a similar, earlier-filed case. (GAO action, Dkt. 93.)[1]

---

[1] The Court will refer to "GAO action" and "US action" when stating docket entries.

The Court denies that motion. Defendants move for judgment on the pleadings. (GAO action, Dkt. 98.) The Court denies that motion as well.

## I. Motion to Consolidate

### A. Background

On August 23, 2016, the United States filed suit against the State of Georgia, alleging that the State's operation of the Georgia Network of Educational and Therapeutic Support ("GNETS") program violates the ADA by unnecessarily segregating thousands of public school students with behavior-related disabilities, or by placing them at serious risk of such segregation, in a separate and unequal educational program. (US action, Dkt. 1.) That case was assigned to District Judge Ross. (*Id.*)

On October 11, 2017, Plaintiffs filed this lawsuit against the State and related Defendants. (GAO action, Dkt. 1.) Plaintiffs allege violations of the ADA, Section 504, and the Fourteenth Amendment to the United States Constitution. (*Id.* ¶ 1.) Plaintiffs allege the State discriminates against thousands of public-school students with disabilities "by segregating them in a network of unequal and separate institutions and classrooms" known as the GNETS program. (*Id.*) Plaintiffs now moved

to consolidate this case into the matter before Judge Ross. (GAO action, Dkt. 93.)

### B. Standard of Review

Pursuant to Federal Rule of Civil Procedure 42(a), Plaintiffs seek consolidation of two cases pending in this district. That rule states:

> If actions before the court involve a common question of law or fact, the court may:
>
> > (1) join for hearing or trial any or all matters at issue in the actions;
> >
> > (2) consolidate the actions; or
> >
> > (3) issue any other orders to avoid unnecessary cost or delay.

The rule "codifies a district court's inherent managerial power to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Young v. City of Augusta*, 59 F.3d 1160, 1168 (11th Cir. 1995) (internal quotation marks omitted). The decision to consolidate cases is committed to the sound discretion of the trial court. *See id.* (Rule 42(a) "is permissive and vests a purely discretionary power in the district court" (quotations omitted)); *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985) ("A district court's decision under Rule 42(a) is purely discretionary."). The

discretion, however, is not without limits. As the test of Rule 42(a) makes clear, a trial court may consolidate cases only when (1) the actions involve a common question of law or fact and (2) they are pending before the same court. *See* Fed. R. Civ. P. 42(a); *Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 765 (11th Cir. 1995); *In re Consol. Parlodel Lit.*, 182 F.R.D. 441, 444 (D.N.J. 1998) ("A common question of law or fact shared by all of the cases is a prerequisite for consolidation.").

When the common question of law or fact requirement has been satisfied, trial courts in the Eleventh Circuit are "encouraged . . . to 'make good use of Rule 42(a) . . . in order to expedite the trial and eliminate unnecessary repetition and confusion.' " *Hendrix*, 776 F.2d at 1495 (quoting *Dupont v. S. Pac. Co.*, 366 F.2d 193, 195 (5th Cir. 1966)). But, "the mere existence of common issues, although a prerequisite to consolidation, does not mandate a joint trial." *Cedar-Sinai Med. Ctr. v. Revlon, Inc.*, 111 F.R.D. 24, 32 (D. Del. 1986). Rather, in determining whether consolidation is appropriate, the court must assess several issues, including (i) whether the specific risks of prejudice and possible confusion are overborne by the risk of inconsistent adjudications of common factual and legal issues, (ii) the burden on parties, witnesses and

available judicial resources posed by multiple lawsuits, (iii) the length of time required to conclude multiple suits as against a single one, and (iv) the relative expense to all concerned of the single-trial, multiple-trial alternatives. *Hendrix*, 776 F.2d at 1495 (quoting *Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 193 (4th Cir. 1982)).

Even though "consolidation may enhance judicial efficiency, '[c]onsiderations of convenience and economy must yield to a paramount concern for a fair and impartial trial.'" *In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373 (2d Cir. 1993) (quoting *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir. 1990)). "The party seeking consolidation bears the burden of establishing that consolidation under Rule 42(a) is appropriate." *Halo Wireless, Inc. v. TDS Telecomm. Corp.*, Nos. 2:11-CV-158, 1:11-CV-2749, 2012 WL 246393, at *3 (N.D. Ga. Jan. 26, 2012).

**C. Discussion**

The Court declines to consolidate its case into Judge Ross's case. First, the parties bring different claims. While the United States only brings an ADA claim, Plaintiffs bring ADA, Section 504, and Fourteenth Amendment claims. The Court notes the substantial similarity between the ADA and Section 504 claims, but Plaintiffs' Fourteenth Amendment

claim requires a showing of intentionality. *See United States v. Florida*, 938 F.3d 1221, 1228 (11th Cir. 2019) (discussing the substantial overlap in the ADA's and Section 504's prohibitions on discrimination on the basis of disability and their shared enforcement provision). Consequently, discovery will be quite different in this case than in Judge Ross's case.

Second, the procedural posture of each case weighs against consolidation. Plaintiffs, unlike the United States, seek class relief. Class discovery and certification are thus only required in this action. Plaintiff argues that other courts have consolidated ADA claims brought by the United States and class representatives, but those cases simply reference and do not discuss consolidation. *See, e.g.*, *A.R. ex rel. Root v. Dudek*, 31 F. Supp. 3d 1363, 1365 (S.D. Fla. 2014); *United States v. New York*, Nos. 13-CV-4165, 13-CV-4166, 2014 WL 1028982, at *2 (E.D.N.Y. Mar. 17, 2014). The cases provided do not analyze the issue of consolidation, indicate whether the defendant opposed consolidation, or address when consolidation was requested.

Third, the two cases have different Plaintiffs. *See Daker v. Warren*, 778 F. App'x 652, 654 (11th Cir. 2019) (involving habeas claims from

same petitioner); *Hargett*, 60 F.3d at 765–66 (upholding decision not to consolidate two cases brought by one plaintiff)

The Court exercises its discretion to refuse consolidation.

## II. Motion for Judgment on the Pleadings

### A. Background

Georgia sends some students with emotional and behavioral disorders to classrooms specifically designed for their needs. This program is called the GNETS Program. Plaintiffs allege GNETS unnecessarily removes students from general education classrooms, leading to stigmatization and a poor education. Plaintiffs seek relief under the ADA, Section 504, and the Fourteenth Amendment of the U.S. Constitution.[2]

#### 1. Overview and Selection into GNETS

GNETS is a state program designed for students between ages three and twenty-one with behavioral needs. (Dkt. 1 ¶ 2.) Through this program, students attend separate classrooms and schools designed to meet their needs. (*Id.* ¶ 5); Ga. Comp. R. & Regs. § 160-4-7-.15(1).

[2] Because of the overlap in the ADA's and Section 504's prohibitions and their shared enforcement provision, the Court refers to both as ADA.

Originally designed for students with Emotional Behavioral Disorder, the program now extends to students unable to succeed in the traditional classroom because of other behavioral problems. *See* Ga. Comp. R. & Regs. § 160-4-7-.15(2)(a) (stating GNETS includes "students with disabilities" who "exhibit intense social, emotional and/or behavioral challenges with a severity, frequency, or duration such that the provision of education and related services in the general education environment has not enabled him or her to benefit educationally based on the IEP"); (Dkt. 1 ¶ 86.)

An Individual Education Plan ("IEP") Team determines a student's eligibility for GNETS. Ga. Comp. R. & Regs. §§ 160-4-7-.15(3)(a), 4(a), 5(b). An IEP Team includes the child's parents, a regular education teacher, a special education teacher, and a representative of the Local Education Association. *Id.* §§ 160-4-7-.06(5)(a)–(g). Before the IEP team places a student in GNETS, the IEP team must show (i) the school has tried intermediate steps to provide the child an education in the general education environment—called Less Restrictive Placements—and (ii) those steps did not work. *Id.* § 160-4-7.15(3); Ga. SBOE R. 160. The IEP team then determines what accommodations or resources the

student needs to meet the federal baseline standard for the student's education, called a Free and Appropriate Public Education ("FAPE"). Ga. SBOE R. 160-4-7.06. The IEP team next determines where the child can get a FAPE. For instance, the student may succeed with more support (like particularized teaching strategies or constant personal adult supervision) in the classroom or with part of the day in a different classroom. The most restrictive setting is residential placement, which places students in a residential program. *See* Ga. Comp R. & Regs. 160-4-7.15(2)(a). GNETS, essentially a separate school, is an intermediate option before residential placement and after traditional classroom options. *Id.* None of the State Defendants are part of the IEP.

### 2. Control of GNETS

Georgia's Constitution grants authority "to county and area boards of education to establish and maintain public schools within their limits." Ga. Const. Art. VIII, Sec. V. (1983). Indeed, the State has a strong commitment to ensuring local boards of education have the exclusive authority to provide an adequate public education. The State has a limited role in special education, consisting of (1) operating three schools not at issue; (2) establishing GNETS eligibility criteria; and (3) providing

funding for GNETS services. Ga. Code Ann. §§ 20-2-152(a) and 20-2-152(c)(1). The State's GNETS grants are general, giving local fiscal agents flexibility. *Id.* § 20-2-152(C)(1)(A); *see also* Ga. Comp. R. & Regs. § 160-4-7-.15(5)(a). Local school districts, through their IEP Teams, also decide whether individual students meet GNETS admission criteria. *Id.* § 160-4-7-.15(3)(a), 4(a), 5(b). The State, however, has some control over GNETS through its duty to create regulations and fund the program. For instance, the Georgia Department of Education ("GDOE") passes regulations on GNETS' operation. *See* Ga. Comp. R. & Regs. 160-4-7.15. The GDOE also grants GNETS funding to local fiscal agents. *See* Ga. *See* Ga. Code Ann. § 20-2-270. The GDOE uses its discretion in evaluating each GNETS funding application. *See* Ga. Comp. R. & Regs. 160-1-4.286.

### 3. Alleged Problems with GNETS

Broadly, Plaintiffs allege GNETS stigmatizes students and provides them an inadequate education. They say GNETS classrooms lack access to libraries, cafeterias, gyms, science labs, music rooms, or playgrounds. (Dkt. 1 ¶ 94.) The instruction is not rigorous; much of it happens on computers, not through teachers. (*Id.* ¶¶ 100–105.) And

electives are sparse. (*Id.* ¶ 105.) GNETS teachers and support staff often physically restrain students to control their behavior. (*Id.* ¶ 109.) GNETS is also stigmatizing. (*Id.* ¶ 90.) When GNET classrooms are in zoned schools, GNETS students enter the buildings through entrances separate from other students. (*Id.* ¶ 97.) Otherwise GNETS classrooms are in different buildings, separating GNETS students from other children. (*Id.* ¶ 5.) Families feel they must consent to these requirements because school officials tell them GNETS is the only way their children can get an education. (*Id.* ¶ 114.)

During the 2016 school year, GNETS served about 5,256 students from school districts across Georgia. (*Id.* ¶¶ 3, 77.) Only ten percent of the students graduated, two-thirds of them receiving a special education diploma. (*Id.* ¶ 107.)

### 4. Procedural History

On January 8, 2018, Defendants moved to dismiss for failure to state a claim. (Dkt. 46.) Defendants asserted Plaintiffs' complaint failed to state a claim upon which relief can be granted because "(1) the State does not administer the GNETS program (Count I); (2) Counts I and II fail to allege a claim for actionable discrimination; (3) the Complaint fails

to state a claim under the Equal Protection Clause of the Fourteenth Amendment (Count III); and (4) 'obey-the-law' injunctions are prohibited in the Eleventh Circuit." (*Id.* at 1.)

On March 19, 2020, the Court denied Defendants' motion to dismiss, and the case proceeded to discovery. (Dkt. 77.) Defendants then filed a motion for judgment on the pleadings. (Dkt. 98.)

**B. Standard of Review**

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings" under Rule 12(c) of the Federal Rules of Civil Procedure. "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Palmer & Cay, Inc. v. Marsh & McLennan Cos., Inc.*, 404 F.3d 1297, 1303 (11th Cir. 2005) (citing *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1291 (11th Cir. 2002)). Thus, the standard of review for a motion for judgment on the pleadings is "almost identical to that used to decide motions to dismiss." *Doe v. Bd. of Cnty. Comm'rs*, 815 F. Supp. 1448, 1449 (S.D. Fla. 1992).

When considering a motion for judgment on the pleadings, the Court must accept all well-pleaded facts in the complaint as true and

draw all reasonable inferences in favor of the plaintiff, the non-movant. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006). But "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Long v. Fulton Cnty. Sch. Dist.*, 807 F. Supp. 2d 1274, 1282 (N.D. Ga. 2011). A complaint will survive judgment on the pleadings if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### C. Discussion[3]

Defendants move for judgment on the pleadings, arguing that (1) pursuant to the holding in *Jacobson v. Florida Secretary of State*, 957 F.3d 1193 (11th Cir. 2020),[4] Plaintiffs lack standing (warranting

[3] The Court acknowledges Plaintiffs' argument that Defendants' motion is unnecessary and untimely and "really just a [m]otion for [r]econsideration." (Dkt. 105 at 4–5.) The Court nevertheless considers it.

[4] The Court notes that the original opinion Defendants cite at 957 F.3d 1193 (11th Cir. 2020) was vacated and substituted by a decision on September 3, 2020. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020). The superseding decision by the Eleventh Circuit made

dismissal or Counts I and II); (2) Eleventh Amendment concerns warrant dismissing Plaintiffs' Counts I and II; (3) under the Court's holding that "funding a program alone is not administration," the Commissioners of the Georgia Department of Community Health ("DCH") and the Department of Behavioral Health and Developmental Disabilities ("DBHDD") should be dismissed; (4) the State has a substantial interest in the GNETS program; (5) Plaintiffs' requested relief is unsupported legally and outrageous as a matter of public policy; and (6) Plaintiffs' failure to exhaust administrative remedies warrant dismissal of the inferior education claim and corresponding prayer for relief. (Dkt. 98.)

**1. Standing**

Article III of the Constitution permits federal courts to adjudicate only "actual cases and controversies." U.S. Const. art. III § 2. "To have a case or controversy, a litigant must establish that he has standing, which must exist throughout all stages of litigation." *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019) (internal quotation marks and citation omitted). "In essence the question of standing is whether

no changes to the original panel's decisions on standing and redressability. *Compare Jacobson*, 974 at 1254–55, *with Jacobson*, 957 F.3d at 1208–09. (*See* Dkt. 104 at 1–2.)

the litigation is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish Article III standing, the plaintiff must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson*, 974 F.3d at 1245 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. The burden by which a plaintiff must show these elements depends upon the stage of litigation at which it is challenged. *Id.*; *see also CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269 (11th Cir. 2006). To establish traceability, "there must be a causal connection between the injury and the conduct complained of—the injury has to the 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). It also "must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 38, 43.

Defendants argue that Plaintiffs lack standing pursuant to *Jacobson*. (Dkt. 98-1 at 10.) They claim Plaintiffs cannot demonstrate any alleged acts of discrimination are traceable to the State nor redressable by a judgment against it. Defendants contend local education agencies make the decisions that place students in GNETS, not the State. (Dkts. 98-1 at 13; 107 at 2.) And the State's rulemaking authority is insufficient to confer standing. (Dkt. 98-1 at 13–14.) Defendants thus contend judgment on the pleadings is appropriate.

In *Jacobson*, the plaintiffs, Democratic voters and organizations, sued the Secretary of State to enjoin enforcement of a law that governs the order in which candidates appear on Florida's ballot. 974 F.3d at 1241. On appeal, the Eleventh Circuit held the plaintiffs lacked standing to sue the Secretary because none of them proved an injury in fact and any injury they might suffer was neither traceable to the Secretary nor redressable by a judgment against her because she does not enforce the law at issue. *Id.* "Instead, any injury would be traceable only to 67 Supervisors of Elections and redressable only by relief against them." *Id.* at 1253. The Eleventh Circuit noted that "[b]ecause the Secretary will not cause any injury the voters and organizations might suffer, relief

against her will not redress that injury—either 'directly or indirectly.' " *Id.* at 1254. The Court in *Jacobson* merely applied the well-established standing test and found that any injuries alleged by a plaintiff must be traceable to the defendant, and therefore, redressable by a Court decision against the defendant. *Id.* at 1255.

Defendants claim the seminal act of alleged discrimination addressed in the complaint is when an IEP team places a child into GNETS.[5] (Dkt. 107 at 2.) Defendants argue that this is not an act of the State and is not traceable to them. (*Id.*) As part of this, Defendants also contend that after *Jacobson*, the State's rulemaking authority is insufficient to confer standing. (Dkt. 98-1 at 13–14.)

In its prior Order, the Court explained that "a state's statutory structure informs whether the state administers the program." (Dkt. 77 at 17.) The *Jacobson* decision is consistent with that conclusion. In that case, Florida law clearly precluded the Secretary of State from controlling the order of candidates on ballots. The Secretary of State merely certified the names of nominated candidates to the local supervisors. 974 F.3d at

---

[5] The Court also notes that the gravamen of Plaintiffs' claim is separation and stigmatization. (Dkt. 77 at 29.)

1253. The local supervisors then had responsibility for printing the ballots in compliance with state law. (*Id.*) The statutory structure made it clear that the alleged harm was neither traceable to the Secretary of State nor redressable by relief against her.

Georgia's statutory structure for GNETS is not so clear. No State Defendant is part of the IEP team making a decision about an individual child. And, while a state actor's rule-making authority may not be enough in the absence of other authority, that is not the case here—at least not on the basis of the record before the Court at this stage of the litigation. There is no clear law, like in *Jacobson*, that prohibits the State from providing relief.[6] Defendants also do not argue this is incorrect as a matter of Georgia law or cite any statutory structure showing this is incorrect.

Plaintiffs also allege GNETS unnecessarily removes students from general education classrooms, leading to stigmatization and a poor

---

[6] *See Ga. Republican Party, Inc. v. Sec'y of State for Ga.*, No. 20-14741, 2020 WL 7488181, at *1 (11th Cir. Dec. 21, 2020) (applying *Jacobson* to conclude that plaintiffs failed to demonstrate that any alleged injury was traceable to and redressable by the Georgia Secretary of State where Georgia law *clearly* gave authority to conduct the absentee ballot signature-verification process to local county supervisors).

education. As explained in the Court's Order on Defendants' motion to dismiss, Plaintiffs allege the State is responsible for "developing rules and procedures regulating the operation of the GNETS grant" and "monitoring GNETS to ensure compliance with Federal and state policies, procedures, rules and the delivery of appropriate instructional and therapeutic services." (Dkt. 77 at 18 (citing Dkt. 1 ¶ 42); Ga. Comp. R. & Regs. § 160-4-7.15(5)(a)). How the State develops rule and procedures "regulating the operation of the GNETS grants" or "monitors GNETS to ensure compliance" with applicable laws is not clear. Plaintiff says it does so in a way that makes it responsible for the harm suffered and able to provide a remedy. Maybe that is true. Maybe not. But, this is not a case like *Jacobson* in which state law so prescribes a state actor's authority such that the Court can say the state actor could not possibly have caused or redress the harm at issue. As the Court previously explained, discovery is necessary to learn whether the State—within the statutory scheme—administers GNETS in such a way that caused the harm at issue and thus can also redress that harm.[7]

---

[7] Should Defendants bring up standing at summary judgment, the Court will determine whether Plaintiffs have met their burden through

Plaintiffs sufficiently allege the State has done and continues to do something that "contributed to [their] harm," specifically administering GNETS in a discriminatory manner. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc); *see also J.N. v. Or. Dep't of Educ.*, 2020 WL 5209846, at *9 (D. Or. Sept. 1, 2020) ("A defendant need not be the 'sole source' of harm, nor must a plaintiff 'eliminate any other contributing causes to establishing its standing.' " (quoting *Barnum Timber Co. v. Envtl. Prot. Agency*, 633 F.3d 894, 901 (9th Cir. 2011)); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (holding that traceability is establishing when a theory of causation "relies . . . on the predictable effect of Government action on decisions of third parties' "). "Accepting these facts as true, which the Court must do at this juncture, it seems clear that actions within the State's control, not solely local measures, cause the alleged discrimination." *United States v. Georgia*, No. 1:16-cv-3088, Dkt. 94 at 11. Plaintiffs' allegations establish a causal connection between the State and the harms suffered by Plaintiffs so as to avoid judgment on the pleadings.

---

affidavits or other evidence. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013).

**2. The Eleventh Amendment**

Defendants contend that Plaintiffs' claims raise Eleventh Amendment concerns. The Eleventh Amendment provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

The Eleventh Amendment has also been held to bar a suit brought by a citizen against his own State. *See Hans v. Louisiana*, 134 U.S. 1 (1890). Federal courts can, however, "vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.' " *Ex parte Young*, 209 U.S. 123, 160 (1908).

Title II's implementing regulation, 28 C.F.R. § 35.130(d), provides that "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." Because Defendants moved to dismiss Plaintiffs' ADA claim on the grounds the State does not administer GNETS, the Court addressed the issue of administration in its Order on Defendants' motion to dismiss. (Dkt. 77 at 8–20.)

Defendants characterize the Court's Order as holding that "Plaintiffs' claim survived on the theory that the State might exceed its constitutional, statutory, and regulatory authority when 'administering' the GNETS program, and this overstep is a necessary element to Plaintiffs' ADA and Rehabilitation Act of 1973 claims." (Dkt. 98-1 at 15.) Defendants contend that the Court's Order forces Plaintiffs to show the State exceeded its authority as an element of their ADA theory, which they claim the Eleventh Amendment does not permit.

Defendants misunderstand the Court's Order, perhaps by ignoring the "sort of" and "kind of" language included therein. The Court never suggested Plaintiffs must prove (or were trying to prove) state officials engaged in *ultra vires* behavior. The Court acknowledged that the State has some authority over GNETS and discovery might show the State uses it to administer GNETS in some relevant way. (Dkt. 77.) The Court was referring to the ambiguity of words in the statuary scheme like "administer," "monitor," and "ensure compliance" and how these words might allow for State actors to exercise control of GNETS "in a way that went beyond a strict reading of the statutory structure (or at least Defendants' preferred reading [of it])." (*Id.* at 18–19.) There is enough

ambiguity or "fuzziness" in these words for Plaintiffs to pursue discovery as to what role the State actually plays in the administration of GNETS, without relying on a claim the State Defendants violated state law. Perhaps the Court should not have used the term "*ultra vires*" in this context, but it was merely acknowledging the gap between the words of the statute and the way state and local officials have applied them in administering GNETS.

The Court rejects Defendants' Eleventh Amendment argument.

### 3. Defendants DCH and DBHDD

In the Court's Order on Defendant's motion to dismiss, the Court found that "broad supervision or funding of GNETS does not constitute administration." (Dkt. 77 at 17.) Defendants contend that Plaintiffs cannot state a claim against Defendants DCH and DBHDD and their respective Commissioners because it is alleged the two departments do nothing more than fund a program. In support of their argument, Defendants cite—not Plaintiff's complaint allegations—but their own characterization of Plaintiff's allegations in their previous motion to dismiss. (Dkt. 98-1 at 18.) Specifically, they claim

> DBHDD is alleged only to provide funding for services that are needed by students enrolled in the GNETS program, and

> DCH is alleged to administer Georgia's Medicaid and Peach Care for Kids programs, which "provides funding for services within GNETS." [Dkt. 1 ¶¶ 48, 51, 53.] Neither agency is alleged to administer the GNETS program; neither is alleged to deny funds to students receiving services through GNETS.

(*Id.*) If the complaint were as Defendants claim, the Court would likely find Plaintiffs' general allegations that DBHDD and DCH broadly supervise and fund GNETS insufficient to state a claim under the "administer" Title II implementing regulation. *See* 28 C.F.R. § 35.130(d).[8] But, as explained in the Court's prior order, Plaintiffs also claim Defendants (including DBHDD and DCH) violated other implementing regulations, including by denying Plaintiffs the opportunity to participate in and benefit from educational services equal to that afforded other students in violation of 28 C.F.R. § 35.130(b)(1)(ii) and by denying Plaintiffs services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students in violation of

[8] Plaintiffs allege, for example, that DCH "administers Georgia's Medicaid and Peach Care for Kids programs, which provide funding to and are integral to the coordinated system of care for children" and "are also a substantial source of funding for services provided through GNETS." (Dkt. 1 ¶ 51.) This claim iss nothing more than broad supervision and funding on the part of DCH.

28 C.F.R. § 35.130(b)(1)(iii).[9] (Dkt. 1 ¶¶ 158(i) and (iii).) In support of this allegation, they allege DBHDD and its commissioner "provide[] funding for services within GNETS that it does not provide to local school districts so that such districts could provide the same or similar services in zoned schools." (*Id.* ¶ 48.) Plaintiffs also allege DCH and its commissioner, "provides funding for services within GNETS that it does not provide to local school districts so that such districts could provide the same or similar services in zoned schools." (*Id.* ¶ 53.) Plaintiffs claim that, by doing this, DCH and DBHDD, inhibit local school districts from providing services to students with disabilities in their local schools, sending them instead to GNETS programs. Even though funding and broad supervision do not amount to administration, Plaintiffs have alleged enough facts to state ADA claims against DBHDD and DCH. Discovery may show otherwise, but the allegations pass muster at this stage of the litigation.

---

[9] The Court notes Defendants footnote which argues 28 C.F.R. § 35.130(b)(1)(ii) and 28 C.F.R. § 35.130(b)(1)(iii) are inapplicable. As noted, above, in the Court's Order on Defendants' motion to dismiss, the Court acknowledged that the State has some authority over GNETS, and discovery might show the State administers GNETS. (Dkt. 77.) The Court also found that Plaintiffs' "allegations suggest the State made decisions that would constitute administering GNETS." (*Id.* at 18.)

### 4. Fourteenth Amendment Claim

Plaintiffs claim Defendants violate the Equal Protection Clause of the Fourteenth Amendment by denying them an equal opportunity to an education. (Dkt. 1 ¶ 166–69.) The Equal Protection Clause of the Fourteenth Amendment "directs that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Most legislation, however, "classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Hispanic Interest Coalition of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1245 (11th Cir. 2012) ("*HICA*") (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)). "[W]here a statute significantly interferes with the exercise of a protected right, it must also be reviewed under a [ ] heightened level of scrutiny." *Id.* Courts apply rational basis review when no suspect class or fundamental right is involved. *Houston v. Williams*, 547 F.3d 1357, 1363 (11th Cir. 2008).

In its prior Order, the Court rejected Defendant's request to apply rational basis review, finding heightened scrutiny applies and the State bears the burden of showing GNETS furthers a substantial state interest. (Dkt. 77 at 33.) Defendants now argue that there is a substantial state

interest since GNETS seeks to serve students for whom general education classrooms have been deemed ineffective in an environment that is less restrictive than residential education. (Dkt. 98-1 at 20.) They contend that the State has an important interest in the provision of educational services in an appropriate setting and of a broad continuum of services. (Dkt. 107 at 9.)

The Court agrees the State has a substantial interest in the provision of educational services in an appropriate setting. *See* Ga. Comp. R. & Regs. 160-4-7-.15(2)(a) ("GNETS services is an option in the continuum of supports that prevents children from requiring residential or more restrictive placement."); *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954) (finding that the most important function of a state may be providing for the education of all of its citizens); GA. Const. art. VIII, § 1, ¶ I ("The provision of an adequate public education for the citizens shall be a primary obligation."); *Gwinnett Cnty. Sch. Dist. v. Cox*, 710 S.E.2d 773, 775 (Ga. 2011) ("By providing for local boards of education to have exclusive control over general K–12 schools, our constitutions, past and present, have limited governmental authority over the public education

of Georgia's children to that level of government closest and most responsive to the taxpayers and parents of the children being educated.”). The Court cannot conclude GNETS furthers that interest. Defendants, who bear the burden, make no substantive argument that GNETS furthers their stated interest. They cite no authority or evidence to support their claim that the only alternative to GNETS is the shipment of students to residential treatment programs. Plaintiffs, on the other hand, allege that students placed in GNETS do not need to be in that setting and that a residential program is not the only alternative to that placement. They say those same students could be educated in their zoned schools. (Dkt. 1 ¶ 87.) Plaintiffs contend that, if Defendants dispersed funding currently concentrated in GNETS to local school districts, those students could remain in their zoned schools and receive better education. (*Id.* ¶¶ 9–11, 112–17.) Plaintiffs allege GNETS classrooms lack access to libraries, cafeterias, gyms, science labs, music rooms, or playgrounds, (*Id.* ¶ 94); GNETS instruction is not as rigorous as in non-GNETS schools, with much of it provided on computers rather than with live teachers, (*Id.* ¶¶ 100–105); electives are sparse, (*Id.* ¶ 105); and GNETS teachers and support staff often physically restrain

students to control their behavior. (*Id.* ¶ 109.) At this stage of the proceedings, the Court must accept these facts as true and consider the allegations in the complaint in the light most favorable to Plaintiffs.[10] *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). In the light of Defendants' conclusory statements and the lens it applies at this stage of the litigation, the Court cannot find GNETS furthers the State's interest.

Defendants also argue that Plaintiffs' Equal Protection claim fails because the complaint does not plead intentional discrimination. (Dkt. 98-1 at 20.) Proof of discriminatory intent is required when a plaintiff claims that a facially neutral policy has been implemented with an intent to discriminate. *See Johnson v. Governor of Fla.*, 405 F.3d 1214, 1222 (11th Cir. 2005) ("A facially-neutral law violates the Equal Protection Clause if adopted with the intent to discriminate."). A plaintiff is not required to allege the intent to discriminate when attacking a policy that discriminates on its face. Intentional discrimination can be established by a facially discriminatory policy—one that explicitly applies less

[10] The Court notes that Defendants provide nothing to refute Plaintiffs' allegations.

favorably to some, or all, members of a protected group. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 198 (1991) (holding that a policy was facially discriminatory because it required only a female employee to produce proof that she was not capable of reproducing); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th Cir. 1995) (finding because the policy facially singled out the handicapped and applied different rules to them, discriminatory intent and purpose were apparent on the policy's face). "A facially discriminatory policy is dispositive evidence of intentional discrimination." *Rodriguez v. Procter & Gamble Co.*, 465 F. Supp. 3d 1301, 1321 (S.D. Fla. 2020).

Plaintiffs contend that this case involves a policy that discriminates on its face against students with disabilities, so the discriminatory intent is apparent on its face. (Dkt. 105 at 18.) Plaintiffs argue that the policy is that "Georgia discriminates against thousands of Georgia public school students with disabilities . . . by segregating them in a network of unequal classrooms known as [GNETS]." (Dkt. 1 ¶ 1.) The Court agrees that this policy is facially discriminatory. But for these students' disabilities, they would not be segregated into GNETS. *See Johnson*

*Controls,* 499 U.S. at 200 (holding that a policy is facially discriminatory if it cannot survive the 'but-for' test; that is, if the 'evidence shows treatment of a person in a manner which but for that person's [protected characteristic] would be different' ") (internal quotation marks omitted) (citing *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978)). Plaintiffs allege Defendants discriminate against thousands of students with disabilities by segregating them in a network of unequal classrooms. (Dkt. 1 ¶ 1.) They claim Defendants place students with disabilities in GNETS, which are segregated programs, by which they are stigmatized and receive a low-quality education. (*Id.* ¶¶ 5–6.) They allege that "[b]y maintaining and funding GNETS separate and apart from local school districts, the State has created a system in which a GNETS referral is the most convenient [or] only option for students with disability-related behavioral needs." (*Id.* ¶ 10.) Because Plaintiffs allege a facially discriminatory policy, discriminatory purpose and intent are apparent on the policy's face.

### 5. Requested Relief

To have standing, a plaintiff must establish: (1) an injury, (2) a causal connection between the injury and the conduct, and that (3) the

injury is redressable by the Court. *See Fla. Pub. Interest Research Grp. Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1083 (11th Cir. 2004).[11] Plaintiffs seek

> a preliminary and permanent injunction requiring Defendants . . . to provide to the Individual Named Plaintiffs and the Plaintiff Class the services necessary to ensure them equal educational opportunity in classrooms with their non-disabled peers.[12]

(Dkt. 1 at 47.) Defendants argue that the Court should dismiss Plaintiffs' claims because of Plaintiffs' "[u]nprecedented, [u]nsupported [r]equests." (Dkt. 98-1 at 20.) Specifically, Defendants allege that issuance of the requested injunction would require the Court—to hold that an ADA regulation supersedes and negates the Individuals with Disabilities Education Act ("IDEA") in two ways: (1) the class-wide relief would preempt the IEP placement process and (2) the class-wide relief would

---

[11] The Court notes that Defendants already disputed Plaintiffs' request for an injunction in their motion to dismiss. (Dkt. 46.) Defendants argued that the requested relief was an impermissible obey the law injunction. The Court disagreed and denied their motion to dismiss. (Dkt. 77 at 35.)

[12] The types of services requested by Plaintiffs have been laid out in the complaint—granting GNETS students access to the same curriculum, access to electives, and entrances through the same doors as students not in GNETS. (Dkt. 1 ¶¶ 97, 101, 104.)

eviscerate the full continuum of services and setting that IDEA requires.[13] (*Id.* at 21.)

As explained above, an IEP is "a written statement for each child with a disability that is developed, reviewed, and revised" pursuant to various rules and procedures. 34 C.F.R. § 300.320(a). An IEP must include various items including "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child." 34 C.F.R. § 300.320(a)(4). "[I]n the case of a child whose behavior impedes the child's learning," the IEP team must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 34 C.F.R. § 300.324(a)(2)(i). The IEP must be reviewed periodically, and at least annually, and revised as appropriate by the IEP team. *See* 34 C.F.R. § 300.324(b)(1)(i), (ii). "The IEP is supposed to be the culmination of a collaborative process between parents, teachers, and school administrators outlining the student's

---

[13] Defendants claim that Plaintiffs ask the Court for placement of all GNETS students in classrooms in the students' respective "zoned" schools. (Dkt. 98-1 at 21.) While this appears in the complaint's introduction, the request is absent from the prayer for relief. (Dkt. 1 ¶ 1.)

disability and his educational needs, with the goal of providing the student with" a FAPE. *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1177 (11th Cir. 2014). GNETS is just one option.

Plaintiffs requested relief does not eliminate IEPs. IEP teams would still have to determine where a child could receive a FAPE. Nothing in Plaintiffs' prayer for relief changes this. The final educational program provided to a child would still be individualized. *See LMP v. School Board of Broward Cnty.*, 2016 WL 10935216, *11 (S.D. Fla. 2016). The requested relief does not lead to a cookie-cutter approach to IEPs. *Id.* at *13 n.22. IEP teams would still be held to the same requirements and considerations.

IDEA requires each public agency "ensure that a continuum of alternative placements [are] available to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.551(a). The continuum must "[i]nclude the alternative placements listed in the definition of special education under § 300.26 (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions)." 34 C.F.R. § 300.551(b)(1). Defendants argue that no court has granted relief extinguishing a

placement option nor could a court do so consistently with federal law. (Dkt. 98-1 at 22.)

Plaintiffs' requested relief would not abolish the continuum of alternative placements. Plaintiffs request an injunction requiring Defendants to provide the Plaintiff Class the "services necessary to ensure them equal educational opportunity in classrooms with their non-disabled peers." (Dkt. 1 at 47.) The current continuum appears to include a student being in the classroom with more support, GNETS, or residential placement. Were the Court to grant Plaintiffs' requested relief, there is no indication (at this stage) that the required continuum of alternative placements, including instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions, would be eliminated. *See* 34 C.F.R. § 300.551(b)(1).

If the Court were to issue Plaintiffs' requested relief, the Court could craft such relief so as to avoid interference with the IDEA. The Court would thus not have to hold that an ADA regulation supersedes and negates the IDEA. The relief would not violate federal law.

### 6. Administrative Exhaustion

Although the Court already addressed administrative exhaustion in its Order on Defendants' motion to dismiss, Defendants request the Court now consider the First Circuit's analysis in *Parent/Prof'l v. Springfield*, 934 F.3d 13 (1st Cir. 2019). Even after review of *Springfield*, the Court still concludes Plaintiffs' claims are not subject to IDEA exhaustion.

"The Individuals with Disabilities Education Act (IDEA) offers federal funds to States in exchange for a commitment to furnish a [FAPE] to children with certain disabilities." *Fry v. Napolean Cmty. Schs.*, 137 S. Ct. 743, 746 (2017). The IDEA has exhaustion requirements, and Plaintiffs must exhaust the administrative procedures when they seek relief available under the IDEA. 20 U.S.C. § 1415(l). Some conduct is prohibited by both the ADA and the IDEA.

Defendants ask the Court to dismiss Plaintiffs' "inferior education" claim and corresponding prayer for relief. (Dkt. 98-1 at 24.) In *Springfield*, the plaintiffs alleged that the defendants violated the ADA by unnecessarily segregating students with mental health disabilities into a separate and inferior school. 934 F.3d at 17. The plaintiffs sought

injunctive and declaratory relief, including "an order that defendants provide the class plaintiffs with 'school-based behavior services in neighborhood schools to afford them an equal educational opportunity and enable them to be educated in neighborhood schools.' " *Id.* at 18. The *Springfield* court held that IDEA's exhaustion requirement applied to ADA claims where "overlap is such that, in pleading what are on the surface ADA claims, the plaintiffs' complaint in substance 'seek[s] relief that is also available under' the IDEA." *Id.* at 27. In *Springfield*, the crux of the plaintiffs' complaint was that defendants failed to provide a FAPE. *Id.* at 25. The court found that the heart of the plaintiffs' complaint was "that defendants failed to provide the *educational instruction* and related services that the class plaintiffs need to access an *appropriate education* in an appropriate environment." *Id.* (emphasis added). While Plaintiffs allege both that they have been stigmatized and that they have received an inadequate education, the gravamen of Plaintiffs' claim is separation and stigmatization. (Dkt. 77 at 29.) Plaintiffs allege they are segregated into separate institutions or classrooms. (Dkt. 1 ¶¶ 1, 5.) They contend that GNETS satellite classrooms are "isolated in trailers, basements, or locked wings, with

separate entrances that are not used by students without disabilities." (*Id.* ¶ 97.) While Plaintiffs also allege they received an inadequate education, the heart of their claim is separation and stigmatization.

The Court also notes that *Springfield* is not binding. In the Court's Order on Defendants' motion to dismiss, it discussed *J.S., III by & through J.S. Jr. v. Houston County Board of Education*, 877 F.3d 979 (11th Cir. 2017) at length—a decision that is binding. The Court recognized then, and recognizes now, that the facts in *J.S.* are distinguishable from the allegations here, yet the Court still follows the Eleventh Circuit's reasoning. In *J.S.*, a child had a personal teaching assistant as part of his IEP. *Id.* at 983–84. This teaching assistant routinely took the child from the classroom to the weight room, where the teaching assistant could get on the computer. *Id.* The child sued, alleging the school board "allowed J.S. [] to be removed from his regular classroom, based on discriminatory reasons and for no purpose related to his education." *Id.* at 986. The court could not easily divorce J.S.'s claim of isolation from the context of him being a student. *Id.* But it held that he had a cognizable intentional discrimination claim under the ADA and Section 504. *Id.* The court found that

> Although the circumstances alleged here do involve a violation of J.S.' IEP, they also implicate those further, intangible consequences of discrimination contemplated in *Olmstead* that could result from isolation, such as stigmatization and deprivation of opportunities for enriching interaction with fellow students. These injuries reach beyond a misdiagnosis or failure to provide appropriate remedial coursework.

*Id.* at 987. That court allowed the plaintiff to bring a separate intentional discrimination claim. *Id.* at 986 ("Although this claim could be brought as a FAPE violation for failure to follow [plaintiff's] IEP, we conclude that it is also cognizable as a separate claim for intentional discrimination under the ADA and § 504."). The Court, for a second time, rejects Defendants' contention that exhaustion is required.

## III. Conclusion

The Court **DENIES** Plaintiffs' Motion to Consolidate Cases (Dkt. 93) and Motion for Judgment on the Pleadings (Dkt. 98).

**SO ORDERED** this 9th day of March, 2021.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE