# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

The Georgia Advocacy Office, et al.,

      Plaintiffs,

v.                           Civil No.: 1:17-CV-3999-MLB

State of Georgia, et al.,

      Defendants.

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs submit this Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS.

Defendants claim that Plaintiffs do not have standing to bring their claims. They are wrong. Plaintiffs have alleged and presented substantial evidence that GNETS students are unnecessarily segregated and denied equal educational opportunities. This is more than sufficient to establish Article III or constitutional standing. Plaintiffs have shown, and can show (1) a concrete, particularized, and actual injury in fact that is neither conjectural nor hypothetical that is (2) traceable to Defendants and (3) subject to redress by a judicial order against Defendants. *See*

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Anderson v. Raffensperger*, 497 F. Supp. 3d 1300, 1307 (N.D. Ga. 2020).

Specifically, Plaintiffs have shown that they are subjected to unnecessary segregation and are deprived of, among other things, "opportunities for enriching interaction with fellow students." *J.S., III v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017). This injury does not require an "individualized analysis" as Defendants claim.[1] In any event, both Plaintiffs W.J. and C.R. are segregated in GNETS programs, and Plaintiffs have provided evidence that such segregation is unnecessary and denies W.J. and C.R. equal educational opportunities. *See e.g.,* Report of Judy Elliott, Ph.D., ("Elliott Report") [ECF No. 188-10[2]] at 1-2; 19-24; 24-26; 28-29; Declaration of Judy Elliott, attached as Exhibit N [ECF No.187-15] to Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification[3] (GNETS students, including W.J. and C.R., are unnecessarily

---

[1] Defendants also conflate the broader argument regarding individualized evidence of a legal violation with the standard for establishing Article III standing. The former goes to the merits of Plaintiffs' claims, which is not part of the standing analysis.

[2] The Elliott Report is also available at Exhibit N [ECF No. 214-22] to Defendants' Brief in Support of Motion for Summary Judgment.

[3] Defendants' claim that Plaintiffs have not identified the specific services that are afforded to non-disabled students but denied to Plaintiffs and others subject to "unjustified isolation" ignores the substantial evidence in this case, including both

segregated and denied equal access to programs and facilities, such as libraries, cafeterias, gyms, science labs, music rooms, and extracurricular activities). This evidence establishes that they have incurred an injury sufficient to confer standing.

This injury is traceable to Defendants because Defendants' own systemic policies and practices lead to the unnecessary segregation of GNETS students and the denial of equal educational opportunities. As a result, Plaintiffs' injuries are redressable since this Court can order that Defendants modify or eliminate those policies and practices that discriminate against Plaintiffs and take other necessary remedial actions.[4]

## A.    Plaintiffs Experience Actual Injury

Plaintiffs, through their experts' substantial review of student records, extensive site visits, and classroom observations of GNETS students, have presented significant evidence of harm in the form of unnecessary segregation and unequal educational opportunities. *See e.g.*, Elliott Report at 1-2; 19-24; 24-26;

---

the deposition testimony of parents of GNETS students describing in detail the lack of enrichment and isolation their children suffer in GNETS as well as Dr. Elliott's report. *See* Elliott Report at 2, 3, 25; Deposition of R.G. [ECF No. 234] at 26:16-27:23; 63:23; Deposition of D.J. [ECF No. 232] at 24:7-13.

[4] Defendants claim O.C.G.A. § 20-2-243 is a bar to enforcement.  Defs.' Brief at 25. On this point, they are, again, wrong.  To the extent O.C.G.A. § 20-2-243 applies outside of the context of quality basic education funding, it merely provides a process for an appeal from a determination made by the State Board of Education. It does not prevent a federal court from ordering Defendants to end or modify policies and practices that discriminate about students with disabilities.

28-29; Deposition of Judy Elliott ("Elliott Dep.") [ECF No. 204] at 187:4-7;

199:10-200:4; Report of Kimm R. Campbell, MSW, LCSW ("Campbell Report")

[ECF No. 188-61[5]] at 13. For example, when Dr. Elliott conducted a review of a

statistically significant random sample of GNETS students' records, she found that

crucial therapeutic services are either not provided to GNETS students, or are

provided insufficiently. Dr. Elliott found that students' Individualized Education

Plans ("IEPs")

> were very different from what is customary for students with
> significant behavior issues. The student IEPs I reviewed did not
> mention counseling, psychological services, social work services, or
> services provided by behavior specialists. No student IEP mentioned
> any 'related services' or supplemental services designed to improve
> behavior." . . . Students with disability-related behaviors like those in
> GNETS customarily receive services from school psychologists,
> behavior specialists, social workers, and counselors, who have
> specialized training. I saw no evidence that such professionals are
> involved in providing needed services to GNETS students.

Elliott Report at 13-14.

Dr. Elliott also found that GNETS students could, but do not, receive

services they need in their zoned schools and thus are unnecessarily segregated

from their non-disabled peers (Elliott Report at 1-2; 19-24); Defendants fail to

effectively implement accepted approaches to improving student behaviors (Elliott

Report at 12-13); and Defendants fail to provide the individualized and intensive

---

[5] The Campbell Report is also available at Exhibit O [ECF No. 214-23] to
Defendants' Brief in Support of Motion for Summary Judgment.

supports required by students with disability-related behaviors (Elliott Report at 13-16). In addition, GNETS students receive inferior teaching and instruction in inadequate facilities and are denied resources and extracurricular activities routinely available to students without disabilities. (Elliott Report at 2-3; 24-26). This evidence is more than sufficient to establish injury in fact for standing purposes.

Despite devoting a significant portion of their brief in support of summary judgment to the standing issue, Defendants do not cite a single case in which a court found that plaintiffs asserting a Title II/*Olmstead* unnecessary segregation claim do not have standing.  In fact, nearly all of Defendants' arguments have little to do with standing at all, but rather relate to the merits of Plaintiffs' claims. For example, Defendants rely heavily on *U.S. v. Mississippi*, 82 F.4th 387 (5th Cir. 2023) (hereinafter "*Mississippi*"). But the basis of the Fifth Circuit's decision was that the United States' case failed on the merits, not that the United States lacked standing. Moreover, the Fifth Circuit's concerns about extending relief to individuals "at risk" were based on the facts of that case. And Defendants ignore that every other circuit court to consider whether persons at risk of unnecessary segregation may assert Title II/*Olmstead* claims has reached a different conclusion than the Fifth Circuit. *See e.g.*, *Waskul v. Washtenaw County Comm. Mental Health*, 979 F.3d 426, 461 (6th Cir. 2020) (integration mandate's "protections

would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation"); *Steimel v. Wernet*, 823 F.3d 902, 911 (7th Cir. 2016); *Davis v. Shah*, 821 F.3d 231, 263 (2nd Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013); *M.R. v. Dreyfus*, 697 F.3d 706, 720 (9th Cir. 2012); *Radaszewski v. Maram*, 383 F.3d 599, 608 (7th Cir. 2004); *Fisher v. Oklahoma Health Care Auth*., 335 F.3d 1175, 1181-82 (10th Cir. 2003).

Finally, regardless of whether Defendants are correct that *Olmstead* does not extend to persons at risk of unnecessary segregation,[6] Defendants cannot deny that Plaintiffs have presented evidence that the "vast majority," Elliott Report at 29, of the approximately 3,000 GNETS students, including Plaintiffs W.J. and C.R., are unnecessarily segregated and denied equal educational opportunities. Such ongoing

---

[6] Defendants are incorrect. Even if a serious risk of unnecessary segregation were not itself actionable under Title II, children referred for placement at GNETS have standing, under well settled law, to seek injunctive relief to prevent a future actionable violation of Title II and *Olmstead*. *See, e.g*., *United States v. W. T. Grant Co*., 345 U.S. 629, 633 (1953) (explaining "[t]he purpose of an injunction is to prevent future violations"); *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (it is also well-established that injunctive relief is appropriate "to prevent a substantial risk of serious injury from ripening into actual harm," *quoting Farmer v. Brennan*, 511 U.S. 825, 845 (1994).

segregation and denial of equal opportunities are injuries in fact sufficient for standing purposes.

**B.    Plaintiffs' Claims Are Traceable To and Redressable By Defendants**.

Defendants rely on *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020), in support of their argument that traceability is lacking.  Specifically, Defendants claim that *Jacobson* stands for the proposition that traceability and redressability are not satisfied because local boards of education are independent, have the authority to perform or not perform the acts Plaintiffs claim are discriminatory, and have no enforcement authority.  But Defendants' argument ignores both that Plaintiffs are challenging Defendants' systemic policies and practices and the substantial evidence Plaintiffs have put forward demonstrating that Defendants administer the GNETS program. *See* Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment ("Pls.' Mem."), ECF No. 188-1 and related exhibits, and Section II.A, below. Thus, whether or not *Jacobson* stands for those propositions is irrelevant here where the evidence shows that Defendants shape GNETS programs' decisions about the provision of GNETS services. Due to the fiscal and programmatic structure that Defendants have created to serve students with disability-related behaviors, school districts are more likely to refer these students to GNETS than to provide them with necessary services in their zoned schools. *See* Deposition of Kimm Campbell ("Campbell

Dep.") [ECF No. 203] at 14:17-21. Because Defendants do administer and exercise control over GNETS, Plaintiffs' actual injuries are directly traceable to Defendants.

Redressability considers whether the named party has the legal "authority to redress the alleged injury." *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp.3d 1128, 1186 (N.D. Ga. 2022) (citing *Jacobson*, 974 F.3d at 1269). Defendants are wrong to claim that they cannot redress the alleged injury. As Plaintiffs have repeatedly established, Defendants' policies and practices directly shape all aspects of the GNETS program, including the unnecessary segregation of students and denial of equal educational opportunity.

For example, Plaintiffs' expert Kimm Campbell identified several reasonable modifications that Defendants could make to their policies and practices to prevent the unnecessary segregation of students in GNETS, including increasing capacity to deliver needed services to students with disability-related behaviors in their schools and in their communities (Campbell Report at 1; 13-21); expanding Georgia's System of Care so that it serves all children with disability-related behaviors, including students in GNETS and students referred to GNETS (Campbell Report at 6-8; 19- 20); and making better use of available resources, especially by more effectively leveraging Medicaid funding, to provide services that help children with disability-related behaviors avoid unnecessary segregation

(Campbell Report at 19-21). If ordered by the Court to do so, Defendants could take these and other actions that would directly redress the legal harms Plaintiffs have incurred due to unnecessary segregation and the denial of educational opportunities.[7]

In sum, as set forth above, Plaintiffs have Article III or constitutional standing to pursue their claims in this case because they have shown a concrete, particularized, and actual injury in fact that is neither conjectural nor hypothetical. This injury is traceable to Defendants because their systemic policies and practices cause the injury, and the injury can be redressed by a judicial order against Defendants requiring them to end their discriminatory actions. Accordingly, Defendants' motion for summary judgment on the issue of standing should be denied.

## II. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND SECTION 504 CLAIMS.

### A. The Undisputed Evidence Demonstrates that the State Administers GNETS.

---

[7] As for Defendants' re-asserted claim that the Court cannot enter an "obey the law" order, that position has been rejected already in this case, and Defendants offer no new arguments here. *See The Georgia Advocacy Office v. State of Georgia*, 447 F. Supp.3d 1311, 1327 (N.D. Ga. 2020); *see also United States of America v. State of Georgia*, 461 F. Supp.3d 1315, 1326-27 (N.D. Ga. 2020).

Defendants assert that Plaintiffs cannot prove that the State administers GNETS, arguing in conclusory fashion that "Plaintiffs have not shown that the State 'regulate[s] the operation of the GNETS grant[s],' or how 'monitoring GNETS to ensure compliance,' standing alone, would demonstrate actionable administration." Defendants' Brief in Support of Motion for Summary Judgment ("Defs.' Brief") at 34–35. Defendants further proclaim that "Plaintiffs have not argued or shown that the State has exceeded its limited authority vis a vis GNETS, which this Court left open in prior orders." *Id*. at 35.

As discussed at length in Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment, the undisputed evidence demonstrates that the State administers GNETS. Moreover, Defendants' argument fails to address the legal principles established by this Court "to determine whether an entity 'administered' a government program." ECF No. 77 at 16–17. Nonetheless – and contrary to the State's assertion – the undisputed evidence shows that the State regulates the operation of the GNETS grant, it monitors GNETS to ensure compliance with Federal and state rules and regulations, and much more.

The State regulates the operation of the GNETS grant. *See* Pls.' Mem. at 14-16. As Dr. Zelphine Smith-Dixon, the former State Director for Special Education for Defendant Georgia Department of Education, explained:

> Q.  And so if a regional GNETS program wanted an additional service to be able to provide to their students,

10

do you know who it is at the -- is there somebody at the state level that would receive and sort of consider that request and ultimately grant or decline?

A.   So there – so yes and no. So ***the function of the program manager for the GNETS program would essentially be doing what you're describing. It would be working with the local GNETS programs, understanding their needs, reviewing their budgets, to ultimately help determine approval for purposes of allowable and appropriate expenditures***. . . .

Q.  Okay. And so did you say that the State Board of Education essentially made those kinds of allocations and decisions?

A.  . . . So their responsibility – that decision comes out of the State legislature. ***It becomes the State Board's responsibility to approve us [sic], to receive it, to allocate it, and to ensure that it's being used appropriately***.

DOJ Deposition of Zelphine Smith-Dixon [ECF No. 237] at 93:8-95:7 (emphasis added).

Defendants appear to concede that the State monitors GNETS to ensure compliance with state and federal law and that such actions constitute administration, although it argues that monitoring "standing alone" does not "demonstrate actionable administration." Defs.' Brief at 34-35. Nowhere do Defendants explain what is meant by "actionable administration," nor do they cite any legal authority demonstrating that some types of administration are actionable while others are not. It is undisputable that the GNETS Rule compels the State to "[m]onitor GNETS to ensure compliance with Federal and state policies,

procedures, rules, and the delivery of appropriate instructional and therapeutic services." GA. COMP. R. & REGS. § 160-4-7-.15(5)(a)(2)(iii). Moreover, the undisputed evidence demonstrates that the State monitors GNETS to ensure compliance in many ways. *See* Pls.' Mem. at 11-13, 18, 22-23. Contrary to Defendants' assertion otherwise, this Court already determined that these actions could constitute administration if proven true, ECF No. 77 at 18, and now the undisputed evidence shows them to be true. *See* Pls.' Mem. at 11-13, 18, 22-23, 28, 32-33.

Finally, Defendants assert that Plaintiffs have not argued or shown that the State has exceeded its limited authority vis-à-vis GNETS. Defs.' Brief at 35. There is no need for Plaintiffs to make such a showing, however. The State has broad authority and an obligation to administer GNETS, and it uses that authority to do so, including by creating and enforcing the mandatory GNETS Strategic Plan, providing day-to-day direction to GNETS directors, funding GNETS and controlling the allocation of funding, executing and operating state-level contracts to provide GNETS services, and mandating IEP file reviews. *See* Pls.' Mem. at 7-23, 30-32. As discussed there, the undisputed evidence shows that GNETS is a program created, structured, and managed by the State. *Id.*

## B.    Defendants' Other Arguments Opposing Plaintiffs' ADA and Section 504 Claims Lack Legal Support.

### 1.    Defendants' Arguments Rely on Significant Misunderstandings or Misstatements of Applicable Law.

Defendants' additional arguments in favor of summary judgment on Plaintiffs' ADA and Section 504 claims[8] rely on three general assertions that are incorrect as a matter of law. First, Defendants wrongly argue that "[*f]or any claim under the ADA*, Plaintiffs bear the burden of identifying a 'reasonable accommodation' that is not only effective but reasonable." Defs.' Brief at 28 (emphasis added). Defendants make this sweeping claim even though the cases they cite concern only one of Plaintiffs' ADA claims – asserting unnecessary segregation under the ADA's integration mandate and the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999). Plaintiffs other ADA claims – that Defendants deny equal educational opportunities to GNETS students, *see* 28 C.F.R. §35.130(b)(1)(i) and (ii), and use methods of administration that have the purpose or effect of discriminating against GNETS students, *see* 28 C.F.R. §35.130(b)(3)(ii) – do not require identifying reasonable accommodations, and thus Defendants' arguments to the contrary are irrelevant.

---

[8] As this Court has previously noted, "[T] he same standards govern discrimination claims under the ADA and the Rehabilitation Act." ECF No. 77 at 7, *citing Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000). Accordingly, Plaintiffs will reference only the ADA or Title II when discussing claims that also arise under Section 504.

Second, Plaintiffs do not – as Defendants wrongly argue – "bear the burden" of identifying an accommodation "that is not only effective but reasonable." Defs.' Brief at 28. In order to establish a prima facie case under the integration mandate and *Olmstead*, Plaintiffs need only show that integrated services are appropriate and are not opposed. *Olmstead*, 527 U.S. at 607.[9] Nothing in the language of the *Olmstead* decision or subsequent cases requires that Plaintiffs, as part of their prima facie case, bear the burden of proving that a modification is both effective and reasonable, as Defendants claim.

Some courts have indicated that, as part of the prima facie case, a plaintiff should identify a proposed modification that is reasonable or plausible. *See Frederick L. v. Dep't. of Pub. Welfare*, 364 F.3d 487, 492 n.4 (3d Cir. 2004) ("articulating a reasonable accommodation" that would allow persons with disabilities to avoid unnecessary institutionalization); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003) ("the existence of a plausible accommodation"). Plaintiffs have identified multiple reasonable or plausible modifications Defendants could make, including an increase in the amount and intensity of therapeutic services and supports that Defendants already provide to students with disability-related behavioral issues, to eliminate the unnecessary segregation of

---

[9] Plaintiffs address Defendants' arguments regarding appropriateness and opposition in Section II.B.3, below.

GNETS students. *See, e.g,* Campbell Report [ECF No. 188-61] at 22-23; Elliott Report [ECF No. 188-10] at 19-20; 24.

Third, Defendants assert that "Plaintiffs failed to conduct any cost or workforce study as *Olmstead* requires to help determine whether the proposed accommodations are reasonable." This argument gets the law exactly backwards. Plaintiffs in *Olmstead* cases do not need to prove, as part of their prima facie case, how much it would cost to implement the modifications sought or whether and how such modifications will impact workforce capacity. Such issues are defenses to *Olmstead* claims, and it is Defendants who have the burden of proving that the relief Plaintiffs seek would fundamentally alter the nature of Defendants' services, programs, or activities. *See Olmstead*, 527 U.S. at 603-06; *Frederick L.*, 364 F.3d at 492 n.4; *Henrietta D.*, 331 F.3d at 280-81. *See also Haddad v. Dudek*, 784 F. Supp.2d 1308, 1329 (M.D. Fla. 2011) (where a plaintiff on a waiver waitlist sought immediate community-based services to avoid institutionalization, the Court denied defendant's motion for summary judgment asserting a fundamental alteration defense and found no shortcomings in plaintiff's requested modification).[10]

---

[10] In any event, Defendants have failed to assert the affirmative defense of fundamental alteration. *See* Defendants' Answer [ECF No. 91] at 2-4 (listing 11 affirmative defenses). An affirmative defense not pleaded in a defendant's answer is waived. *Keybank Nat'l Ass'n v. Hamrick*, 576 F. App'x 884, 888 (11th Cir.

## 2.    Defendants' Arguments Regarding Plaintiffs' Non-*Olmstead* Claims Should Be Rejected.

Defendants make a series of arguments in response to Plaintiffs' non-*Olmstead* claims. Defs.' Brief at 30-32. All lack legal merit and should be rejected.

First, Defendants' attempt to parse the meanings of "provide" and "administer" is both unconvincing and irrelevant. Defs.' Brief at 30. As demonstrated in Plaintiffs' Memorandum and discussed again in Section II.A, above, Defendants administer the GNETS program, which, as Plaintiffs' evidence shows, unnecessarily segregates students with disability-related behaviors and denies them equal educational opportunity. *See, e.g.*, Elliott Report at 1-3; 19-24; 24-26; Campbell Report at 1; 13-21. Defendants' contrary arguments, based on strained and conclusory legal interpretations, are unpersuasive.

Defendants next argue that Plaintiffs' claims are an attempt to impose an impermissible "standard of care" regarding the quality of services provided to GNETS students. *See Olmstead*, 527 U.S. at 603 n.14. On the contrary, Plaintiffs' non-*Olmstead* ADA claims relate to Defendants' failure to provide GNETS students with equal educational opportunities compared to their non-disabled peers. *See* Elliott Report at 2-3; 24-26. Consistent with the requirements of the

---

2014); *Branch Banking & Tr. Co. v. Morgan*, 2017 WL 635119, at *2 (N.D. Ga. Feb. 15, 2017).

ADA, Plaintiffs do not seek "best" or "equal" outcomes for GNETS students compared to their non-disabled peers, but only equal opportunities. Such equality of opportunity is at the core of the ADA's non-discrimination mandate, and Defendants' attempt to argue otherwise must be rejected.

Defendants further argue that "Plaintiffs have not identified a 'method of administration' that causes the alleged harm" or "produced competent evidence that the criteria set forth in the GNETS Rule has the 'purpose or effect' of discrimination."[11] Defs.' Brief at 31. Plaintiffs have come forward with significant evidence to the contrary. For example, Plaintiffs' expert Kimm Campbell identified several policies and practices of Defendants that have led to the unnecessary segregation of GNETS students, including: 1) Defendants' failure to make better use of available resources, especially by more effectively leveraging Medicaid funding, to increase the availability of services that help children with disability-related behaviors avoid unnecessary segregation; and 2) Defendants' failure to reform and/or restructure their System of Care so that its benefits extend to all children with disability-related behaviors, including those currently being served in GNETS. Campbell Report at 22-23; *see also* Elliott Report at 12-13; 18-19 (describing Defendants' failure to effectively implement accepted approaches to

---

[11] Defendants provide no legal authority or other support for their apparent position that Plaintiffs' methods of administration claim relates only to the contents of the GNETS Rule, GA. COMP. R. & REGS. § 160-4-7-.15. No such limitation exists.

improve student behavior, provide necessary individualized services to support students with disability-related behavior, and properly train and support classroom teachers and others assisting GNETS students). In short, Defendants' arguments regarding the methods of administration claim do not withstand scrutiny.

Finally, Defendants seek to dismiss Plaintiffs' non-*Olmstead* ADA claims as nothing more than "repackaged IDEA claims." Defs.' Brief at 31. As the Supreme Court has made clear, however, the IDEA is not the only statute relevant to protecting the rights of students with disabilities. In *Fry v. Napolean County Schools*, 580 U.S. 154 (2017), the Court held that the non-discrimination requirements of Title II of the ADA and Section 504 also apply in the school context.

> [T]he IDEA guarantees individually tailored educational services, while Title II and § 504 promise[s] non-discriminatory access to public institutions for people with disabilities of all ages. That is not to deny some overlap in coverage: The same conduct might violate all three statutes.

*Id*. at 155-56.

This Court has previously found that "stigmatization is the gravamen of [Plaintiffs'] complaint," ECF No. 77 at 30, and the support for that conclusion has only grown stronger as this case has proceeded. As already discussed above, Plaintiffs have produced significant evidence in support of their non-*Olmstead* claims. Although Defendants seek to limit the Court's finding regarding the

gravamen of the Complaint to Plaintiffs' *Olmstead* claim, no such limitation appears in the Court's opinion. In addition, Defendants' actions leading to Plaintiffs' claims regarding methods of administration and the denial of unequal educational opportunities are directly related and contribute to the unnecessary segregation challenged in Plaintiffs' *Olmstead* claim. Accordingly, this Court's prior finding that "stigmatization is the gravamen of [Plaintiffs'] complaint," remains valid and is consistent with other cases allowing ADA and other civil rights claims even though they arose in the school context and implicate educational issues. *See J.S., III v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979 (11th Cir. 2017) (Title II *Olmstead* claim); *Doe v. Dallas Ind. Sch. Dist.*, 941 F.3d 224, 227 (5th Cir. 2019) (Title IX claim).

Since Defendants' legal arguments regarding Plaintiffs' non-*Olmstead* arguments lack legal merit, and, at a minimum, Plaintiffs have identified disputes of material fact, Defendants are not entitled to summary judgment on these claims.

### 3. Defendants' Arguments Regarding Plaintiffs' *Olmstead* Claim Should Be Rejected.

Defendants make three additional arguments specific to Plaintiffs' claim that GNETS students are unnecessarily segregated (what Defendants describe as Plaintiffs' "*Olmstead* Claim"). All lack legal merit and should be rejected by this Court.

First, Defendants assert that "the integration mandate represents an improper expansion of the ADA's text." Defs.' Brief at 32.[12] In addition to lacking legal merit, this argument is irrelevant since Plaintiffs do not, as Defendants wrongly state, "cite the integration regulation as the basis of liability." Defs.' Brief at 33. Plaintiffs instead base their unnecessary segregation claim solely on Title II of the ADA. Count I of Plaintiffs' Complaint [ECF No. 1], which includes the unnecessary segregation claim, contains the heading "VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12131 et seq." and makes no reference to 28 C.F.R. §35.130(d). *Id*. at 42.

Plaintiffs' reliance on Title II is consistent with the Supreme Court's *Olmstead* decision, which is based solely on the language of Title II, including the meaning of "discrimination." *Olmstead*, 527 U.S. at 587 ("[t]his case concerns the proper construction of the anti-discrimination provision contained in [Title II]"); 588 ("[m]indful that it is a statute we are construing…"); 589 ("[t]his case concerns Title II…"); 607 ("we conclude that, under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities…"). Plaintiffs' claim relies on the core holding of *Olmstead*, i.e., that

---

[12] Defendants use the term "integration mandate" to refer specifically to 28 C.F.R. §35.130(d), which states: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."

the unnecessary segregation of people with disabilities constitutes discrimination under Title II, and thus the validity of the integration mandate contained in 28 C.F.R. §35.130(d) is irrelevant.

In addition to being irrelevant, Defendants' argument that §35.130(d) is an "improper expansion" of the requirements of Title II also is wrong as a matter of law. Defendants' analysis mistakenly focuses on the meaning of the words "administer" and "provide." Defs' Brief at 33-34. The correct legal question is whether §35.130(d) is a valid interpretation of Title II's prohibition on "discrimination." Despite claiming that the question of the regulation's validity "is not a difficult one," Defs.' Brief at 33, Defendants do not cite any case in the nearly 25 years since *Olmstead* was decided finding §35.130(d) an unreasonable or invalid interpretation of Title II.

Plaintiffs' integration claim is based solely on Title II. Thus, this Court need not address Defendants' argument, regardless of its merit, that 28 C.F.R. §35.130(d) is an invalid or unreasonable interpretation of the statute.

Second, Defendants argue that Plaintiffs' unnecessary segregation claim should fail because "no treatment professional has determined that those already or at risk of being referred by local officials for GNETS services could appropriately

be served in the more integrated settings." Defs. Brief at 32.[13] Defendants rely

heavily on *United States v. Florida*, 938 F.3d 1221 (11th Cir. 2019), in support of

their position. But the point of dispute in that case was whether the United States

Department of Justice can bring an action to enforce the requirements of Title II,

*id*. at 1225, not what the elements of a valid *Olmstead* claim are generally, or who

must make a determination of appropriateness for integrated settings specifically.

The language Defendants claim "removes any doubt," Defs.' Brief at 35, is nothing

more than a summary of the *Olmstead* decision. It is certainly not a holding by the

Eleventh Circuit that an *Olmstead* claim fails unless a "state's treatment

professional" – and only a state's treatment professional – determines that the

plaintiffs are appropriate for integrated settings.

Defendants ignore the numerous post-*Olmstead* cases holding that a

determination of appropriateness from a treating professional is not a prerequisite

to prevailing on an unnecessary segregation claim. *See, e.g., Day v. District of*

---

[13] Defendants' position on this issue has been inconsistent. Here, Defendants first
state that a "treatment professional" must determine appropriateness. Defs. Brief at
32. Defendants then argue that only a "*State's* treatment professional" must be
involved. Defs. Brief at 35 (emphasis added). *In United States of America v. State
of Georgia*, Civil Action No. 1:16-cv-03088- ELR (N.D. Ga.), where the same
issue is currently being litigated, Defendants first argued that only a state treating
*physician* can make the determination, a position that the Court rejected. *Id*., ECF
No. 53 at 8-9; ECF No. 61 at 14-16 (emphasis added). In their recently filed brief
in support of their Motion for Summary Judgment, Defendants assert that only a
"*responsible*, treating physician" can make the determination. *Id*., ECF No. 429-1,
at 20 (emphasis added).

*Columbia*, 894 F. Supp.2d 1 (D.D.C. 2012) ("although the Court

in *Olmstead* noted that a State 'generally may rely on the reasonable assessments

of its own professionals,' it did not hold that such a determination was required to

state a claim" (citation omitted)); *Disability Advocates, Inc. v. Paterson*, 653 F.

Supp.2d 184, 258-59 (E.D.N.Y. 2009), *vacated on other grounds sub nom*.

*Disability Advocates., Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675

F.3d 149, 162 (2d Cir. 2012) (requiring a determination by treating professionals,

who are contracted by the State, "would eviscerate the integration mandate" and

"condemn the placements of [individuals with disabilities] to the virtually

unreviewable discretion" of the State and its contractors); *Long v. Benson*, 2008

WL 4571904, at *2 (N.D. Fla. 2008) (a State "cannot deny the [integration] right

simply by refusing to acknowledge that the individual could receive appropriate

care in the community. Otherwise the right would, or at least could, become

wholly illusory."); *Joseph S. v. Hogan*, 561 F. Supp.2d 280, 291 (E.D.N.Y. 2008)

(rejecting argument that *Olmstead* requires that state mental health professionals be

the ones to determine that an individual's needs may be met in a more integrated

setting); *Frederick L. v. Dep't. of Pub. Welfare*, 157 F. Supp.2d 509, 539-40 (E.D.

Pa. 2001) (rejecting argument that *Olmstead* "require[s] a formal recommendation

for community placement."). *See also United States of America v. State of*

*Georgia*, 461 F. Supp. 3d 1315, 1324 (N.D. Ga. 2020).

Defendants also ignore cases and other authority that show the different ways, other than opinions from state treatment professionals, to demonstrate that segregated persons with disabilities can be appropriately served in integrated settings. *See e.g.*, *Radaszewski v. Maram*, 383 F.3d 599, 612–13 (7th Cir. 2004) (plaintiff's allegations that he had lived and received services at home for years demonstrated appropriateness); *Disability Advocates, Inc.,* 653 F. Supp. at 245-46 (evidence that individuals with similar disabilities were living and receiving services in integrated settings demonstrated appropriateness); *see also* U.S. Department of Justice, Statement of Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (2011) at 4 ("the ADA and its regulations do not require an individual to have had a state treating professional make such a determination . . . This evidence may come from their own treatment providers, from community-based organizations that provide services to people with disabilities outside of institutional settings, or from any other relevant source. Limiting the evidence on which *Olmstead* plaintiffs may rely would enable public entities to circumvent their *Olmstead* requirements by failing to require professionals to make recommendations regarding the ability of individuals to be served in more integrated settings.").

In addition, Defendants' claim that a "State's treatment professional" must make the decision regarding appropriateness of integrated settings is at odds with the process that Defendants admit is used in determining whether a student will be placed in GNETS. An IEP Team is not a "treatment professional." IEP Teams include parents, teachers, other relevant individuals, and the child where appropriate. 20 U.S.C. § 1414(d)(1)(B). In addition, the GNETS Rule requires that for any IEP Team meeting at which a GNETS placement will be considered, "[t]he IEP meeting will include a GNETS director or his/her designee." GA. COMP. R. & REGS. § 160-4-7-.15(3)(b). Even assuming a "treatment professional" is part of the IEP Team, that person will not be the sole decision maker regarding the student's placement. It is illogical for Defendants to argue that the law requires that a "State's treatment professional" make the determination of appropriateness for an integrated setting when, as a factual matter, a team including teachers, school officials, parents, and a GNETS director or designee typically makes that determination by reaching a consensus of its members.

At a minimum, Plaintiffs have shown materials facts are in dispute regarding whether GNETS students can be appropriately served in more integrated settings. *See Disability Advocates, Inc.*, 653 F. Supp.2d at 257-59 (plaintiff "not required to show that each of its constituents had been deemed eligible for supported housing by a treatment provider" and crediting "persuasive evidence from a variety of

sources" that plaintiff's constituents could receive services in the community, including assessments by plaintiff's experts that "virtually all" constituents could be served in community settings."). Plaintiffs have produced evidence from experts that the "vast majority" of GNETS students are unnecessarily segregated and could be educated in more integrated settings if Defendants provided appropriate services. *See* Elliott Report at 1; 19-24; 29; *see also* Campbell Report at 1; 13-15; 21. Accordingly, for the legal and factual reasons set forth above, Defendants' arguments regarding appropriateness of integrated placements should be rejected.

Third, and finally, Defendants claim they are entitled to summary judgment because "the Plaintiffs have provided no evidence of systemic non-opposition." Defs.' Brief at 32-33. Defendants' one-paragraph argument on this point provides no persuasive legal or factual support for their position.

Explicit statements are not the standard for determining whether individuals (in this case, primarily parents of GNETS students) do not oppose more integrated settings nor does the absence of such statements create an inference that the individual opposes an integrated placement. *See Messier v. Southbury Training Sch.*, 562 F. Supp.2d 294, 337 (D. Conn. 2008) ("[D]efendants cannot establish compliance with the integration mandate by showing that class members never requested community placement.").

> The relevant question is whether service recipients with disabilities would choose community-based services if they were actually

> available and accessible … not whether persons with disabilities (or,
> in this case, their parents or guardians) would accept discharge to the
> community today, with inadequate access to community-based
> services. If the latter were the case, it would defeat the purpose of the
> integration mandate.

*United States v. Florida*, 2023 WL 4546188, at *47 (S.D. Fla. July 14, 2023),

*appeal filed*, No. 23-12331 (11th Cir.), *citing Kenneth R. v. Hassan*, 293 F.R.D.

254, 270 n.6 (D.N.H. 2013) ("[T]he *meaningful* exercise of a preference will be

possible only if an adequate array of community services are available....")

(emphasis in original); *Disability Advocates, Inc.*, 653 F. Supp.2d at 263 (people

reporting "a preference to move out of their adult home is merely 'a floor' with

regard to who would truly be willing to move if given" information and support in

making a "true choice"); *Messier*, 562 F. Supp.2d at 332-34, 339-42 (finding

plaintiffs not opposed to community services where guardians expressed "interest"

in, or would consider, community placement).

In addition, Defendants ignore the evidence of record regarding opposition

to GNETS placements. For example, D.J., the parent of Plaintiff W.J., made clear

at his deposition that he wants W.J. returned to a zoned school:

> Q.    And when you say "pushed into GNETS," can you clarify what
>       you mean by that?
>
> A.    At the time of his transition, *it is my understanding that we
>       didn't have a real choice*.

* * *

Q.  Okay. At the time did you agree to W.J.'s GNETS placement?

A.  At the time, *with the information I had*, I did agree.

Q.  Do you still agree with W.J.'s placement in GNETS?

A.  No.

* * *

Q.  Yes. Is there anything you like about Harrell Learning Center [W.J.'s GNETS placement]?

A.  There is nothing I like about Harrell Learning Center.

* * *

Q.  In your opinion would W.J. be more successful if he was placed back in a general education setting?

A.  Yes.

Deposition of D.J. [ECF No. 232] at 24:14-17 (emphasis added); 53:15-21

(emphasis added); 55:17-20; 57:23-58:1. *See also* Deposition of R.G. [ECF No.

234] at 44:11-45:12; 52:18-23; 55:12-15; 60:4-12; Deposition of J.A., [ECF No.

233] at 56:12-21; 63:13-19; 67:5-10.

Where, as in this case, appropriate integrated services are not available, the

alleged "choice" to enter or remain in a segregated setting does not constitute a

meaningful choice to "oppose" integrated services as contemplated by *Olmstead* or

Title II. *See, e.g.*, *Olmstead*, 527 U.S. at 593, 603 (plaintiff E.W. refused

inappropriate discharge from institutional setting to a homeless shelter and

remained institutionalized, and the Court held that EW did not oppose community integration); *Messier*, 562 F. Supp.2d at 331, 342 (considering the actual availability of placement opportunities as relevant evidence to determining whether guardians had made an informed choice to oppose community placement).

Accordingly, because Defendants' legal arguments are meritless and, at a minimum, Plaintiffs have established that material facts remain in dispute regarding their claims under Title II and Section 504, Defendants' Motion for Summary Judgment on those claims should be denied.

## III. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT OF PLAINTIFFS' EQUAL PROTECTION CLAIM.

Defendants argue that they do not intentionally segregate students in GNETS. The State does not, because it cannot, contest that GNETS facilities segregate students. According to Plaintiffs' expert Judy Elliott, 62% of GNETS students are placed in a GNETS center, which is a self-contained facility separate from a zoned school that only GNETS students attend. Elliott Report [ECF No. 188-10] at 20. Approximately 38% are placed in GNETS satellite classrooms, which are contained in separate wings in zoned schools apart from where non-GNETS

students are educated.[14] *Id*. Some GNETS centers are located behind barbed wire.[15]

Likewise, Defendants do not, because they cannot, contest that segregation in GNETS facilities violates the Equal Protection Clause. *See, e.g., Brown v. Board of Education of Topeka*, 347 U.S. 483, 495 (1954) ("Separate educational facilities are inherently unequal."). Instead, Defendants argue their discrimination is unintentional because their GNETS policy regulations are facially neutral. Defs.' Brief at 36-39.

This Court has already rejected this argument once, *see* ECF No. 123 at 30-31 ("[t]he Court agrees that [the GNETS] policy is facially discriminatory"), and its prior holding remains correct. The GNETS Rule applies, on its face, "to students with disabilities, ages 5-21." GA. COMP. R. & REGS. § 160-4-7-.15(2)(a). The GNETS Rule also treats students with disabilities differently from students without disabilities. It required that the GNETS program provide "comprehensive educational and therapeutic support services" to students with disabilities "with greater intensity and frequency than what is typically delivered in a general

---

[14] Dr. Elliott also found that GNETS students receive inferior teaching and instruction in inadequate facilities that do not provide resources routinely available to students without disabilities. Elliott Report at 3; 18-19; 24-26.

[15] As Dr. Elliott stated in her report, "[t]he centers are more like institutions than schools. The centers I visited were fenced in, *some with barbed wire*, and some had police cars and officers on site. Indeed, both outside and inside, most have the feel of juvenile corrections facilities." Elliott Report at 3 (emphasis added).

education school environment" in facilities "staffed to meet the needs of a unique population of students." *Id.* § (2)(a-c). This language is facially discriminatory because, as the Court previously explained, "[b]ut for these students' disabilities, they would not be segregated into GNETS." ECF No. 123 at 30; *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) (a policy is facially discriminatory if it cannot survive the "but-for" test; that is, if "the evidence shows treatment of a person in a manner which but for that person's [protected characteristic] would be different"). And while the GNETS Rule's goals might sound laudable, "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Id.* at 200.

Defendants argue that the Court's prior holding was mistaken because "not all students with behavior-related disabilities are referred to the GNETS Program," Defs.' Brief at 38, but this misses the point. Although the GNETS Rule does not shunt all disabled students into GNETS centers with "the feel of juvenile corrections facilities," Elliott Report at 3, under the GNETS Rule a student without a disability will never be condemned to one. *See* GA. COMP. R. & REGS. § 160-4-7-.15(2)(a). This is facial discrimination – the GNETS Rule does not treat disabled and non-disabled students the same way. *Cf. Johnson Controls, Inc.*, 499 U.S. at 199 ("Johnson Controls' policy is not neutral because it does not apply to the

reproductive capacity of the company's male employees in the same way as it applies to that of the females.").

Finally, Defendants suggest in a footnote that, in light of *Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019), the Court should revisit its prior holding that *Hispanic Interest Coalition of Alabama v. Governor of Alabama*, 691 F.3d 1236 (11th Cir. 2012) ("*HICA*") subjects the GNETS Rule to heightened scrutiny. But *Estrada* is inapposite because, as Defendants admit, it "decline[d] to extend heightened scrutiny to a classification that allegedly burdens *postsecondary education*." *Estrada*, 917 F.3d at 1310 (emphasis added). In contrast, the issue in both *HICA* and this case is "whether the state statute 'significantly interferes with the exercise of the right to an *elementary public education* as guaranteed by *Plyer [v. Doe,* 457 U.S. 202 (1982)].'" ECF No. 77 at 32 (*quoting HICA*, 691 F.3d at 1244). Accordingly, "the heighted scrutiny warranted in *HICA* is also warranted here." ECF No. 77 at 33. As Defendants have not shown a substantial interest in segregating students with disabilities in centers with "the feel of juvenile corrections facilities," Elliott Report at 3, and other locations, Plaintiffs are entitled to take their Equal Protection claim to trial.[16]

---

[16] Defendants assert that "if the GNETS Rule is facially discriminatory, then so is the IDEA." Defs.' Brief at 38. In this, it is correct. The IDEA is facially discriminatory because it treats students with disabilities differently than students without disabilities. But no one here is arguing that the IDEA does not further a substantial state interest.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs have demonstrated that Defendants

arguments in support of their Motion for Summary Judgment lack legal merit. In

addition, at a minimum, Plaintiffs also have established that a dispute of material

fact exists regarding Plaintiffs' claims under Title II of the ADA, Section 504 of the

Rehabilitation Act, and the Equal Protection Clause. Accordingly, Defendants'

Motion for Summary Judgment should be denied.

Dated:  January 15, 2024                Respectfully submitted,

  */s/ Jessica C. Wilson*
**DLA PIPER LLP (US)**
Jessica C. Wilson (GA #231406)
33 Arch Street, 26th Floor
Boston, MA 02110-1447
Tel. 617-406-6000
Fax 617-406-6100
jessica.wilson@us.dlapiper.com

Christopher G. Campbell (GA #789533)
One Atlantic Center
1201 West Peachtree Street, Suite 2800
Atlanta, Georgia 30309-3450
Tel. 404-736-7800
christopher.campbell@usdlapiper.com

**CENTER FOR PUBLIC
REPRESENTATION**
Mark J. Murphy (*Pro Hac Vice*)
5 Ferry Street #314
Easthampton, MA 01027
Tel. 413-586-6024
mmurphy@cpr-ma.org

**BAZELON CENTER FOR
MENTAL HEALTH LAW**
Ira A. Burnim (*Pro Hac Vice*)
1101 15th Street, N.W., Suite 1212
Washington, D.C. 20005
Tel. 202-467-5730
irabster@gmail.com

**GEORGIA ADVOCACY OFFICE**
Devon Orland (GA #554301)
1 West Court Square
Decatur, GA 30030

**GOODMARK LAW FIRM**
Craig Goodmark (GA #301428)
1425 A Dutch Valley Place
Atlanta, GA 30324
404-719-4848
cgoodmark@gmail.com

*Counsel for Plaintiffs The Georgia
Advocacy Office, The Arc of the United
States, R.F., C.S., and Q.H.*

**THE ARC OF THE UNITED STATES**
Shira Wakschlag (*Pro Hac Vice*)
1825 K Street, N.W., Suite 1200
Washington, D.C. 20006
202-534-3708
wakschlag@thearc.org

*Counsel for Plaintiff The Arc of the
United States*

## **L.R. 7.1(D) CERTIFICATION**

I certify that Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment has been prepared with one of the fonts and point selections approved by the Court in Local Rule 5.1(C). Specifically, this document has been prepared using 14-point Times New Roman font on this 15th day of January 2024.

*/s/ Jessica C. Wilson*
Jessica C. Wilson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment with the Clerk of Court using the CM/ECF system on this 15th day of January 2024.

<u>/s/ Jessica C. Wilson</u>
Jessica C. Wilson
