# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

The Georgia Advocacy Office, et al.,

        Plaintiffs,

v.                                 Case No. 1:17-cv-3999-MLB

State of Georgia, et al.,

        Defendants.

_____/

## **OPINION & ORDER**

Advocacy organizations for individuals with disabilities and students with disabilities sued the State of Georgia and public officials in Georgia for violating federal law based on their operation of the Georgia Network of Educational and Therapeutic Support ("GNETS"). (Dkt. 1.) Defendants move for summary judgment. (Dkt. 214.) Plaintiffs oppose. (Dkt. 242.) Concluding Plaintiffs lack standing to bring their claims, the Court grants Defendants' motion.

## I.    Background[1]

### A.    Overview and Selection into GNETS

Like nearly all states, Georgia fulfills its obligation to provide students a free and appropriate public education through public schools.[2] Most students are educated in a traditional classroom setting with traditional teacher-student interaction.  Students with disabilities may need additional resources or accommodations.  Georgia law requires local school districts to "provide" special education services to those students to ensure they obtain the required education.  O.C.G.A. §§ 20-2-152(b), 20-2-50.   As part of this, each local school board must create an Individualized Education Program ("IEP") to outline the additional resources or accommodations it will provide each student to ensure each receives the necessary education.  Ga. Comp. R. & Regs. 160-4-7-.06.  A student's IEP team (which includes the student's parents, a regular educator familiar with the child, a special education teacher familiar

---

[1] When citing deposition testimony, the Court cites the page of the deposition transcript rather than the CM/ECF pagination.  Otherwise, the Court cites the CM/ECF page for each docket entry it references.

[2] This required educational standard is set in the Individuals with Disabilities in Education Act ("IDEA").  20 U.S.C. § 1400 *et seq.*

with the child, and other local officials) establishes a program for that child. *Id.* The program must include (among other things) a statement of the special and supplemental educational services and aids the school will provide the child, any accommodations "that are necessary to measure the academic achievement and functional performance of the child," and "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the nonacademic and extracurricular activities." *Id.* The hope is that these students can receive an education (with accommodations or adjustment) in traditional classrooms.

Some children suffer from such severe social, emotional, or behavioral challenges that they cannot obtain the necessary education in the traditional school environment. Many years ago, Georgia established the GNETS program to provide resources to local school districts for use in educating those students in a different setting without requiring residential or more restrictive placement. (Dkt. 191-1 at 31); Ga. Comp. R. & Regs. 160-4-7-.15(2)(a). Most GNETS students receive their education in one of two environments: GNETS centers (that is, self-contained facilities separate from general education schools that only

GNETS students attend) or GNETS school-based locations (that is, classrooms exclusively for GNETS students but located in general education schools).  (Dkt. 263-1 ¶ 6); Ga. Comp. R. & Regs. 160-4-7-.15(4)(c).  The GNETS "continuum of services by environment" ranges from "[s]ervices provided in the general education setting in the student's Zoned School or other public school" to "[s]ervices provided in a facility dedicated to GNETS for the full school day," with options in between, including separating students for only part of the school day.  *Id.*  This means, even when in GNETS, some students can still receive instruction in their zoned schools.  Other GNETS students may be segregated for the entire school day—either in GNETS centers or GNETS classrooms in their zoned schools.

A student receives GNETS services only if his or her IEP team determines those services are necessary for the student to receive an appropriate education because educational services in a lesser restrictive environment have failed.  *Id.* 160-4-7-.15(4)(a).  Local school districts are also responsible for monitoring GNETS students and transitioning them back into traditional classrooms when they no longer need GNETS services.  *Id.* 160-4-7-.15(5)(b)(8) (charging local school districts with

"monitor[ing]" the student IEPs to "determine students' progress and access to services in a lesser restrictive environment").

Georgia has 24 regional GNETS programs to cover its 181 public schools. (Dkt. 263-1 ¶ 2.) Each regional program has a person who serves as a regional director and a local school district (or a collective of local school districts) that serves as the fiscal agent. (Dkt. 263-1 ¶¶ 3–4); O.C.G.A. § 20-2-270.1.

## B.   Alleged Problems with GNETS

Plaintiffs broadly allege GNETS encourages unnecessary segregation of students who could receive the required education in a less restrictive environment. They contend "the students placed in GNETS do not need to be there." (Dkt. 1 ¶ 9.) According to Plaintiffs, "[t]he State does not provide local school districts necessary funding to provide needed disability-related behavioral services in zoned schools" and instead "consolidate[s] the majority of its funding for these services in GNETS." (Dkt. 1 ¶ 11.) "As a result," Plaintiffs contend, "local school districts have little incentive and few resources to provide the services necessary to educate children with disability-related behavioral needs in their zoned schools." (*Id.*) In other words, Plaintiffs say that, by creating

and funding GNETS separate and apart from local school districts, the State created a system that encourages school districts to segregate children with disabilities into GNETS as the "most convenient" or only option. (Dkt. 1 ¶ 10.)  Plaintiffs say that, instead of funding GNETS, the State should allocate enough money so all local school districts can educate all children (even those with severe disabilities) in their zoned schools.

Plaintiffs further allege that, once in GNETS, students lack access to libraries, cafeterias, gyms, science labs, music rooms, and playgrounds; instruction in GNETS schools and classrooms is not rigorous and relies too much on instruction through computers rather than through teachers; electives are sparse; and GNETS teachers and support staff often improperly restrain students to control their behavior.  (Dkt. 1 ¶¶ 94, 100–109.)   Plaintiffs also allege GNETS is harmful and stigmatizing because GNETS students are physically separated from other students either because they enter a general school building in separate entrances or because they are housed in different buildings entirely.  (Dkt. 1 ¶¶ 5, 90, 97.)

Plaintiffs—three children (represented by their parents) who are

6

currently or were previously enrolled in GNETS and two advocacy groups whose constituents are GNETS students and those at risk of being placed in GNETS—sued Defendants, claiming their operation of GNETS violates the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973, and the Equal Protection Clause of the Fourteenth Amendment.  Plaintiffs seek to represent a class of "[a]ll students who are now (or in the future will be) in GNETS or at serious risk of being placed in GNETS."  (Dkt. 187-1 at 7.)  Plaintiffs say "a student is 'at serious risk' of being placed in GNETS if the student has been referred to GNETS."  (*Id.*)  So, there are three categories of GNETS students at issue here: named Plaintiff students W.J., C.R., and J.F., non-named Plaintiff students who are in GNETS represented by the organizational Plaintiffs, and non-named Plaintiff students who are at risk of being placed in GNETS also represented by the organizational Plaintiffs.  Plaintiffs seek a declaration that Defendants are violating the rights of the named Plaintiffs and putative class under the ADA, Rehabilitation Act, and Fourteenth Amendment; an injunction requiring Defendants to provide the named Plaintiffs and putative class "the services necessary to ensure them equal educational opportunity in

classrooms with their non-disabled peers" (in other words, an end to the segregation of any students in GNETS); and attorneys' fees.  (Dkt. 1 at 47.)

### C.   Procedural History

Defendants previously moved to dismiss.  (Dkt. 46.)  The Court denied that motion, holding all Plaintiffs' claims survived.  (Dkt. 77.) After filing an answer, Defendants moved for judgment on the pleadings. (Dkt. 98.)  The Court denied that motion, too.  (Dkt. 123.)  The parties engaged in discovery, and Defendants now move for summary judgment. (Dkt. 214.)[3]

## II.   Legal Standard

Summary judgment is appropriate when "the movant shows that

---

[3] Plaintiffs also filed a motion for class certification and a cross-motion for summary judgment on the issue of whether there is evidence Defendants "administered" GNETS in such a way that might make them liable under the ADA and Rehabilitation Act. (Dkts. 187; 188.)  Because the Court concludes Defendants are entitled to summary judgment, Plaintiffs' motions are moot.  The arguments raised by those motions, however, are pertinent to many of the issues raised in Defendants' summary judgment motion.  Accordingly, the Court relies on some of the arguments the parties make in support of those other motions.   In addition, Defendants filed unopposed motions to seal Plaintiffs' experts' reports pursuant to the parties' protective order "as they contain information protected under the Family Education Rights and Privacy Act." (Dkts. 207; 210.)  The Court grants those motions.

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). The nonmoving party then has the burden of showing summary judgment is improper by coming forward with "specific facts" demonstrating a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Salinero v. Johnson & Johnson*, 995 F.3d 959, 964 (11th Cir. 2021).

## III.  Discussion

"Article III of the Constitution limits federal courts to adjudicating actual 'cases' and 'controversies.'" *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019). The doctrine of standing "constitutes the core of Article III's case-or-controversy requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998). Article III standing requires three elements: (1) a concrete,

particularized, and actual or imminent injury in fact that is neither conjectural nor hypothetical; (2) the injury is fairly traceable to the actions of the defendant; and (3) the court can redress the injury through a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Defendants say the evidence shows, as a matter of law, Plaintiffs lack standing to bring their claims. (Dkt. 214-1 at 13.)

## A. Injury in Fact

Injury in fact is "the 'first and foremost' of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). This requirement ensures a plaintiff has a "personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014). To meet this requirement, an injury must be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "When a plaintiff seeks prospective relief to prevent a future injury, [he or she] must establish that the threatened injury is certainly impending." *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1280 (11th Cir. 2020).

Defendants say Plaintiffs fail to establish an injury in fact for three reasons: (1) Plaintiffs have not shown they experienced individualized discrimination, making their alleged injuries conjectural rather than particularized, actual, and concrete; (2) Plaintiffs identify no "specific services that [Defendants] provide non-disabled students and denied to" Plaintiffs; and (3) the mere risk of being placed in GNETS is not an actual or imminent injury.  (Dkt. 214-1 at 14–22.)  Plaintiffs say "their experts' substantial review of student records, extensive site visits, and classroom observations of GNETS students, have presented significant evidence of harm in the form of unnecessary segregation and unequal educational opportunities."  (Dkt. 242 at 3.)  They also contend the evidence shows at least the "vast majority" of GNETS students have suffered discrimination because of their disabilities.  (Dkt. 242 at 6.)

### 1.   *Olmstead* **Claims**

Both "Title II of the ADA and [section] 504 of the Rehabilitation Act forbid discrimination on the basis of disability in the provision of public services."  *J.S., III by & through J.S., Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017).[4]   One of Title II's implementing

---

[4] The same standards govern discrimination claims under the ADA and

regulations—the so-called "integration mandate"—requires a "public entity [to] administer . . . programs . . . in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). This means a public entity must provide programs and services to a disabled person in a setting that allows the disabled person to interact with non-disabled persons as much as possible and, conversely, that unjustified segregation of a person constitutes discrimination based on disability. The Supreme Court explained in *Olmstead v. L.C. ex rel. Zimring* that an integration mandate claim requires a plaintiff to show three things: (1) that his or her disability does not prevent him or her from receiving treatment or services within the community at large, (2) that he or she does not oppose community-based services, and (3) the public entity can reasonably accommodate those services. 527 U.S. 581, 607 (1999); *see also United States v. Florida*, 938 F.3d 1221, 1250 (11th Cir. 2019) (describing *Olmstead*'s three elements).

This case involves the State's obligation to provide Plaintiffs a free and appropriate public education. And because Plaintiffs claim

---

the Rehabilitation Act. *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

Defendants committed statutory violations, causing them statutory injuries, the Court must examine whether the evidence shows Plaintiffs meet statutory requirements. It seems obvious that a "person would not suffer an injury (and therefore not have standing to sue) in a Title II ADA-access case unless they were unable to access a public service because of their disability"—in other words, that they suffered an actual statutory violation. *Karantsalis v. City of Miami Springs, Fla.*, 17 F.4th 1316, 1324 (11th Cir. 2021). So to establish standing, Plaintiffs must show (among other things) that, despite their disabilities, they could receive the required education in a setting less restrictive than the GNETS program into which they have been segregated. Unnecessary segregation is the issue. *Olmstead*, 527 U.S. at 604 (violation of integration mandate requires analysis of "a disabled individual's" specific ability and desire to receive community-based resources); *see also Boyd v. Steckel*, 753 F. Supp. 2d 1163, 1174 (M.D. Ala. 2010) (to succeed on *Olmstead* claim, disabled individual must provide evidence he or she "qualified for community-based services . . . i.e., that they are appropriate to meet his [or her] needs").

13

Plaintiffs rely on an expert opinion from Dr. Judy Elliott to argue the State unnecessarily segregated them into GNETS when they could have received the necessary education in their zoned schools with appropriate accommodations. (Dkt. 242 at 3–4, 6–7.)[5] To form her opinion, Dr. Elliott toured 22 GNETS sites and approximately 116 GNETS classrooms, reviewed student records for 76 disabled students enrolled in GNETS, reviewed publicly available information from state and federal websites, read various depositions taken in this case (including depositions of the Director of North Metro GNETS, the State Director of Special Education, and the named Plaintiffs' parents), and reviewed other records concerning the named Plaintiffs' education—all to determine whether the State unnecessarily segregates GNETS students and whether Defendants "deny equal education opportunities to GNETS students." (Dkt. 212-1 at 2, 5–7.)

Dr. Elliott was extremely critical of GNETS. Much of her report focuses on her belief GNETS schools do not provide the required

---

[5] Defendants moved to exclude all of Plaintiffs' experts pursuant to Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (Dkts. 211, 212, 213.) Because the Court concludes Defendants are entitled to summary judgment even considering those opinions, it declines to address the issue.

education or necessary services to disabled students. She concluded, for example, that while "students are placed in GNETS primarily due to their behavior," GNETS schools do not provide so-called Positive Behavioral Intervention and Supports or any other resources to improve students' behavior, despite saying they are committed to doing so (Dkt. 212-1 at 13–14); the individual student IEPs she reviewed "did not mention counseling, psychological services, social work services, or services provided by behavior specialists" as she would have expected for GNETS students (Dkt. 212-1 at 14); that, even when IEPs included Behavior Intervention Plans, no evidence suggested the GNETS schools were following those plans (Dkt. 212-1 at 15); that during her classroom visits she did not see any "individualized interventions focused on improving coping, behavior regulation, adaptive behavior, or interpersonal relationships" as would be necessary to educate GNETS students (Dkt. 212-1 at 16); that despite a stated mandate to "collaborate with professionals [outside of the schools] to enhance students' emotional, behavioral, and academic development," her observations and analysis showed that "the GNETS programs do not use outside professionals or agencies to provide services at anywhere near the level

that they should or in an amount that would lead to meaningful benefits for students"; (Dkt. 212-1 at 18); that GNETS teachers were not adequately trained to teach students with behavioral and mental disabilities, "taught above the [students'] cognitive and communication abilities," failed to use lesson plans or incentives to reinforce appropriate behavior, and (in her opinion) often began teaching only when she entered the classroom to observe (Dkt. 212-1 at 18–19); that GNETS students were denied educational opportunities equal to those available to their non-disabled peers, including because those students receive poorer instruction, have shorter school days leading to less instruction, and are denied access to extracurricular activities, libraries, and media rooms; and that widely accepted research confirms both the "harmful impact of segregating students with disabilities" and "the significant positive association between time spent being educated with non-disabled peers" (Dkt. 212-1 at 22–23).

Most of Dr. Elliott's findings attack the quality of the education local school districts provide GNETS students. The Court includes those allegations here to provide a complete discussion of Dr. Elliott's opinions. The Court, however, discusses them in more detail below in regard to

Plaintiffs' non-*Olmstead* claims, as these allegations are not (primarily) relevant to their *Olmstead* claim.   Dr. Elliott's opinion regarding the harmful impact of segregation—while adjacent to Plaintiffs' *Olmstead* claims—is also largely immaterial.   A plaintiff asserting an *Olmstead* claim need not show any specific harm from segregation.   The integration mandate forbids unnecessary discrimination of disabled people without requiring evidence of a harmful impact.   *See Olmstead*, 527 U.S. at 600 (recognizing "unjustified institutional isolation of persons with disabilities is a form of discrimination").

As to the issue of "unnecessary segregation," Dr. Elliott says little and provides almost no details.   She begins with the general allegation that:

> the vast majority of GNETS students can be educated along with their non-disabled peers in zoned schools if they receive appropriate educational and therapeutic services. They do not need to be segregated in separate classrooms and facilities from non-disabled peers.

(Dkt. 212-1 at 21.)   She alleges "the services [GNETS students] need to improve their behaviors are not being provided in the GNETS program . . . [and] could undeniably be provided in regular education classrooms in zoned schools."   (*Id.*)   Unfortunately, she provides no basis for this

conclusion. She explains the "entrance packets" for a GNETS student should include information explaining why "the student needs to be in GNETS to receive adequate special education," including information about the student's IEP and evidence of services delivered in a more integrated setting. (*Id.*) Only six of the 76 files she reviewed had "information to make clear why a GNETS placement was being recommended." (*Id.*) She did not say the other students did not require segregation, just that the decision was not documented. She explains GNETS has "no clear criteria for the student to transition back into the zoned school," suggesting segregation of some students continued when no longer necessary. (*Id.*) Finally, she notes that GNETS segregated most students for lunch, physical education classes and other non-academic activities. She concludes provision of those services in an integrated setting "could easily be accomplished." (Dkt. 212-1 at 22.)

As noted above, Dr. Elliott concluded "the vast majority" of GNETS students did not need to be segregated to receive the appropriate education. She did not say "none of them" need to be segregated. At her deposition, she confirmed her lack of an absolute opinion, admitting segregation may be appropriate for some students. (Dkt. 204-1 at 69–

70.)[6]   This is important because, as explained, an *Olmstead* claim requires an individual assessment of a disabled person's ability to receive services in an integrated environment.   So Dr. Elliott's general assessment that "most" disabled students or a "vast majority of them" do not require segregation into GNETS does not support standing for any particular Plaintiff.

Dr. Elliott addresses each named Plaintiff's individual circumstances.   She makes a conclusory assertion that "[t]hey were unnecessarily segregated at GNETS . . . [and] could have been educated in an integrated setting in a zoned school alongside their non-disabled peers, had they received appropriate services."   (Dkt. 212-1 at 28.)   She offers no facts or analysis to back this up.   "A party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory

---

[6] In her report, Dr. Elliott adopts the opinion of Plaintiffs' other expert (Kimm Campbell) that "nearly all students with disability-related behaviors, including GNETS students and students at risk of being placed in a GNETS program, can be served in general education settings along with their non-disabled peers."   (Dkt. 212-1 at 31.)   Again, this opinion refers to "nearly all" students—not all.   When deposed about that assertion, Campbell explained she thought the "vast majority" of GNETS students were at risk of being unnecessarily segregated.   (Dkt. 203-1 at 15–16.)

allegations." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (concluding affidavit insufficient to avoid summary judgment because expert failed to explain factual basis for opinion); *see also TocMail, Inc. v. Microsoft Corp.*, 67 F.4th 1255, 1265 (11th Cir. 2023) (expert opinion did not establish injury in fact where "expert assumed injury but offered no evidence as to injury"); *Weiss v. Standard Ins. Co.*, 672 F. Supp. 2d 1313, 1320 (S.D. Fla. 2009) ("to be probative, an expert affidavit supporting or opposing a motion for summary judgment must set forth a process of reasoning beginning from a firm foundation").

Her particular discussion of each named Plaintiff is no better.  Dr. Elliott alleges W.J.'s local school district placed him in GNETS "without a placement packet that included required and necessary information." (Dkt. 212-1 at 29.)  She does not, however, explain why that placement was unnecessary, how the district could provide the required education in an integrated setting, or suggest his family opposed GNETS placement.  She explains GNETS has failed to provide him necessary services "including skills to manage or improve his disability related behavior" and that the neglect "aggravated W.J.'s impulsivity and difficulty in social situations." (*Id.*)  This acknowledges W.J.'s behavioral

problems and need for additional services (that are not being provided). But that does not go to unnecessary segregation.  To establish W.J. suffered that *Olmstead* injury, Dr. Elliott would have to explain his disabilities, how they manifest in the classroom setting, and how the school district could provide accommodations to enable him to receive the necessary education in a less restrictive setting.  She must engage in some discussion of his specific disabilities and available accommodations to explain why a prior segregation decision was inappropriate given those disabilities, what accommodations could be provided to allow the school district to provide the necessary education in a less restrictive setting, or how future segregation would be unnecessary.  At the very least, Dr. Elliott would have to aver she has considered those issues and determined segregation in GNETS is not necessary.[7]  Absent some discussion like that, Dr. Elliott's opinion does not show W.J. suffered unnecessary segregation.  *United States v. Mississippi*, 82 F.4th 387, 394 (5th Cir. 2023) (whether disabled individual can receive community-

---

[7] Notably, Dr. Elliott does not directly say W.J.'s placement in GNETS was unnecessary like she does with the other two named Plaintiffs. Instead, she merely refers to his "unnecessary segregation" in the concluding sentence of the section of her report dealing with W.J.  (Dkt. 212-1 at 28–29.)

based services and consents to those services are "necessarily patient-specific").

She makes general allegations for C.G. as well—that the school district placed him in GNETS unnecessarily, that his entrance packet did not have the required information, and that GNETS denied him necessary services while depriving him of equal educational opportunities. (Dkt. 212-1 at 30.) She acknowledges C.G. is no longer in GNETS but believes he is "at serious risk of being readmitted." (*Id.*) But again, she offers no assessment of C.G.'s individual situation—specifically the problems he faces, the resources the school district could have provided to avoid his past segregation, or any reason (other than his disability and past placement) to think the school district will change his school designation. Absent this, Plaintiffs fail to establish standing for C.G.'s potential future segregation. *See J W by and through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018) ("A party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury.") (emphasis in original).

Dr. Elliott alleges J.F.'s local school district should not have removed him from his zoned school and placed him into GNETS while he was in kindergarten because that placement was "unnecessary and ineffective." (Dkt. 212-1 at 28.) She does not explain why that was unnecessary. She does not assess (or even discuss) the criteria the school district used in making a GNETS designation, accommodations the district failed to provide to keep him in his zoned school, or why she believes he could have been educated in a less segregated environment. She also does not suggest it was done without his family's consent. She establishes his segregation (including at lunch) but does not explain why that was not necessary. (*Id.*) J.F. also is no longer in the GNETS program. But Dr. Elliott does not say why that decision was made or suggest it should have been made sooner. She acknowledges J.F. has been diagnosed with autism and experiences behavioral episodes and, as a result, contends he is "at serious risk of being readmitted to GNETS." (*Id.*) But she does not explain why that would be inappropriate or why that is likely to occur.

Dr. Elliott's allegations are insufficient to establish that the named Plaintiffs were unnecessarily segregated, that their local school districts

could have provided the necessary education in a less restrictive environment, or that they face a threatened injury sufficient to confer standing.[8]  Having failed to present any other evidence on that front, the named Plaintiffs have not shown they suffered an injury on their *Olmstead* claims.  They lack standing to assert those claims.  This failure is also fatal to the claims of the putative class.  *See Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124 (11th Cir. 2019) ("'At least one plaintiff must have standing to seek each form of relief requested in the complaint.'") (quoting *Town of Chester v. Laroe Estate, Inc.*, 581 U.S. 433, 434 (2017)).

Nor can the organizational Plaintiffs show an injury in fact. "Organizations have standing to sue on behalf of their members only when the members themselves 'would otherwise have standing to sue in their own right.'" *Cahaba Riverkeeper v. U.S. Envtl. Prot. Agency*, 938

---

[8] Ms. Campbell generally opined that the State could "prevent . . . unnecessary segregation" through several broad measures all of which would require the State to reroute funding and resources or otherwise create resources that don't yet exist to serve disabled students in ways other than GNETS.  (Dkt. 213-1 at 22–23.)  Like with Dr. Elliott, however, Ms. Campbell does not tie those purported solutions back to the named Plaintiffs or explain how they could have prevented their segregation.  Both experts cast far too broad a net to show the purported non-necessity of Plaintiffs' segregation into GNETS is anything but speculative.

F.3d 1157, 1162 (11th Cir. 2019) (quoting *Hunt v. Wa. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  The organizations raise claims on behalf of "students with disability-related behavioral needs in Georgia public schools who are, or are at serious risk, of being, enrolled in GNETS and their families." (Dkt. 1 ¶¶ 23, 34.)  But Plaintiffs fail to identify any individualized evidence showing which (if any) of these students meet *Olmstead*'s appropriateness or consent requirements.  They rely on Dr. Elliott's opinion that the "vast majority" of GNETS students were improperly placed in the program.  (Dkt. 242 at 6.)  But, as already explained, Dr. Elliott also concedes at least *some* students need the separate settings about which Plaintiffs complain. (Dkt. 203-1 at 15, 18–19; 204-1 at 69–71.)  And her findings were based on a purportedly representative sample of GNETS students—not an individualized survey of all those students or something of the like.  (Dkt. 188-10 at 5–7.)  So, as best the Court can tell, Dr. Elliott did not (and could not) say with any certainty whether each (or which) student represented by the organizational Plaintiffs was improperly segregated.  Without knowing the unique characteristics of each student, it is impossible to say whether each could be appropriately served in his or her zoned school.  So, on this

record, the organizational Plaintiffs cannot point to a single constituent member GNETS student that can meet *Olmstead*'s requirements.  So their injuries are also too speculative to pass muster under Article III.[9]

In the end, Plaintiffs do not really grapple with the fact that proving unnecessary segregation requires individualized evidence under *Olmstead*.  They focus too much on Dr. Elliott's generalized opinion of over-segregation.  But Dr. Elliott's concession that at least some GNETS

---

[9] This also presents a problem for Plaintiffs' desire to bring this case as a class action.  Generally, before a court certifies a class, it "need not determine whether there are potentially uninjured class members who . . . lack standing at [the pre-certification] stage." *Sunshine Children's Learning Center, LLC v. Waste Connections of Fla., Inc.*, 671 F. Supp. 3d 1366, 1374 (S.D. Fla. 2023).  Still, where a court must engage in "individualized inquiries that predominate over the common issues in [the] case" to determine standing for putative class members, a class action is not appropriate.  *Id.*; *see also Cordoba v. DIRECTV, Inc.*, 942 F.3d 1259, 1277 (11th Cir. 2019) (where it appears "large portion of the class does not have standing," and "making that determination for these members of the class will require individualized inquiries," court must consider "before certification whether the individualized issue of standing will predominate over the common issues in the case").  Plaintiffs' inability to show any of the putative class members meet *Olmstead*'s elements without examining each member's individual circumstances is likely fatal to their ability to maintain this litigation as a class action.  In any event, because the Court concludes the named Plaintiffs lack standing, this case cannot move forward as a class action or otherwise.  *See id.* at 1264 (typically, "all that Article III requires for [a class claim] to be justiciable is that a named plaintiff have standing.").

students require segregated services begs the questions: which ones
don't?  Which ones do?  Which ones were injured?  Plaintiffs' inability to
answer those questions based on the evidence is fatal to their ability to
establish *Olmstead* standing.[10]

---

[10] In a related case the United States Department of Justice brought
against the State for allegedly violating the ADA through its operation of
GNETS—including by improperly segregating disabled
students—another judge in this district concluded the DOJ presented
evidence that GNETS students suffered concrete injuries for standing
purposes. *United States v. State of Georgia*, Case No. 1:16-cv-3088 (N.D.
Ga.), Dkt. 499 at 17–18.  In that case, the DOJ sued the State pursuant
to its authority to sue "any public entity" on behalf of individuals with
disabilities "to vindicate [those individuals' rights]" under the ADA.
*United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730,
737 (11th Cir. 2021).  The court assumed the DOJ could prove an injury
in fact on behalf of GNETS students by showing "individualized evidence
of the affected students' injuries." *United States*, Dkt. 499 at 17–18.
Holding that the DOJ had done so, the court explained the DOJ provided
"evidence of several instances of concrete injuries suffered by individual
students placed in GNETS." *Id.* at 19.  This evidence included formal
complaints and other correspondence to the DOJ by the parents of
individual GNETS students describing specific things that happened to
their children while in the program. *Id.* at 19–24.  Paired with other
evidence of systemic failures by GNETS to provide students with the
behavioral supports they need, the court concluded the DOJ had proven
"many students with disabilities currently placed in GNETS suffer
concrete injuries in multiple ways." *Id.* at 25.  But the DOJ case is
different from this one in two meaningful ways: first, this litigation
(unlike the DOJ case) is a class action, which requires Plaintiffs to show
an injury in fact for the named Plaintiffs—something they have not done;
and second, Plaintiffs do not offer the kind of individualized evidence the
DOJ provided in the other case.  So, the DOJ case does not affect the
Court's conclusion regarding Plaintiffs' failure to show injury in fact.

## 2. Non-*Olmstead* Claims

Plaintiffs raise three statutory non-*Olmstead* claims, asserting Defendants violate the ADA by: (1) denying them "the opportunity to participate in and benefit from educational services equal to those afforded other students"; (2) denying them "services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students"; and (3) "[u]tilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs" with respect to Plaintiffs. (Dkt. 1 ¶ 158.) They also raise an Equal Protection claim, contending the "educational opportunity provided by Defendants" to Plaintiffs "is unequal to that provided to non-disabled students in zoned and other public schools." (Dkt. 1 ¶ 167.)

As an initial matter, because Plaintiffs seek only injunctive relief, the fact J.F. and C.G. are not currently in GNETS defeats their ability to show an injury in fact on their non-*Olmstead* claims—even though there is evidence they suffered discrimination in the past.[11]   An injunction

---

[11] The Court refers here only to Plaintiffs' claims that they suffer ongoing

requiring the provision of equal educational services in GNETS would do nothing for J.F. and C.G.  Plaintiffs have, however, presented evidence from which a jury could conclude named Plaintiff W.J. and other current GNETS students represented by the organizational Plaintiffs receive educational opportunities inferior to those of non-disabled students.  Dr. Elliott opines that in GNETS, W.J. suffers discrimination.  And she provides a basis for that assessment.  She says, "[a]t GNETS," W.J. "has been repeatedly restrained, secluded, and suspended," "attends school in a run-down building that lacks many of the benefits of a non-GNETS setting, including science labs, media centers, and a full lunchroom," and "cannot participate in extracurricular activities." (*Id.*)  This is enough to show GNETS continues to deprive W.J. educational opportunities he could receive at a traditional school.

As for other current GNETS students represented by the organizational Plaintiffs, Dr. Elliott opines that "[t]he instruction and educational opportunities in the GNETS program are significantly inferior to the instruction and opportunities typically provided to general

---

discrimination while in GNETS.  The Court later addresses Plaintiffs' contention that J.F. and C.G. may be readmitted to GNETS and thus face threat of future injury.

education students and significantly inferior to the instruction and opportunities received by students with disabilities in their zoned schools." (Dkt. 188-10 at 3.) She identifies specific problems that led her to this conclusion: "[t]eaching and instruction at GNETS is poor"; GNETS "facilities are deficient"; students at GNETS centers "lack access to" thinks like extracurricular activities and media centers; and the "segregated and restrictive nature of the GNETS program denies students [the] opportunity to interact and socialize with non-disabled peers." (Dkt. 188-10 at 3–4.) And importantly, Dr. Elliott never walked back the absolute nature of her conclusion about the inferior education GNETS students receive as she did with her segregation opinion. So Plaintiffs have shown Defendants injured (and continue to injure) current GNETS students by giving them an inadequate education compared to their non-disabled peers, regardless of whether they should have been in GNETS in the first place.

In arguing otherwise, Defendants say Plaintiffs "have not identified specific services that are afforded to non-disabled students and denied" GNETS students. (Dkt. 214-1 at 14 (emphasis omitted).) But, as just explained, Plaintiffs *do* point to evidence that certain, specific services

are inadequate—particularly for W.J.  And Defendants cite no authority imposing such a specificity requirement for standing purposes.  The heart of Plaintiffs' non-*Olmstead* claims is that while in GNETS, they suffer discrimination in the provision of educational services.  They have shown evidence of that.  So, they have established an injury in fact on the non-*Olmstead* claims.

### 3.   At-Risk Plaintiffs

The Court concludes Plaintiffs have not shown a future injury in fact by the at-risk Plaintiffs on any of their *Olmstead* claims but some Plaintiffs have shown a future injury in fact on their non-*Olmstead* claims.  As already explained, to establish standing for a future injury, a plaintiff must show the threatened injury "is certainly impending." *Indep. Party of Fla.*, 967 F.3d at 1280.  An injury is imminent for standing purposes where there is "sufficient likelihood that [the plaintiff] will be affected by the allegedly unlawful conduct in the future."  *Sierra v. City of Hallandale Beach, Fla.*, 996 F.3d 1110, 1113 (11th Cir. 2021) (internal quotation marks and citation omitted).

In defining their putative class, Plaintiffs consider students to be "at serious risk of being placed in GNETS" if they have "been referred to

31

GNETS." (Dkt. 187 at 2.)  W.J. is still in GNETS, so he doesn't fit that definition.  And J.F. and C.G. have not been referred to GNETS, so they don't fit, either.  Accordingly, none of the named Plaintiffs are at-risk under Plaintiffs' class definition and cannot show any certainly impending *Olmstead* or non-*Olmstead* injury.

Even expanding the definition of "at-risk" to cover students—including J.F. and C.G.—who might one day be referred to GNETS because of their disabilities, the Court concludes the evidence is too speculative to establish such an injury in fact for any *Olmstead* claim. Dr. Elliott says—in conclusory fashion—that J.F. and C.G. are "at serious risk of being readmitted to GNETS." (Dkt. 212-1 at 29–30.)  In support, she says J.F. "was recently diagnosed with autism and still experiences behavioral episodes that impact his learning and the learning of others," and C.G. "continues to struggle with disability-related behaviors and does not receive appropriate services in his zoned school to address those issues." (*Id.*)  That's it.  So to consider J.F. and C.G. of being at risk of re-referral to GNETS, the Court would have to simply assume that J.F.'s and C.G.'s IEP teams will refer them based only on their disabilities *and* that such referral would be inappropriate.  That would be rank

speculation.  Nothing in the record suggests such an outcome is certainly impending.   The same is true for the students represented by the organizational Plaintiffs on the *Olmstead* claims.  Plaintiffs do not point to evidence about even a single student who has been unnecessarily referred to (or is certain or even likely to be referred to) GNETS.[12]

As for their non-*Olmstead* claims, however, Plaintiffs have presented some evidence that students represented by the organizational Plaintiffs who have been referred to GNETS are at imminent risk of suffering discrimination in the provision of educational services once they enter the program.  So, the organizational Plaintiffs have shown an injury in fact for students who have been referred to GNETS on their

---

[12] The Court recognizes that the court in the related DOJ case held otherwise.  In that case, the court found the fact some students were "denied 'necessary behavioral health services' in non-GNETS schools" was enough to show a "'serious risk of unnecessary segregation.'" *State of Georgia*, Case No. 1:16-cv-3088, Dkt. 499 at 25.  In support, the court relied on evidence showing one student who exited GNETS was quickly re-referred after failing to receive appropriate services in his zoned school, other specific complaints related to individual students showing they requested but did not receive certain services in their zoned schools, and expert testimony showing several students on Medicaid or PeachCare did not receive any services under those programs in their zoned schools before being referred to GNETS.  *Id.* at 26–31.  Plaintiffs here do not present any individualized evidence—much less at a similarly detailed level—for any student.

non-*Olmstead* claims.

### 4. Summary

The Court concludes Plaintiffs have not shown W.J. was improperly segregated into GNETS. Nor have they shown J.F. and C.G. are at certainly impending risk of being placed in GNETS. They thus lack standing to assert any *Olmstead* claims. Similarly, because Plaintiffs have not presented non-conclusory evidence even a single GNETS student—including W.J.—has been unnecessarily segregated or faces an imminent threat of that injury, the organizational Plaintiffs also lack *Olmstead* standing. And since the Court concludes Plaintiffs have not shown J.F. or C.G. face a certainly impending risk of being readmitted into GNETS, Plaintiffs have also failed to establish standing for the non-*Olmstead* claims for those students. Plaintiffs have, however, produced evidence from which a jury could find that W.J. and current GNETS students represented by the organizational Plaintiffs receive educational opportunities inferior to those of non-disabled students in violation of Title II of the ADA and Section 504 of the Rehabilitation Act. They have also shown students represented by the organizational Plaintiffs who have been referred to GNETS face a certainly impending risk of

discrimination once they enter the program.  Plaintiffs have established injury in fact only for those students on these claims.

### B.    Traceability

"To satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'"  *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "[A] plaintiff need only demonstrate, as a matter of fact, 'a fairly traceable connection between the plaintiff's injury and the complained of conduct of the defendant."  *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cty. Bd. of Registration & Elections* 36 F.4th 1100, 1116 (11th Cir. 2022) (citation omitted).

As an alternative argument that Plaintiffs lack standing, Defendants say any injury any Plaintiff may have suffered is traceable only to local actors—not to Defendants.  (Dkt. 214-1 at 23.)  They contend "local, constitutional officers"—meaning local school boards and others who make student placement decisions and control the education provided to GNETS students—"directly oversee and have exclusive

authority to perform or not perform the acts Plaintiffs allege constitute discrimination." (*Id.*) Plaintiffs insist they have presented evidence showing Defendants "administer" GNETS and cause their injuries through "systemic policies and practices." (Dkt. 242 at 7.) Specifically, they say the evidence suggests Defendants "shape GNETS programs' decisions about the provision of GNETS services" based on, among other things, the "fiscal and programmatic structure" Defendants have created. (*Id.*)

In addressing traceability, Plaintiffs primarily refer to the arguments they made in their partial motion for summary judgment. (Dkt. 242 at 7.) In that motion, Plaintiffs sought summary judgment only on the question of whether Defendants "administer GNETS" in a manner contemplated by the ADA's integration mandate. (Dkt. 188 at 2.) Plaintiffs couch their arguments about "administration" in terms of the level of control and direction Defendants exert over GNETS. (Dkt. 188-1 at 30 ("Through many mechanisms, the State acts and exerts control to ensure that GNETS operates as designed."). Accordingly, the Court examines traceability—and the conduct of Defendants that Plaintiffs claim shows control or direction—under that lens.

### 1. Georgia's Constitutional and Statutory Framework for Public Education

Georgia's Constitution grants county and area boards of education the exclusive authority to "establish and maintain public schools within their limits." Ga. Const. Art. VIII, Sec. V. This provision "embodies [Georgia's] fundamental principle of exclusive local control of general primary and secondary (K-12) education." *Gwinnett Cty. Sch. Dist. v. Cox*, 710 S.E.2d 773, 775 (Ga. 2011). The Georgia Supreme Court has explained "[t]he constitutional history of Georgia could not be more clear that, as to general K-12 public education, local boards of education have the *exclusive* authority to fulfill one of the 'primary obligation[s] of the State of Georgia,' namely, '[t]he provision of an adequate public education for the citizens.'" *Id.* at 776 (emphasis added) (quoting Ga. Const. Art. VIII, Sec. I, Par. I).

Consistent with this principle, Georgia requires local school districts to "provide" special education services, including GNETS. O.C.G.A. §§ 20-2-152(b), 20-2-50; Ga. Comp. R. & Regs. 160-4-7-.15. The State's role in special education is limited to: (1) operating three schools not at issue in this litigation; (2) establishing GNETS eligibility criteria; and (3) providing funding to local school districts for GNETS services.

37

O.C.G.A. §§ 20-2-152(a), 20-2-152(c)(1).[13]   And again, local school boards—through individual IEP teams—decide whether individual students should be referred to GNETS and how long they should stay there.  Ga. Comp. R. & Regs. 160-4-7-.15(3)(a), 4(a), 5(b).

The State has some authority over GNETS.  The State promulgates regulations that impact the program.  The State Board of Education ("SBOE"), for example, established the criteria IEP teams must examine in developing a child's IEP, which may ultimately result in referral to GNETS.  *Id.* 160-4-7-.06.  The SBOE also created rules setting out the continuum of placement options for GNETS students.  *Id.* 160-4-7-.15.

The State also has primary authority over funding for GNETS.  The SBOE "receive[s] and disburse[s] [GNETS] funds."  Ga. Comp. R. & Regs.

---

[13] Plaintiffs contend a provision of the Georgia Constitution dealing with "special schools" empowers the State to promulgate rules governing GNETS. (Dkt. 188-1 at 8 (citing Ga. Const. art. VIII § 5, ¶ VII(a)).) None of the statutes cited as authority for the GNETS Rule, however, address "special schools." *See* O.C.G.A. §§ 20-2-152, 20-2-240, 20-2-270, 20-2-271, 20-2-272, 20-2-274. By contrast, § 20-2-152(c)(1)(e) identifies the "special schools" contemplated by that constitutional provision: the Georgia School for the Deaf, the Georgia Academy for the Blind, the Atlanta Area School for the Deaf, and others approved as "special schools" by the General Assembly. GNETS does not fall under that statute. The Court thus rejects Plaintiffs' argument that this constitutional provision demonstrates State control over GNETS. (Dkts. 188-1 at 8; 273 at 13–14.)

160-4-7-.15(5)(a).   Local school districts must submit applications for grant money, after which the SBOE "[a]dminister[s]" the grant funds by collaborating with the Georgia Department of Education ("DOE") to develop "rules and procedures regulating the operation of the GNETS grant, including the application process," notify "the fiscal agents regarding each year's fiscal allocation and approve GNETS services budgets," and "[m]onitor GNETS to ensure compliance with Federal and state policies, procedures, rules, and the delivery of appropriate instructional and therapeutic services." *Id.* 160-4-7-.15(5)(a)(2), (c)(4).

In other words, "[d]istilled down, on the one hand, local governmental authorities run individual GNETS schools and place students in GNETS.  On the other hand, the State funds GNETS and develops rules and procedures and then ensures GNETS complies with those rules and procedures." (Dkt. 77 at 10.)  But "[n]othing in the statutes or regulations suggest[s] the State of Georgia intended to create GNETS outside of [Georgia's constitutional] construct or to limit the local school boards' exclusive authority to educate students." (Dkt. 77 at 11.) What the question really boils down to on Plaintiffs' *Olmstead* claims is whether the evidence shows the State "administers" GNETS in a way

contemplated by the ADA and Rehabilitation Act and, if so, whether *Defendants*' administration of the program caused Plaintiffs' unnecessary segregation.  (Dkt. 77 at 11–12.)  As for Plaintiffs' non-*Olmstead* claims, the question is whether Defendants control GNETS in some way that makes them responsible for the educational and therapeutic services students receive in the program (that is, what happens in GNETS classrooms and facilities).  The Court uses the broad (and vague) term "administer" because the integration mandate refers to a public entity's responsibility to disabled individuals in terms of how it "administer[s]" its services or programs.  28 C.F.R. § 35.130(d).  But for standing purposes, it is not sufficient that an entity merely "administers" its programs and services in some abstract way.  Rather, the entity must administer those services and programs in a way that harms the plaintiff.

The Court previously set out helpful principles in determining whether the State "administers" GNETS in such a way that it could be liable under the ADA and Rehabilitation Act for Plaintiffs' injuries: (1) "the Court looks to whether the [State] made decisions that led to segregation"; (2) "funding a program alone is not administration"; (3) the GNETS "statutory structure informs whether the [S]tate administers

[GNETS]"; (4) "the [S]tate need not have made the direct decisions that led to the discrimination, as using criteria that leads to discrimination sufficiently forms a causal connection'"; and (5) "the level of control the [State] has informs whether [Plaintiffs] have shown a causal connection." (Dkt. 77 at 16–17.)  Applying this framework, the Court already found some conduct about which Plaintiffs complain does not show administration as a matter of law: (1) the State's "broad supervision or funding of GNETS" do not constitute administration so as to establish causation (and thus traceability); and (2) "the allegations that claim the [S]tate encourages GNETS through its funding scheme are not enough," given that local school districts make decisions about how to use that funding.  (Dkt. 77 at 17–18.)

The Court also held, however, that "discovery might show the State administers GNETS" through its developing and applying rules and procedures regulating the operation of GNETS grants and its monitoring regional GNETS programs for compliance with those rules and procedures.  (Dkt. 77 at 18.)  Now that discovery is over and the parties have marshalled evidence about Defendants' direction over GNETS, the Court concludes that—even if some of the Plaintiffs could show

actionable injuries—none have presented evidence showing those injuries are traceable to Defendants' administration or involvement with GNETS.

### 2.   Basic Principles of Traceability

As an initial matter, while Plaintiffs contend a myriad of things Defendants do and have done show they administer, control, or direct GNETS, Plaintiffs fail to show a connecting line between that conduct and any of their specific injuries.  But for a plaintiff to have standing, there must be some "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co.*, 523 U.S. at 103.  The plaintiff's injury cannot "result [from] the independent action of some third party not before the court." *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265 (11th Cir. 2011).  And traceability does not exist where "an independent source would have caused [the plaintiff] to suffer the same injury." *Swann v. Sec'y, Georgia*, 668 F.3d 1285, 1288 (11th Cir. 2012); *see also* 13A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 3531.5 (3d ed. Apr. 2020 Update) ("standing may be defeated by finding a different cause" and "[d]irect breaks in the causal chain have defeated standing in

a wide variety of other circumstances").

Take W.J. for example. The evidence shows W.J. "attends school in a run-down building that lacks many of the benefits of a non-GNETS setting, including science labs, media centers, and a full lunchroom." (Dkt. 212-1 at 29.) As discussed in detail below, Plaintiffs present evidence the State has some control over GNETS facilities. But they don't show a connecting line between that control and W.J.'s lack of access to science labs, media centers, or adequate lunchrooms. Plaintiffs do not, for example, point to any evidence showing the State caused the local GNETS program to fail to provide those educational services to W.J., had any control over the nature of the building, or made any decision whatsoever over W.J.'s education. Nor do they offer any evidence showing the State's control over GNETS facilities required or even encouraged W.J.'s IEP team to place him in GNETS. The same is true for all Plaintiffs' injuries. The Court has previously outlined all of Dr. Elliott's criticisms and the bases for her conclusion that GNETS students receive an inferior education in comparison to their non-disabled peers. But Plaintiffs fail to trace any of the issues she identified to anything the State did or failed to do. Having failed to tie any specific

43

State conduct to Plaintiffs' specific injuries, Plaintiffs cannot show those injuries are traceable to Defendants.

### 3.    Existence of GNETS

In the absence of any identifiable connection between the State's conduct and the injuries they allege, Plaintiffs say the mere existence of GNETS (whose maintenance Plaintiffs contend is a State act) results in unnecessary segregation in violation of the ADA, thereby resulting in GNETS students receiving an inadequate education once placed in the program. (Dkt. 188-1 at 33–34.) But the *local* actors—not Defendants— decide whether to place a student in GNETS and the educational services the student receives in the program. So, there is no State "decision[] that led to segregation," nor does the "statutory structure" of GNETS require or even *permit* the State to "administer" GNETS in terms of those placement and educational  decisions. (Dkt. 77 at 17.) That the State established a program that local actors might misapply in a way that results in unnecessary segregation and the provision of inferior educational opportunities does not render the State liable for those wrongs. And no evidence suggests the State created a program that requires these statutory violations. Interestingly, Plaintiffs offer no

evidence Defendants had any involvement in the local school districts' decision to place them in GNETS (or any impending decision to place them in GNETS) or over the type of education and resources they receive (or will receive) in the program.

Plaintiffs disagree, saying "[t]he availability of GNETS as a separate, organized, segregated option for students with disabilities incentivizes local decision-makers to forego consideration of less restrictive options"—*i.e.*, providing services in the students' zoned schools. (Dkt. 188-1 at 38–39.) But Plaintiffs present no evidence that the existence of GNETS compels local actors to do anything at all—much less segregate students or "refrain from providing appropriate services in integrated settings." (Dkt. 188-1 at 29.) The text of the GNETS Rule belies Plaintiffs' contention, as it provides local officials complete discretion over whether to apply for and how to use GNETS funds. Ga. Comp. R. & Regs. 160-4-7-.15(5)(b)–(c). No local actor is required to use GNETS. And once a program receives funding, nothing in the GNETS Rule nor any other State act requires local officials to exercise their discretion to use those funds to physically separate GNETS students or to use that money in any specific way. Local school districts can use the

funds to provide GNETS students "[s]ervices . . . in the general education setting in the student's Zoned School or other public school." *Id.* 160-4-7-.15(4)(c)(1). So, the mere provision of money for GNETS does not mandate segregation or require local school districts to use the money in ways Plaintiffs contend result in the provision of an inadequate education.

Under the GNETS Rule, an IEP team can only refer a student to GNETS if it determines the general education setting has not succeeded in providing the student the required education and GNETS services provide the "least restrictive environment" where the student can obtain the required education. Ga. Comp. R. & Regs. 160-4-7-.15(4). The GNETS Rule also explains that GNETS is "a service available within the continuum of supports . . . that *prevents* children from requiring residential or more restrictive placement." Ga. Comp. R. & Regs. 160-4-7-.15(2)(a) (emphasis added). Plaintiffs point to no counter evidence showing the GNETS Rule was intended to or mandates segregation.[14]

---

[14] Plaintiffs cite their expert's opinion to argue "[r]eal-world data confirms that GNETS functions" to mandate unnecessary segregation because "[a]lmost every GNETS student ends up in the two most restrictive settings" set by the GNETS Rule. (Dkt. 188-1 at 6.) Again, however, Plaintiffs have not shown the kind of individualized evidence

Again, the local, constitutionally elected school officials decide whether to apply for voluntary GNETS grants, whether to refer an individual student to GNETS, whether to physically segregate any GNETS students, and what services to provide students within GNETS. Ga. Comp. R. & Regs. 160-4-7-.15(4)(a). The State doesn't force local actors to do any of that. Nor could it under the GNETS Rule. Because local officials have exclusive authority over which students are referred to GNETS and what services the local school districts provide them—and because no evidence suggests anyone but local actors referred (or will refer) the named Plaintiffs to GNETS, placed (or will place) them in a segregated setting, and then provided (or will provide) them educational and behavioral services—the State's "general supervision" of the GNETS program is not enough to show traceability on Plaintiffs' claims. *Jacobson*, 974 F.3d at 1253–54.

---

necessary to determine whether any particular student was improperly segregated into one of these two settings, nor can they show that it is something *Defendants* did that caused that segregation rather than the local IEP teams who make those decisions. If a bad decision was made by a local actor, that entity bears responsibility. Not Defendants merely because they offer a program that local actors can misapply.

### 4.    SBOE's Classification Criteria

Plaintiffs also argue the State "administers" GNETS in a way that leads to unnecessary segregation (and thus an inadequate education) because the SBOE "create[s] classification criteria 'used to determine eligibility of students for state funded special education programs' such as GNETS." (Dkt. 188-1 at 9–10 (citation omitted).)  But Plaintiffs don't claim the classification criteria the SBOE has adopted are per se discriminatory.  As the Court already explained, Plaintiffs agree that some students are properly placed in GNETS using those criteria.  Nor do they offer evidence from which a reasonable jury could infer that those criteria were applied (or will be applied) in a discriminatory manner to the named Plaintiffs or anyone in particular.  Again, Dr. Elliott's only basis for finding the named Plaintiffs were (or will be) improperly segregated is her assertion that some systemic deficiency that causes over-referral of *all* GNETS students also caused (or will cause) the improper referral of the named Plaintiffs.

What's more, Plaintiffs offer no evidence the SBOE created those criteria with discrimination in mind.  Indeed, the SBOE has generally tracked the criteria established and imposed by federal law—criteria the

State must follow to receive federal funding under the IDEA.  *Compare* Ga. Comp. R. & Regs. 160-4-7-.05 *with* 20 U.S.C. § 1412(a)(5).  So, Plaintiffs can't link any unnecessary segregation—of the named Plaintiffs or otherwise—to the State through its classification criteria, either.  Having failed to do that, any injuries Plaintiffs suffered (or will suffer) as a result of discrimination once placed in GNETS cannot be tied back to the State's classification criteria.

### 5.    Other Evidence of Administration

Plaintiffs also claim the State "administers" and controls GNETS in ways that cause their injuries because: (1) the State employs two full-time DOE staffers who "oversee GNETS"; (2) State employees "provide direction to GNETS directors"; (3) the State exercises control over GNETS services through its funding decisions; (4) the State governs GNETS through the GNETS Rule; (5) the State enters into contracts to provide GNETS services; (6) the State sometimes mandates IEP file reviews; and (7) the State enforces a mandatory "Strategic Plan" that sets operational guidelines and assessment requirements on regional GNETS programs.  (Dkt. 188-1 at 12–27.)  Defendants say all these things show "State guidance (rather than administration)," such that their

involvement in the program is too attenuated to be traceable to Plaintiffs' asserted injuries.  (Dkt. 263 at 21.)

### a.   State-Level GNETS Employees

The State employs two staffers who work with regional GNETS directors to monitor the program—the Program Manager and the Program Specialist.  (Dkts. 188-17; 188-18; 188-19.)  Plaintiffs say these employees "help the [DOE] administer GNETS" in a manner that brings them within the scope of the ADA.  (Dkt. 188-1 at 12.)  While the Court agrees the Strategic Plan shows State control, it concludes Plaintiffs fail to connect that control to any of their claimed injuries.

As explained above, the State is responsible for monitoring GNETS to ensure compliance with state and federal law.  That the State needs full-time employees to do that job is unsurprising.  In arguing otherwise, Plaintiffs cite deposition testimony they claim shows the two employees have a direct hand in the operation of GNETS.  (Dkt. 188-1 at 12 n.12.)  That is not correct—the cited testimony only supports the proposition these employees *monitored* GNETS within the bounds of the Georgia Constitution and the State's duty under federal law and the GNETS Rule, not that they directed GNETS in any way.  For example, the State's

former director of special education services testified one division she oversaw was responsible for "*monitoring* . . . the local school systems and the GNETS program." (Dkt. 188-5 at 17 (emphasis added), 18 ("There were *monitoring* activities to ensure that special education programs were being provided to the students in each local district as well as the GNETS program.") (emphasis added), 99 (explaining State employees collected data on GNETS).) Similarly, the cited testimony of a deputy superintendent at the DOE explains she "met with" the GNETS Program Manager "to get data on staffing and performance measures." (Dkts. 188-14 at 30; 235-1 at 30 (explaining the DOE was collecting data from GNETS to provide an evaluation and recommendation to the State regarding funding).) That the State collects data on GNETS is unremarkable. It must do that to comply with its obligations under the IDEA. *See* 20 U.S.C. § 1418.

The other two depositions cited by Plaintiffs are equally unavailing. A former DOE employee testified the State does "not directly provid[e] services for [GNETS] students," but instead is responsible only for "making available the funds coming with state general supervision," ensuring compliance with state board rules and policies, and providing

"guidance, . . . technical assistance, . . . [and] monitoring." (Dkt. 188-13 at 173–74.) The state director of special education testified she merely "oversee[s] the GNETS program manager," and that regional GNETS programs must file applications for funding explaining "how the funds will be utilized." (Dkts. 188-22 at 14; 188-24 at 34.) She did not say anything about what (if anything) the State does afterward to direct how the regional programs use those funds. And, as the Court already explained, the State's "general supervision" is not sufficient. None of this testimony shows the sort of direction required to constitute "administration" for purposes of the integration mandate, nor does it show anything the two State employees did had any impact at all on what happened (or will happen) in GNETS classrooms or facilities. So, the fact the State has two employees dedicated to monitoring GNETS in no way causes local school districts to segregate Plaintiffs or provide them inadequate services once in GNETS.

### b.   State Employees' Direction

Plaintiffs also contend the State "administers" GNETS in a way that causes their injuries because its employees "provide direction to GNETS directors" by "regularly communicat[ing] with [those] directors

to ensure coordination and compliance across the programs." (Dkt. 188-1 at 16.)  But the documents and testimony Plaintiffs cite do not support this assertion.   They reference a document explaining the "[r]esponsibilities" of the State's GNETS Program Specialist, which include things like: "[p]rovide consultation regarding improvement on the GNETS strategic plan"; "[c]omplete GNETS End of Year reviews-provide ratings and feedback"; and "[d]evelop and conduct training in collaboration with the GNETS [Program Manager] for stakeholders." (Dkt. 188-20 at 2.)  Plaintiffs do not, however, explain how any of these responsibilities demonstrate direction rather than guidance or advisement.  The document doesn't say, for example, that the Program Specialist can require regional GNETS directors (or any other regional GNETS staffers) to make placement decisions, decide how a local school district will spend its GNETS funds to provide educational services, or otherwise control a district's constitutional authority to give GNETS students an education.  Similarly, the cited testimony of the GNETS Program Manager merely says she and the Program Specialist would meet with regional GNETS directors to "collaborat[e]," give "updates . . . on the strategic plan," and "provide some professional learning and

technical assistance for the directors." (Dkt. 188-4 at 78–79.) This is not evidence of control or administration. Nor are the nine other instances (mostly emails) cited by Plaintiffs, where GNETS directors sought guidance from the State about how to follow SBOE rules and procedures on issues ranging from student eligibility for GNETS (again, non-discriminatory classification criteria set by the SBOE) to where certain students could be placed once referred to GNETS. (Dkt. 188-1 at 17 n.30.) While the cited instances show State employees provided advice to regional directors on these questions, none suggest the State compelled any local actor to do anything at all or made any decisions about how or where students would be educated.

In arguing to the contrary, Plaintiffs say the cited instances show regional GNETS directors not only ask the State logistical questions, but instead "seek direction from the State on how to interpret the GNETS Rule, make GNETS placement decisions, and decide other aspects of daily GNETS operations." (Dkt. 273 at 7.) Plaintiffs miss the point. These communications do not show the regional GNETS directors sought "direction" from the State or felt they were required to follow the guidance provided because the State did not (and could not) have

compelled those directors to do anything.  Instead, those directors were simply seeking guidance from the State on how to comply with the GNETS Rule.  Other evidence confirms this understanding.  (Dkts. 188-48 at 221 (regional GNETS director testifying he reached out to State Program Manager "a couple of times . . . for guidance"); 188-49 at 108–110 (regional GNETS director testifying she emailed GNETS Program Manager for "guidance" on staffing and she had to follow IEP team placement decisions even if she felt those decisions were "inappropriate").)

### c.    Funding Process

Plaintiffs also say "[t]he funding process for GNETS regional programs demonstrates the control the State has over GNETS" because the State "allocate[s] funding among its regional programs using criteria it created and enforces," such that any GNETS funds provided by the State come with "substantial strings attached."  (Dkt. 188-1 at 31.) Specifically, Plaintiffs argue the State's funding of GNETS grants constitutes administration and control that causes their injuries because the State: (1) appropriates funds that may be used only for GNETS grants; (2) requires local school districts who seek to use GNETS grants

to apply for them on an annual basis by providing various types of data; (3) uses a unique funding formula for the GNETS grants different than its funding formula for local school districts; and (4) fails to use its system of care "to support students with disability-related behaviors in their zoned schools." (Dkt. 188-1 at 18–22.)[15] The Court previously held Plaintiffs cannot show the State has actionable control over GNETS by claiming the State "encourages GNETS through its funding scheme." (Dkt. 77 at 17–18.) Nothing about Plaintiffs' evidence changes that. The Court explained the State's funding scheme "preserve[s] the flexibility of local fiscal bodies to make decisions." (Dkt. 77 at 18 (citing O.C.G.A. § 20-2-152(c)(1)(A), Ga. Comp. R & Regs. 160-4-7-.15(5)(a).) Plaintiffs do not dispute that the State cannot compel any regional program to apply for a GNETS grant. And once a program applies for and receives such a grant,

---

[15] The system of care is intended by the General Assembly "so that children and adolescents with a severe emotional disturbance and their families will receive appropriate educational, nonresidential and residential mental health services, and support services, as prescribed in an individualized plan." O.C.G.A. § 49-5-220(a)(6). The parties disagree about whether the General Assembly has passed a law actually requiring the State's implementation of the system of care. (Dkt. 243 ¶ 164.) But it doesn't really matter. As discussed below, even if the system of care is operational, the State's failure to use a separate system does not constitute administration of GNETS.

the GNETS Rule affords the pertinent local school district significant discretion on whether to spend the funds on integrated or segregated settings and imposes no limitation on how the district can spend the funds on different types of services. Ga. Comp. R. & Regs. 160-4-7-.15.

Plaintiffs also fail to explain how the fact regional GNETS programs must provide certain data in their voluntary grant applications contributes to their purported discrimination. Indeed, as already explained, the State must collect this data under the IDEA. Nor do Plaintiffs explain how the existence of a separate funding formula shows any causal connection to their alleged discrimination. Finally, regarding the system of care, Plaintiffs cannot show state control by proving a negative. The core of their argument is that, in certain instances, the State *should* use other components of the system of care to serve GNETS students but does not. Under any definition, inaction is not direction.[16] At bottom, Plaintiffs fail to show the State's providing voluntary funding

---

[16] To the extent Plaintiffs suggest Defendants' failure to use the system of care to serve GNETS students causes their non-*Olmstead* injuries, as discussed in detail below, the Court concludes this still does not provide Plaintiffs standing because the State cannot force local school districts to accept these other services.

to local officials without telling them how to spend it is traceable to their injuries.

### d.    GNETS Rule

Plaintiffs say the State "governs GNETS through the GNETS Rule" by "assigning roles, duties, and reporting obligations within the GNETS program." (Dkt. 188-1 at 22.)  Plaintiffs point to five specific things mandated by or related to the GNETS Rule they say show State control: (1) the State has a responsibility to "[m]onitor GNETS to ensure compliance with Federal and state policies, procedures, rules, and the delivery of appropriate instructional and therapeutic services"; (2) local school districts must "[c]ollaborate with [the DOE] to implement activities outlined in the GNETS strategic plan to improve GNETS practices and student services," "[c]omplete the annual needs assessment embedded in the GNETS strategic plan," and "[s]ubmit student and program data as requested by [the DOE]"; (3) regional programs use student eligibility forms developed by the State to implement the GNETS Rule; (4) the State requires regional programs to provide data "including program level and student-specific information"; and (5) the State required certain regional programs to upgrade or move facilities (Dkt.

188-1 at 23–25 (citations omitted).)

Plaintiffs provide no evidence anything in the GNETS Rule—including the provisions they cite—compels local officials to act at all, much less in a manner that impacts the decisions at the heart of Plaintiffs' discrimination claims. The evidence merely shows the State offering guidance and monitoring—nothing more. For example, a former DOE employee testified the GNETS Rule provides "direct *guidance* from the State perspective about coordination of supports and services for" GNETS students. (Dkts. 188-125 at 220 (emphasis added).) And the other deposition testimony cited by Plaintiffs merely confirms regional GNETS programs had duties to report data to the State, not any State-imposed duties related to the provision of GNETS services. (Dkt. 192-1 at 29–30.) The documents Plaintiffs cite don't help either. They are simply application documents related to whether a student should be referred to GNETS. (Dkt. 188-1 at 23 n.54.) Regardless of whether these documents were developed by the State, the State's creation and implementation of eligibility criteria (which includes a necessity element) does not cause Plaintiffs' injuries, particularly when Plaintiffs do not allege any of the criteria (as opposed to the application of that criteria)

caused (or will cause) their injuries.[17]

### e.    State Contracts

Plaintiffs say the State controls GNETS because it "executes and operates State-level contracts to provide GNETS services."  (Dkt. 188-1 at 25.)  Plaintiffs point to two contracts in fiscal year 2019 totaling $1.3 million they say "cover a significant portion of the purported therapeutic services provided by regional programs."  (*Id.*)  To begin with, Plaintiffs provide no evidence placing that $1.3 million in the context of individual GNETS programs' budgets for 2019—particularly problematic given 2019 GNETS grants exceeded $75 million.  *See* Governor's Office of Planning and Budget, Amended FY 2019 Appropriations Bill, at 41, available at https://opb.georgia.gov/budget-information/budget-documents/appropriations-bills.  Nor do they cite any evidence showing how anyone used those funds, let alone that they used them in a discriminatory manner.  In fact, the documents Plaintiffs cite show the State did not require regional GNETS programs to work with any entity

---

[17] As for the State's "involv[ement]" in "improving the physical facilities in which GNETS is conducted," the Court concludes this provides some evidence of administration.  The Court discusses the State's facilities-related involvement in more detail below.

with which the State contracted.  An email Plaintiffs cite from 2017, for example, shows the DOE gave regional GNETS programs "two options . . . to consider": (1) receiving a reimbursement from the DOE "for providing clinical therapeutic related services . . . when entering into an agreement with a [DOE] identified provider," or (2) "provid[ing] clinical therapeutic related services for intensive students by a licensed/certified personnel without a reimbursement from [the DOE]."  (Dkt. 188-103 at 2.)  That the State gave regional GNETS programs the discretion to decide whether to use State-approved or contracted services—even with an incentive attached—does not show Plaintiffs' injuries are traceable to the State's conduct, particularly when Plaintiffs have not tied any of these programs to their alleged injuries.

The other documents cited by Plaintiffs confirm the State provided regional GNETS programs the *option* to voluntarily contract with State-approved (or contracted) service providers in exchange for additional money.  (Dkts. 188-104 (explaining 11 of 24 regional GNETS programs "received grant reimbursement for" bringing in social workers); 188-105 (explaining regional GNETS program "entered into a service agreement" with State-approved social worker to provide therapeutic services); 188-

106 (regional GNETS official asking if local program could receive increase in grant to retain therapeutic services providers); 188-107 (meeting agenda explaining some sites receive grant for "therapeutic supports" while "other sites . . . do not receive the grant"); 188-108 (regional GNETS director informing State that local program had "contracts signed" with State-approved therapeutic services provider); 188-109 (discussing grant allocations for therapeutic services "when a therapeutic provider is contracted" by regional GNETS program).) None of those documents show the State forced regional programs to use those services or that doing so caused their injuries.

### f.   IEP File Reviews

Plaintiffs also say the State controls GNETS because "[o]n occasion, the State has required GNETS regional programs to review IEP files and assess compliance with State-imposed operating standards." (Dkt. 188-1 at 26.) But Plaintiffs don't connect those reviews to any of their claimed injuries. They don't say, for example, the State required the reviews because it disagreed with a local school district's placement decision, wanted reconsideration of services provided in GNETS, or, in any way, exercised (or tried to exercise) any control over the local education

62

decision.  Indeed, they don't even say anyone from the State reviewed the named Plaintiffs' (or any other Plaintiffs') files.  While they say the reviews "led to 'disproportionality concern[s]' about certain disability category areas," and caused the State to "examine the appropriateness of . . . students receiving those services," they do not offer any evidence about how or whether those reviews required regional GNETS programs to do anything but report data.

Plaintiffs cite testimony from State officials explaining the State did not even tell regional GNETS directors why it was requesting IEP file information.  (Dkts. 188-21 at 214; 188-49 at 369; 188-126 at 198.)  Other cited testimony shows the State did it to determine whether students were appropriately receiving services in GNETS but does not show the result of those reviews or whether the State did anything in response. (Dkt. 188-125 at 240–242.)  To the extent this testimony could arguably suggest State action, a former DOE employee made clear any "solutions" to problems identified by the reviews were "done in concert working with local programs," which "were also reviewing records, eligibility, information, trying to determine . . . the appropriateness of placement services."  (Dkt. 188-125 at 269.)  In other words, the local school districts

would have been the entity to make any modifications because of the reviews. Plaintiffs thus fail to show these mandated IEP reviews resulted in any State action at all, much less State action that led to discrimination.

Put simply, Plaintiffs' description of the evidence they cite for each of these six purported instances of State control does not match reality. None of it demonstrates the State controlled or directed decisions made by local education officials, whether individuals on IEP teams, individuals running regional GNETS programs, or anyone working for local school districts. Nor does this evidence counter the notion that local officials have total discretion to decide whether to apply for GNETS grants in the first place and, if they do, how to spend the funds they receive. Nor does it counter the fundamental concept in Georgia that the local school districts decide how to educate children, including whether to place a child in GNETS and the nature of educational and behavioral services they will provide each child. Plaintiffs cannot show—using this evidence—that Defendants "administered" or otherwise controlled GNETS in a manner that led (or will lead) local school districts to place them in the program or to provide them inferior services once there. So,

Plaintiffs cannot trace these acts to their purported injuries. *Jacobson*, 974 F.3d at 1253–54 (because independent officers, rather than state-level official, made decision on what order to list candidates on ballots, purported injuries related to that ordering was not traceable to the state).[18]

### g.   Strategic Plan

Plaintiffs also say the State's development and enforcement of a "Strategic Plan"—which sets operational standards for regional GNETS programs—shows State control or administration so as to satisfy the traceability requirement of standing. (Dkt. 188-1 at 13–16.) The Court disagrees. The Strategic Plan was developed in late 2015 and 2016 by the GNETS Program Manager and other State officials in collaboration with regional GNETS directors. (Dkts. 188-5 at 96–101; 188-15 at 22–23; 188-25; 188-26; 188-27 at 3; 188-28 at 96–101, 169–170.) The Plan sets performance monitoring standards for regional GNETS programs in a

---

[18] The court in the DOJ case found that some of these same facts established the State's administration of GNETS so as to make it liable for an *Olmstead* violation. *United States*, Case No. 1:16-cv-3088 (N.D. Ga.), Dkt. 499 at 46–53. This Court simply disagrees that these facts show State involvement in local school board decisions to place any child in GNETS or the services that child would receive in the program.

range of areas, including—pertinent to Plaintiffs' claims—academic instruction, behavioral and therapeutic services, and facilities safety and management. (Dkt. 188-9 at 3–23.) Within each of those categories, the Plan lays out individual action items and specifies how regional GNETS programs can demonstrate they implemented each action item. (*Id.*) To do so, the Plan requires each regional GNETS director (a local actor) to assess his or her programs' compliance with the Plan at the end of the year and provide that self-assessment and supporting evidence to the State. (Dkts. 188-9 at 6–7; 188-35 (describing the "[d]ocumentation and evidence" regional GNETS programs may use in supporting self-assessment ratings); 188-36 at 3 (explaining State would only "accept" program's self-assessment if "evidence presented clearly supports" that assessment).) The State follows up, including by reviewing supporting evidence, asking questions, and touring facilities. (Dkts. 188-12 at 90–91; 188-15 at 162–165; 188-20 at 3; 188-36 at 3–4; 188-38 at 3–4; 188-39 at 34.) The State then determines the regional programs' final compliance ratings and provides feedback, including steps the programs should take to improve. (Dkts. 188-20 at 3; 188-36 at 3–4.)

Importantly, the Strategic Plan's individual action items relate directly to some of Dr. Elliott's criticisms and Plaintiffs' claimed injuries. For example, the standards on academic instruction include, among other things, ensuring "[t]eachers will plan and deliver Georgia Standards-based lessons for assigned subjects," ensuring regional programs provide "[s]upplemental instructional programs/materials . . . to meet the needs of students," and ensuring teachers and support staff engage in professional training, including by "attend[ing] instructional related trainings provided by the [DOE], . . . and conferences to ensure GNETS staff are aware of changes in the field and that instructional practices align[] with the [S]tate's expectations and standards." (Dkt. 188-9 at 14–15.)   Similarly, as part of the behavioral support and therapeutic services standards, the Plan requires regional programs to train staff on things like positive behavior intervention supports and trauma-informed care practices, create behavioral and therapeutic support teams at each GNETS site, and assess students' social-emotional development using "network approved standardized assessments." (Dkt. 188-9 at 11–12.)  And as for facilities management and safety, the Plan requires regional programs to use State-imposed facility condition

assessments, monitor facilities in line with those standards, and "advocate for repair/improvement with key stakeholders." (Dkt. 188-9 at 20.) Before implementing this component of the Strategic Plan, the State conducted a facility review and found several GNETS facilities could "no longer provide instructional therapeutic services" due to their condition. (Dkts. 188-99 at 4; 188-101 at 4.) The State noted that "findings from these assessments were related to building structures, ADA access, overall maintenance and adequate cafeterias and playgrounds." (Dkt. 188-101 at 4.) The State imposed a "mandatory exit plan for all students receiving services" in the affected sites and required the affected regional programs to either (1) submit a proposal to relocate to a new facility contingent on DOE approval, or (2) apply for State funding to cover the costs of repairs, which came with some State-imposed conditions. (Dkts. 188-99 at 4; 188-101 at 4.)

The State also ensures regional programs are complying with the Strategic Plan's standards by conducting regular reviews and even engaging in "regular site visits." (Dkt. 218-1 at 144.) While the Strategic Plan has nothing to do with whether a student is initially placed in GNETS, it clearly provides the State some oversight on how regional

GNETS programs provide academic instruction, behavioral and therapeutic supports, and facilities-based services—critical to Plaintiffs' claims they experience (or will experience) discrimination by receiving an inadequate education and lack the therapeutic supports they need to succeed.

Defendants counter that the Strategic Plan fails to show State control because "[n]one of the cited evidence identifies any consequences of alleged violations of" the Plan, such that the Plan is merely "guidance" and not "compulsory." (Dkt. 263 at 20.) But the evidence reveals otherwise. The GNETS Program Manager testified compliance with the Strategic Plan is "not optional." (Dkt. 188-4 at 114.) One regional GNETS director agreed the Strategic Plan "is designated by the State," is "implemented by the" regional GNETS program, and then the program is "accountable to the State for those criteria." (Dkt. 188-15 at 23.) Another director wrote in 2020 that her program was "required to abide by [DOE] mandated operational standards" and was "compelled by forced compliance with standards externally imposed and monitored by [the DOE]." (Dkt. 188-50 at 2.)[19] Also telling is the fact that regional GNETS

---

[19] Defendants argue this document is not evidence the State forces

programs must include their self-assessments under the Strategic Plan
in their application materials for future GNETS grants.  (Dkt. 191-1 at
81–82.)  According to a former member of the SBOE, the State has
authority—and has exercised this authority—to withhold or pause
GNETS funding to regional programs when those programs fail to comply
with State-imposed responsibilities.  (Dkt. 273-1 at 166–167.)[20]  In sum,
the Strategic Plan requires compliance with State-developed standards
in areas of GNETS operations that relate directly to Plaintiffs' claimed

---

compliance with the Strategic Plan because it does not identify what
standards the regional GNETS director was referencing.  (Dkt. 263 at 22
n.15.)  But the document goes on to say the subject regional program's
data on "behavioral, therapeutic, [and] academic" standards
"distinguishes and differentiates what [the program] is in fact doing . . .
thus enrollment has declined due to implementation of the operational
standards."  (Dkt. 188-50 at 2.)  This suggests the director is discussing
the Strategic Plan.  And in any event, at summary judgment, the Court
must view the evidence most favorably to Plaintiffs.  *Davis v. Williams*,
451 F.3d 759, 763 (11th Cir. 2006).

[20] For the same reasons, Defendants' new argument at summary
judgment that Plaintiffs' injuries are not traceable to them because there
is a non-judicial avenue for challenging the withholding of State funds
fails.  (Dkt. 214-1 at 25.)  The former SBOE official's testimony suggests
the State can withhold (and has withheld) GNETS funds through
outright denying or pausing grant money based on regional programs'
non-compliance with State-imposed "responsibilities."  (Dkt. 214-1 at 25.)
There is thus a question of fact over whether the State can (and/or has)
withheld GNETS funds outside the bounds of the non-judicial resolution
process cited by Defendants.

injuries. Failure to comply may result (and has resulted) in the State's withholding funding for regional programs. This is enough to show the State had some level of control or influence over the local school districts' use of GNETS funds.

That control, however, is not traceable to Plaintiffs' claimed injuries. Plaintiffs have not pointed to any evidence showing the State's enforcement of the Strategic Plan led to any student's improper segregation into GNETS or a worse education once placed there. Indeed, the Strategic Plan has nothing to do with a student's placement into GNETS at all. Nor is there evidence that the standards set forth in the Plan caused regional GNETS programs to fail to provide GNETS students access to libraries, cafeterias, or gyms (Dkt. 1 ¶ 94); provide a less rigorous, non-standard curriculum (Dkt. 1 ¶¶ 100–101); fail to employ teachers certified in the subject matter they are teaching or provide in-person rather than virtual instruction (Dkt. 1 ¶ 102–103); fail to provide access to elective or extracurricular activities (Dkt. 1 ¶ 104–105); improperly restrain students (Dkt. 1 ¶ 109); or provide inadequate facilities (Dkt. 242 at 5). Indeed, the Strategic Plan seems intended to *improve* these issues by, for example, requiring regional programs to

ensure teachers are better-trained and teaching the statewide curriculum, ensuring staff are trained on proper crisis intervention and "restraint methods," and keeping facilities up to par. (Dkt. 188-9 at 12, 14–15.) This evidence shows the State has some ability to identify poorly performing GNETS schools and to mandate improvements with the threat of withholding funds. But the power of the purse to compel better behavior does not amount to the responsibility for that bad behavior in the first instance.

The Court returns to the allegation the State has failed to provide W.J. appropriate access to science labs, media centers, and lunchrooms. Plaintiffs do not show that the State, by requiring the local GNETS program to comply with facilities standards set forth in the Strategic Plan, caused or even contributed to W.J.'s injuries. The Strategic Plan imposes safety and maintenance standards for local GNETS program, but nowhere do they require (or prohibit) those programs from offering science labs, media centers, lunchrooms, or any other specific service. So, the Strategic Plan does not allow traceability of W.J.'s injuries to the State. Nor do Plaintiffs offer any evidence suggesting the Strategic Plan

resulted in any of their alleged injuries. For all of these reasons, Plaintiffs have failed to show their injuries are traceable to Defendants.[21]

### C.   Redressability

The next step in the standing analysis is redressability. An injury is redressable when 'a decision in a plaintiff's favor would significantly increase the likelihood that [he or] she would obtain relief.'" *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1186 (N.D. Ga. 2022) (quoting *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019)); *see also Ga. Ass'n of Latino Elected Offs., Inc.*, 36 F.4th at 1116) (it must be "likely," not merely "speculative," that alleged injury will be redressed by a favorable decision). "Thus, if a state [] official lacks the authority to redress the alleged injury, the court cannot enter a judgment that may remedy the plaintiff's injury, which means the plaintiff lacks standing." *Fair Fight Action, Inc.*, 634 F. Supp. 3d at 1286.

---

[21] Defendants recently submitted supplemental authority to argue mere administration is no longer enough under the ADA to hold them liable, because the DOJ regulation imposing that type of liability is invalid. (Dkt. 288 (citing *Loper Bright Enters. v. Raimondo*, 2024 WL 3208360 (U.S. June 28, 2024).) Because the Court concludes Defendants do not even administer GNETS in a way that harms Plaintiffs, however, the Court need not answer whether *Loper Bright* invalidates the DOJ regulation.

Defendants say Plaintiffs lack standing because Defendants have no authority to redress their alleged injuries. (Dkt. 214-1 at 25–26.) According to Defendants, "an order against the State would not bind any local officials"—the people who make the educational decisions. (Dkt. 214-1 at 26.) Plaintiffs say their expert "identified several reasonable modifications that Defendants could make to their policies and practices to prevent the unnecessary segregation of students in GNETS." (Dkt. 242 at 8.)

The Court agrees with Defendants. None of those local actors are parties to this lawsuit. So no order would bind them or control how and where they educate GNETS students. The State could not force local actors to do the things Dr. Elliot says would prevent unnecessary segregation or discrimination. The State, for example, cannot control the placement decision of any specific student or group of students as state law leaves that to the local actors. Nor could the State control the educational services the local school boards provide. The State cannot, for example, require local actors to implement positive behavioral interventions and supports in the way Dr. Elliott recommends, make local school boards accept services from other State providers, or force

behavioral health service providers to partner with local school districts or become Medicaid providers. (Dkt. 188-61 at 20, 22.)

Consider the named Plaintiffs. The Court could not order the State to force their local school districts to remove any of them from GNETS (or, in J.F.'s and C.G.'s cases, to prevent their readmission into GNETS). It could not force the local school districts to use allocated GNETS funding to provide different services to the named Plaintiffs, or to accept other sources of funding to improve or modify the services the districts currently provide. The local school districts—and only those districts—make those decisions under well-established state law. The State's lack of authority in this regard defeats standing. *See Jacobson*, 974 F.3d at 1255 ("Because the [plaintiffs] failed to sue the officials who will cause any future injuries, even the most persuasive of judicial opinions would [be] powerless to redress those injuries.").[22]

---

[22] Plaintiffs don't ask the Court to do anything with regard to the Strategic Plan. But even if they did, any relief the Court could provide would be speculative. If, for example, the Court ordered the State to modify the Strategic Plan, local school districts could simply decline to follow it. While that may result in the State withholding funds, any particular district could simply choose not to accept those funds or even sue the State for overstepping its role. Put simply, because the State cannot mandate the local school districts do anything, nothing the Court could order the State to do would likely remedy Plaintiffs' injuries.

Indeed, to provide Plaintiffs the requested relief would require the Court to rewrite or ignore state statutes. Dr. Elliott, for example, suggests GNETS should more effectively implement positive behavioral interventions to better serve GNETS students, including Plaintiffs W.J. and J.F. (Dkt. 212 at 12–13, 28, 30.) But state law says local boards of education are "*encouraged*" to implement positive behavioral interventions in their schools, particularly in high need schools. O.C.G.A. § 20-2-741(b) (emphasis added). Nothing requires them to do so. To provide the requested relief, the Court would have to ignore this state law. It has no such authority. *Badaracco v. Comm'r*, 464 U.S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement.").

Plaintiffs, in essence, ask the Court to eliminate GNETS or require the State to do things the Court is not authorized to order. "But 'federal courts have no authority to erase a duly enacted law from the statute books.'" *Jacobson*, 974 F.3d at 1255 (citation omitted). Indeed, even assuming Plaintiffs could point to a State statute or regulation related to GNETS that violates federal law, federal courts can only "'enjoin executive officials from taking steps to enforce a statute.' [They] can

exercise that power only when the officials who enforce the challenged statute are properly made parties to the suit." *Jacobson*, 974 F.3d at 1255 (citation omitted).  This limitation on the Court's authority bars Plaintiffs' request that the Court mandate alternative funding or some other affirmative act by the State to remedy their alleged statutory injuries.  Plaintiffs thus have not shown the Court can redress any of those injuries.

Because the Court concludes Plaintiffs lack standing, it declines to consider the merits of their claims.

## IV.   Conclusion

The Court **GRANTS** Defendants' Motion for Summary Judgment (Dkt. 214) and Defendants' Motions for Leave to File Under Seal (Dkts. 207, 210).   The Court **DENIES AS MOOT** the remaining pending motions.  (Dkts. 187, 188, 211, 212, 213, 290, 294).

**SO ORDERED** this 27th day of September, 2024.


MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE