## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

The Georgia Advocacy Office, et al.,

        Plaintiffs,

v.                            Case No. 1:17-cv-3999-MLB

State of Georgia, et al.,

        Defendants.

_____/

## <u>ORDER</u>

In 2017, advocacy organizations for individuals with disabilities
and students with disabilities sued the State of Georgia, various state
agencies, and public officials in their official capacities for violating
federal law based on their operation of the Georgia Network of
Educational and Therapeutic Support ("GNETS"). (Dkt. 1.) They
asserted claims under the Americans with Disabilities Act, Section 504
of the Rehabilitation Act, and the Fourteenth Amendment's Equal
Protection Clause. (*Id.* ¶¶ 154–60, 161–65, 166–69.) After years of
litigation, the Court granted Defendants' motion for summary judgment
and dismissed this case for lack of standing. (Dkt. 303.) Plaintiffs now

move for reconsideration.  (Dkt. 305.)  Defendants respond.  (Dkt. 306.)[1]

The Court grants in part and denies in part the motion.[2]

## I.    Motion for Reconsideration Standard

"A motion for reconsideration made after final judgment falls within the ambit of either Rule 59(e) (motion to alter or amend a judgment) or Rule 60(b) (motion for relief from judgment or order)." *Arevalo v. Mentor Worldwide LLC*, 2022 WL 16753646, at *6 n.9 (11th Cir. Nov. 8, 2022).  Plaintiffs mention both Rules.  (Dkt. 305-1 at 3.)  But their characterization does not control.  *See Wusiya v. City of Mia. Beach*, 614 F. App'x 389, 395 (11th Cir. 2015) ("In classifying a post-judgment motion as either a Rule 59(e) motion or a Rule 60(b) motion,

---

[1] The Court, as did Defendants in their summary judgment briefing (Dkt. 214-1 at 1), uses "Defendants" and the "State" interchangeably unless otherwise noted.  These relevant Georgia agencies include the Department of Education, Department of Community Health ("DCH"), Department of Behavioral Health and Developmental Disabilities ("DBHDD").

[2] The Court assumes the reader is familiar with the background of this case.  The Court also notes this Order cites several unpublished cases that are not binding.  The Court cites them nevertheless as instructive. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

the party's label is not controlling.").  Plaintiffs filed their motion "28 days after the entry of . . . judgment," which is "within the period allowed under Federal Rule of Civil Procedure 59(e)."  Fed. R. Civ. P. 59(e); *Andela v. Univ. of Mia.*, 461 F. App'x 832, 837 (11th Cir. 2012).  And Plaintiffs "attack the merits" of the Court's summary judgment order, say "the order contain[s] errors of law," and ask the Court to "set aside [the] grant of summary judgment"—all of which are indicative of a Rule 59(e) motion.  *N. Ill. Gas Co. v. USIC, LLC*, 2023 WL 2977784, at *6 (11th Cir. Apr. 18, 2023); *Greene v. Ala. Dep't of Pub. Health*, 715 F. App'x 916, 919 n.4 (11th Cir. 2017); *Bell v. Fla. Highway Patrol*, 589 F. App'x 473, 474 n.1 (11th Cir. 2014).  So Plaintiffs' motion is "properly characterized as a Rule 59(e) motion to alter or amend the judgment, rather than a Rule 60 motion for relief from the judgment."  *Bell*, 589 F. App'x at 474 n.1.[3]

---

[3] *See Johnson v. Fla. Dep't of Corr.*, 829 F. App'x 889, 896 n.5 (11th Cir. 2020) ("[W]hen the post-judgment relief sought is the setting aside of the grant of summary judgment, it is properly characterized as a Rule 59(e) motion to alter or amend the judgment, rather than a Rule 60 motion for relief from the judgment."); *Brown v. Synovus Fin. Corp.*, 783 F. App'x 923, 931 (11th Cir. 2019) ("Rule 59(e) applies to motions for reconsideration of matters that are encompassed in a decision on the merits of the dispute; Rule 60 applies to motions for reconsideration of matters collateral to the merits."); *Caraway v. Sec'y, U.S. Dep't of Transp.*, 550 F. App'x 704, 710 (11th Cir. 2013) ("Because the plaintiffs

That said, "[r]elief under Rule 59(e) is an extraordinary remedy reserved for the exceptional case." *Martin v. Actavis Pharma, Inc.*, 71 F.4th 617, 620 (7th Cir. 2023); *see Banister v. Davis*, 590 U.S. 504, 516 (2020) ("Rule 59(e) motions seldom change judicial outcomes."). Litigants cannot use such motions to recycle old arguments or to offer new legal theories, evidence, or arguments that they should have presented in the previously filed motion. *Bryan v. Murphy*, 246 F. Supp. 2d 1256, 1259 (N.D. Ga. 2003). Rather, and as relevant here, movants may request reconsideration in the light of "manifest errors of law or fact." *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1250 (11th Cir. 2023).

"A manifest error is not just any error," a conclusion that "may or may not have been error," or a finding about which there is some "doubt." *In re D.C.*, 792 F.3d 96, 98 (D.C. Cir. 2015); *Broadnax v. Dunn*, 2020 WL 3051239, at *1 (N.D. Ala. June 8, 2020). It is "[a]n error that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record." *Error*,

---

filed the motion for reconsideration within 28 days of the district court's dismissal order, and because the plaintiffs' motion calls into question the correctness of that order, we construe the plaintiffs' motion as being filed under Rule 59(e).").

Black's Law Dictionary (11th ed. 2019) (defining "manifest error"); *see Shuler v. Garrison*, 718 F. App'x 825, 828 (11th Cir. 2017).[4]  This is a "stringent" standard. *Sheffler v. Americold Realty Tr.*, 2023 WL 3918491, at *2 (11th Cir. June 9, 2023).  And its application is "committed to the sound discretion of the district judge."  *Mincey v. Head*, 206 F.3d 1106, 1137 (11th Cir. 2000).

## II.  Discussion[5]

Defendants moved for summary judgment, arguing Plaintiffs lack Article III standing.   (Dkt. 214-1.)    Defendants attacked Plaintiffs'

---

[4] *See also Dickinson v. Zurko*, 527 U.S. 150, 155 (1999) (noting "clear case of error," "clearly wrong," and "manifest error" are phrases that "might be thought to mean the same thing"); *Montes v. Shearson Lehman Bros.*, 128 F.3d 1456, 1461 (11th Cir. 1997) ("'Manifest' means 'evident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not obscure or hidden, and is synonymous with open, clear, visible, unmistakable, undubitable, indisputable, evident, and self-evident.'").

[5] In the light of the parties' many arguments, the Court considers the arguments as follows.  First, the Court disregards several arguments raised by the parties in a perfunctory manner, in footnotes, or in a reply brief.  *See Whitten v. SSA, Comm'r*, 778 F. App'x 791, 793 (11th Cir. 2019) ("For an issue to be adequately raised in [a] brief, it must be plainly and prominently raised and must be supported by arguments and citations to the record and to relevant authority."); *Pinson v. JPMorgan Chase Bank, N.A.*, 942 F.3d 1200, 1209 n.5 (11th Cir. 2019) ("We do not ordinarily consider arguments raised in passing in one footnote rather than the

standing at each element, claiming (1) Plaintiffs never suffered a cognizable injury in fact for their *Olmstead* and non-*Olmstead* claims; (2) Plaintiffs' claimed injuries are traceable to local actors, not Defendants; and (3) so any action against them wouldn't redress the cited harms. (*Id.*) The Court granted the motion. (Dkt. 303.)[6] Now, Plaintiffs say the Court erred by:

> (1) analyzing standing for Plaintiff C.G. rather than Plaintiff C.R.;
>
> (2) assessing the credibility of Plaintiffs' evidence when concluding Plaintiffs largely failed the injury in fact requirement;

---

body of the brief"); *United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994) ("Arguments raised for the first time in a reply brief are not properly before a reviewing court."). That includes extraneous string cites a party includes in footnotes to conserve space, thus circumventing the Local Rule's page limits. Second, the Court focuses on the parties' most significant arguments and gives short shrift to arguments that lack merit. *See, e.g.*, *Duren v. Hopper*, 161 F.3d 655, 667 n.16 (11th Cir. 1998) ("All other arguments are without merit and warrant no discussion."); *Palciauskas v. U.S. INS*, 939 F.2d 963, 966 n.4 (11th Cir. 1991) ("Petitioner presents several other arguments that are without merit and warrant no discussion.").

[6] The Court consequently denied as moot all remaining motions. Plaintiffs, for example, moved to certify a putative class and for summary judgment, arguing Defendants "administered" GNETS in a manner to hold them liable under the ADA and Rehabilitation Act. (Dkts. 187; 188.) Plaintiffs now move for reconsideration *only* of the Court's granting of Defendants' motion. (Dkt. 305.)

(3) holding sua sponte Plaintiffs The Arc of the United States and The Georgia Advocacy Office ("GAO") lack standing;

(4) concluding improperly that Plaintiffs insufficiently showed traceability and redressability;

(5) applying the Individuals with Disabilities Education Act ("IDEA"); and

(6) dismissing the action with prejudice.

(Dkt. 305-1 at 1–3.)    Plaintiffs insist these "clear errors" warrant reconsideration.    (*Id.*)    Subject to one clerical error, Plaintiffs fail to identify any errors—let alone "manifest errors"—that, if corrected, would change the outcome of the Court's ruling.

Before diving into Plaintiffs' specific arguments, the Court must address the elephant in the room: the many deficiencies in Plaintiffs' motion.    Plaintiffs mostly seek to "relitigate old matters" and "reargue[] prior arguments" from their summary judgment briefing.    *MacPhee*, 73 F.4th at 1250; *Holt v. United States*, 249 F. App'x 753, 756 (11th Cir. 2007).    And Plaintiffs' motion sometimes includes evidence they could have presented to the Court in their statement of material facts but did not do so.    *See United States v. F.E.B. Corp.*, 52 F.4th 916, 933 (11th Cir. 2022) ("Litigants cannot use a Rule 59(e) motion to raise argument or present evidence that could have been raised prior to the entry of

7

judgment."). What's more, Plaintiffs' approach spreads their points so thin they often amount to nothing at all. They, for instance, often try to compensate for their lack of analysis by providing lengthy string cites to evidence or cases, most of which comes nowhere close to supporting the cited proposition. The Court has tried its best to give Plaintiffs the benefit of the doubt for many of their arguments or citations. And it occasionally notes the most egregious examples of these missteps. But the Court does not allow parties to raise cursory, undeveloped arguments in hopes that it will comb through this exceedingly dense record and build out their arguments. They bear the burden at this stage, anyway. These deficiencies are fatal to most of their arguments. In the interest of completion, however, the Court addresses Plaintiffs' arguments in turn, devoting at least proportionate attention to the effort Plaintiffs dedicate when making the arguments.

### A.    Ground One

In May 2023, the Court granted Plaintiffs' motion to replace the three original named Plaintiffs for three new named Plaintiffs: W.J., J.F., and C.G. (Dkt. 167.) Several months later, Dr. Judy Elliott (one of Plaintiffs' experts used to show the injury in fact requirement) authored

a report discussing only those new named Plaintiffs.  (Dkt. 188-10 at 31 (report dated August 31, 2023).)   Months later, however, the Court granted Plaintiffs' motion to substitute Plaintiff C.R. for Plaintiff C.G. (Dkt. 186.)  Apparently noticing Dr. Elliott's report has no discussion of C.R., Plaintiffs produced a short, supplemental declaration by Dr. Elliott, noting her opinions regarding C.R. and how she formed them. (Dkt. 187-15.)  But when moving for summary judgment, Plaintiffs never attached Dr. Elliott's supplemental declaration, including only Dr. Elliott's original report.  (Dkts. 188.).  And Plaintiffs made no mention of either C.R. or Dr. Elliott's supplemental declaration in their many statements of material facts.  (*See* Dkts. 188-2; 244.)  In the Order, the Court recognized C.R. as a named Plaintiff student and, unlike the other students, did not expressly analyze C.R.'s standing.   (Dkt. 303 at 7.) Plaintiffs now say the Court manifestly erred by analyzing former named Plaintiff C.G. instead of C.R., "who remains segregated in GNETS" and "has standing to raise her claims."  (Dkt. 305-1 at 5.)

Even if Plaintiffs are right, the issue amounts to, at most, harmless error.  Plaintiffs give little effort to show how C.R. has standing.  (*See* Dkt. 305-1 at 5 (concluding summarily "C.R. goes to school at GNETS

and has standing to raise her claims").)  Perhaps for good reason, too, since C.R. lacks standing for the same reasons that the Court concluded W.J. lacks standing.  C.R., like W.J., "attends a GNETS center" in Georgia.  (*Compare* Dkts. 187-15 ¶ 9, *with* 212-1 at 29.)  In her supplemental declaration, Dr. Elliott averred she followed the same methodology and reviewed the same records as done in her expert report.  (*Compare* Dkts. 187-15 ¶¶ 4–5, *with* 212-1 at 5–7, 27.)  She testified that her review of those records demonstrated C.R., "like the record of other GNETS students," "has been unnecessarily segregated in GNETS."  (Dkt. 187-15 ¶¶ 6, 7.)  On her *Olmstead* claims, however, these conclusory remarks of C.R.'s "unnecessary segregation" fail to establish an injury in fact.  As the Court noted in its Order discussing W.J., Dr. Elliott would have had to explain C.R.'s "disabilities, how they manifest in the classroom setting, and how the school district could provide accommodations to enable [her] to receive the necessary education in a less restrictive setting."  (Dkt. 303 at 21.)  She never did that.  So Dr. Elliott's conclusory opinion cannot establish C.R.'s injury in fact for the *Olmstead* claim.

Regarding the non-*Olmstead* claims, Dr. Elliott's supplemental declaration establishes an injury in fact for C.R. for the same reasons the Court previously held such an injury in fact existed for W.J.  (*Id.* at 29–31.)  Dr. Elliott, most importantly, opines that C.R. (like W.J.) received "poor instruction within GNETS" and "has been repeatedly restrained and suspended," suggesting GNETS provided C.R. inferior educational opportunities to those of non-disabled students.  (*Compare* Dkts. 187-15 ¶¶ 11 & 13, *with* 212-1 at 29–30.)

Still, C.R.'s non-*Olmstead* claims fail at traceability and redressability, just like W.J.'s non-*Olmstead* claims fail in this regard. While the evidence shows, for example, the State has some control over GNETS facilities and C.R. "has received poor instruction within GNETS," they offer no evidence connecting the State to these local school-board-level failures in providing the services.  (Dkt. 187-15 ¶¶ 11–12.) Similarly, though Dr. Elliott averred C.R. "has not received services from outside professionals while at her zoned school," mostly from the absence of "any appropriate [positive behavioral interventions supports] strategies" in GNETS (*Id.* ¶ 12), the State cannot "require local actors to implement [these interventions and supports] in the way Dr. Elliott

11

recommends" (Dkt. 303 at 74).  After all, to do so would require rewriting O.C.G.A. § 20-2-741, which merely "encourage[s]" local boards to implement those interventions.  *See* O.C.G.A. § 20-2-741(b)(1) ("Local boards of education are encouraged to implement PBIS and RTI programs and initiatives in their schools, and particularly in high needs schools.").  In short, any such error is harmless.[7]  So this argument fails.

## B.    Ground Two

At summary judgment, Plaintiffs produced Dr. Elliott's report to support their claims.  (Dkt. 188-10.)  Defendants subsequently moved to

---

[7] There's also the problem with Plaintiffs' presentation of this evidence. While they cited Dr. Elliott's supplemental declaration in their response to Defendants' motion for summary judgment (Dkt. 242 at 2), no one ever really discussed C.R. in their statement of material facts or even cited Elliott's supplemental declaration there.  (*See* Dkts. 243; 263-1; 274; 275-1.)  And although they now rely on certain deposition testimony given on C.R.'s behalf (Dkt. 305-1 at 7), Plaintiffs admit they omitted altogether this evidence from their motion for summary judgment and class certification briefing given "briefing timelines" (*Id.* at 7 n.4.).  So it fell well within the Court's discretion to ignore their evidence and focus on the other Plaintiffs Dr. Elliott described in her report.  *See* LR 56.1(B)(1)(d), NDGa (instructing courts to disregard evidence "set out only in the brief and not in the movant's statement of undisputed facts"); *see also Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (Compliance with Local Rule 56.1 is the only is "the only permissible way for [Plaintiffs] to establish a genuine issue of material fact.").  And though the Court drew some "arguments" from Plaintiffs' motion for class certification (Dkt. 303 at 8 n.3), it didn't say it would hunt and peck through this expansive record to collect Plaintiffs' supporting *evidence*.

exclude her testimony pursuant to Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (Dkt. 212.) The Court, however, found Defendants entitled to summary judgment, even considering Dr. Elliott's testimony. (Dkt. 303 at 14 n.5.) Applying basic summary judgment law on conclusory expert opinions, the Court carefully parsed Dr. Elliott's conclusions and reasoning. (*Id.* at 14–31.) It ultimately found many of Dr. Elliott's conclusions insufficiently supported. (*Id.*) Plaintiffs, citing this discussion, now say the Court erred when it "assessed the credibility of Plaintiffs' proffered evidence," and evaluated their evidence under a standard that goes "well beyond the 'low' threshold required for showing injury." (Dkt. 305-1 at 5–8.)

True enough, courts cannot weigh evidence or make credibility decisions at summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage[,] the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). But the Order never waded into that territory. Indeed, Plaintiffs' criticism reflects a misunderstanding between the terms credibility and sufficiency. On the one hand, credibility means the veracity or

trustworthiness of some evidence.  *Credibility*, Black's Law Dictionary (12th ed. 2024) ("The quality that makes something (as a witness or some evidence) worthy of belief."); *Credible Evidence*, Black's Law Dictionary (12th ed. 2024) ("Evidence that is worthy of belief; trustworthy evidence.").   Sufficiency—on the other hand—(at least at summary judgment) means whether the evidence, taken as true, creates a genuine issue of material fact or stands for the cited proposition.

The Court's analysis of Dr. Elliott's report easily falls into this second category.  At summary judgment, conclusory expert opinions cannot create a genuine issue of material fact.  *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment."); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (explaining the Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value" and cannot defeat a well-supported motion for summary judgment); *Matthiesen v. Banc One Mortg. Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999) ("[T]he testimony of an expert can be rejected on summary judgment if it is conclusory and thus fails to raise a genuine issue of material fact.").  This

hornbook principle requires the Court—as it did in the Order—to assess the factual support for Dr. Elliott's conclusions and determine whether they created a triable issue (sufficiency), not whether the Court believes the support to be true or worthy of belief (credibility).

To be sure, consider the examples of the Court supposedly weighing credibility that Plaintiffs cite. They first contend the Court assessed Dr. Elliott's credibility on her *Olmstead*-related conclusions. (Dkt. 305-1 at 6.) But the Court never passed on, for example, whether it doubted the accuracy of her testimony. Rather, the Court explained how she "provide[d] almost no details" to back her unnecessary segregation conclusions and why her sweeping generalization that "'most' disabled students or a 'vast majority of them' do not require segregation into GNETS does not support standing for any particular Plaintiff." (Dkt. 303 at 17–19.) Plaintiffs also say the Court weighed in on Dr. Elliott's credibility "with respect to whether named Plaintiffs W.J. and J.F. suffered from unnecessary segregation." (Dkt. 305-1 at 6.) Yet again, however, the Court took care to describe how none of Dr. Elliott's "general assertions" suggested W.J. and J.F. were unnecessarily segregated in GNETS. (Dkt. 303 at 19–24.) So Defendants are right: "the Court's

conclusions that evidence did not explain 'why,' 'how,' or 'if' something occurred are based on the *insufficiency* of Plaintiffs' evidence and not the Court's considerations of the *quality* of Plaintiffs' evidence." (Dkt. 306 at 10.) Plaintiffs' argument thus fails.[8]

---

[8] Plaintiffs also raise several other meritless arguments in this section. First, they say *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 879 (11th Cir. 2000) limits the Court's ability to decide disputed factual issues or make credibility decisions without a hearing. (Dkt. 305-1 at 6, 8; 307 at 4–5.) Yes and no. Yes, *Bischoff* stands for that principle. But no, the Court never made these findings of credibility or fact in the first place, as explained above. Second, they believe a disputed factual question existed on Plaintiffs' injuries because Dr. Elliott's testimony on Plaintiffs' inadequate "behavioral services in zoned schools prior to GNETS admission" conflicts with other deposition testimony noting "behavioral intervention plans [] and functional behavioral assessments [] are routinely prepared and implemented prior to student referral to GNETS." (Dkt. 307 at 4.) Though the Court hardly understands this argument, Plaintiffs raise it the first time in their reply, so the Court ignores it. Finally, citing Dr. Elliott's report generally, her supplemental declaration (not attached to their summary judgment papers), and miscellaneous deposition testimony (some of which they admit they never attached, either (*see* Dkt. 305-1 at 7 n.4)), they say the Court wrongly found they produced no evidence suggesting their injury in fact for the *Olmstead* claims because "Plaintiffs provided ample evidence to support all three individual named Plaintiffs' *Olmstead* claims." (Dkt. 305-1 at 7 (citing Dkt. 303 at 25).) Absent some explanation about *how* the cited evidence shows *Olmstead*'s appropriateness or consent requirements, the Court doesn't consider this perfunctory argument.

## C.    Ground Three

At summary judgment, Defendants moved under a theory that Plaintiffs generally lacked standing to assert any of their claims. (Dkt. 214-1 at 13–28.)  They argued Plaintiffs failed to raise a cognizable injury in fact for any of their "three types of injuries"—injury to named Plaintiffs, injury to a putative class of Plaintiffs, and injury to those "at risk" of institutionalization in GNETS.  (*Id.* at 14.)  Confronted with that broad argument, Plaintiffs never challenged that assertion.  Rather, Plaintiffs, too, took a broad approach, arguing generally "Plaintiffs . . . have presented significant evidence of harm in the form of unnecessary segregation and unequal education opportunities." (Dkt. 242 at 3–7.)  The Court ultimately found Plaintiffs failed to show an injury in fact for their *Olmstead* claims, and, alternatively, the remaining claims failed at traceability and redressability.  (Dkt. 303 at 24–33.)  Now, Plaintiffs say the Court erred by "sua sponte" dismissing The Arc and GAO without giving them a chance to show such standing. (Dkt. 305-1 at 8–9.)  Plaintiffs contend Defendants never expressly said The Arc and GAO (known collectively in the Order as "organizational

Plaintiffs") lack standing, so the Court shouldn't have passed on this issue. (*Id.*)  The Court disagrees.

Courts have "an independent obligation to assure that standing exists" at every point in the litigation. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).  To that end, as Plaintiffs point out, "the Supreme Court has explained that, in limited circumstances, 'elementary principles of procedural fairness' mandate that a court provide the party with 'an opportunity to provide evidence of [its standing]' instead of *sua sponte* dismissing the action for lack of jurisdiction." *City of Mia. Gardens v. Wells Fargo & Co.*, 956 F.3d 1319, 1320 (11th Cir. 2020) (alterations in original) (quoting *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 271 (2015)).  The Court's analysis never departed from that principle.  Here, Plaintiffs faced this lack of standing argument since the earliest days of this case. (*See, e.g.*, Dkt. 98-1 (Defendants' 2020 motion for judgment on the pleadings for lack of standing).)  At summary judgment, Defendants attacked each element of Plaintiffs' standing, arguing generally "Plaintiffs lack standing." (*See* Dkt. 214-1 at 13–28.)  At the very latest, they knew Defendants believed their evidence on standing failed to create a genuine issue of material fact by that point.  Their opportunity

to put forth evidence supporting their injuries—for each Plaintiff—existed at summary judgment.  They tried (and failed) in their response.  (Dkt. 242 at 1–8.)  That they failed to create a genuine issue of material fact on standing does not mean the Court sua sponte resolved the issue.  *Cf. Ala. Legis. Black Caucus*, 575 U.S. at 270–71 (observing the unfairness of dismissing a claim for lack of standing where plaintiff produced evidence creating "a common sense inference" that it had standing, and neither the lower court nor defendants challenged that evidence before dismissal); *City of Mia. Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1286 (11th Cir. 2019) (non-movant "had more than enough time to take any steps necessary to ensure that it would be able to prove standing," and the movant "actively contested the [non-movant's] proof of injury and causation, the very elements of standing that [the court] determined the [non-movant] failed to establish").

Indeed, rather than making this argument on its own, the Court addressed the argument exactly as presented.  As mentioned above, Defendants challenged each element of standing for all Plaintiffs.  (Dkt. 241-1 at 13–28.)  Plaintiffs responded with generalities about their standing as a group.  (Dkt. 242 at 1–9.)  Because the parties argued at

19

such high level of generality, the Court focused the issue according to each Plaintiff, the claims they pressed, and the remedy they sought. (*See, e.g.,* Dkt. 303 at 20–26, 28–29.)  Standing jurisprudence demands that kind of specificity.  *See Davis v. FEC*, 554 U.S. 724, 734 (2008) ("[A] plaintiff must demonstrate standing for each claim [he or she] seeks to press and for each form of relief that is sought." (internal quotation marks omitted)).  So to evaluate whether GAO and The Arc had standing, the Court considered the type of injuries the organizational Plaintiffs asserted.  *See Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1571 (11th Cir. 1991) ("The courts apply slightly different tests to examine when an organization has standing to bring a claim directly and when the organization has standing to bring the claim on behalf of its member.").  Because organizational Plaintiffs never challenged Defendants' assertions of their types of injuries to their members (as opposed to *themselves* as organizations) in their summary judgment papers (which organizational Plaintiffs signed onto, Dkt. 242 at 33–34), the Court considered whether organizational Plaintiffs' "members themselves 'would otherwise have standing to sue in their own right.'" *Cahaba Riverkeeper v. EPA*, 938 F.3d 1157, 1162 (11th Cir. 2019)

(quoting *Hunt v. Wa. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  To do this, the Court decided whether Plaintiffs' members had "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  That is precisely how Defendants framed (and Plaintiffs responded to) the issue.  It thus makes no sense to claim the Court sua sponte resolved an issue by directly addressing the arguments presented.  Their argument thus lacks any merit and fails.[9]

### D.   Ground Four

At summary judgment, Defendants alternatively argued that all Plaintiffs' cited injuries are traceable to local boards of education and

---

[9] Plaintiffs also complain the Court never gave them (specifically GAO) a chance to show standing as Georgia's Protection and Advocacy agency, which could show direct injury to itself (as opposed to injuries on behalf of its members).  (Dkts. 305-1 at 9; 307 at 6.)  That would have been a fine argument to make at summary judgment.  But having failed to make that argument then, they cannot do so now.  *See Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1338 (N.D. Ga. 2000) ("Parties [] may not employ a motion for reconsideration as a vehicle to present new arguments or evidence that should have been raised earlier[.]").  Even if they had raised the argument and proved injury to themselves, however, they could not hurdle the Court's redressability holding.

other local actors only, not the State. (Dkt. 214-1 at 22–25.) Defendants also said no court order (or injunction) here could redress Plaintiffs' harms because the State has no authority to take those actions. (*Id*. at 25–26.) The Court agreed with both arguments. Because Plaintiffs framed their traceability analysis in terms of the State's control and direction over GNETS, the Court examined traceability from that angle. (Dkt. 303 at 36.) After reviewing Georgia's constitutional and statutory scheme for public education, the Court dug into the evidence for each supposed discriminatory action and found none had a connection to the State (or at least not in some relevant way to their harms). (*Id*. at 37–73.) Next, the Court found it couldn't order the State to do any of the cited actions because the State has no authority over those matters. (*Id*. at 73–77.) Plaintiffs now say the Court erred in both sections. (Dkt. 305-1 at 10.) They say the Court's analysis rests on a faulty conclusion "that the State cannot 'force' local entities to take action that would address Plaintiffs' claims," "improperly dismissed the role of [the] State [] in GNETS . . . and completely ignored Defendants [DBHDD] and [DCH]." (*Id*. at 2–3.) For both issues, Plaintiffs largely double-down on their previously rejected arguments. So the question becomes whether

Plaintiffs have shown manifest error of law or fact in the prior traceability or redressability analysis. For the reasons discussed below, they come nowhere close.

### 1. Traceability

Standing's traceability prong requires a plaintiff to show some "fairly traceable connection between [a] plaintiff's injury and the complained-of conduct of [a] defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998); *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1116 (11th Cir. 2022). This standard, however, is more forgiving than a typical proximate cause analysis. *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("[I]n evaluating Article III's causation (or 'traceability') requirement, we are concerned with something less than the concept of 'proximate cause.'"). Still, a plaintiff's injury cannot "result [from] the independent action of some third party not before the court." *Hollywood Mobile Ests. Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265 (11th Cir. 2011); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020). Accordingly, traceability does not exist where "an independent source would have caused [the

plaintiff] to suffer the same injury." *Swann v. Sec'y, Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012).

On traceability, Plaintiffs specifically fault the Court for applying a traceability standard akin to proximate causation and failing to consider the roles of Defendants DBHDD and DCH in administering GNETS. (Dkt. 305-1 at 11–15.)   None of these arguments have merit.   At the outset, Plaintiffs make a slightly different argument than they made in their summary judgment papers.   Earlier, Plaintiffs claimed "Defendants do administer and exercise control over GNETS," so their "actual injuries are directly traceable to Defendants." (Dkt. 242 at 8.)   Perhaps realizing the tenuous connection, they presently say their injuries flow "at least indirectly, if not directly" from their many cited instances of the State's supposed control of and direction over GNETS.   (Dkts. 305-1 at 11–12; 307 at 7.)   So, they reason, the Court must have applied too rigorous a standard for causation.   (*Id.*; *Id.*)

Plaintiffs misunderstand the prior Order's reasoning.   Their traceability argument faced an uphill battle from the start since the injury they alleged arose from the conduct of third parties.   *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 381 (D.C. Cir. 2020) ("Where

traceability and redressability depend on the conduct of a third party not before the court, 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992))). And their problem at summary judgment was not one of degree. Instead, their causation argument failed because they never produced sufficient evidence showing *any* of their cited harms—unnecessary segregation and unequal education opportunities—are traceable (directly or indirectly) to the State. (*See, e.g.*, Dkt. 303 at 43–44 ("Having failed to tie any specific State conduct to Plaintiffs' specific injuries, Plaintiffs cannot show those injuries are traceable to Defendants.").) The Order painstakingly walked through this disconnect for each of Plaintiffs' cited instances of control. It, for example, surveyed Georgia's constitutional and statutory scheme, which affords local school boards near plenary control over the very actions Plaintiffs say harmed them. (Dkt. 303 at 37–42.) The Court then explained why each action Plaintiffs cited as indicative of the State's control (or "administration") lacked an evidentiary footing. (Dkt. 303 at 44–73.) So they failed to show any relevant connection, either directly or indirectly, between their cited harms and Defendants.

25

Plaintiffs' other argument about Defendants DBHDD and DCH fares no better. They insist the Court overlooked these specific Defendants, "who have clear and separate ADA obligations related to their respective agency missions to administer medically necessary Medicaid and other behavioral health services to Georgia's eligible recipients, including GNETS students." (Dkt. 305-1 at 13.) As they did in their summary judgment brief (Dkt. 188-1 at 20–22), Plaintiffs say DBHDD and DCH "administer" GNETS because they must "develop[] a coordinated system of care" for students (like some in GNETS), and DCH "administers the State's Medicaid and Peach Care for Kids program, which provide significant funding for GNETS." (Dkt. 305-1 at 13–14.) This argument misses the point. Even if those agencies have distinct roles, they never produced any evidence demonstrating *how* those functions linked up with their cited harms. Although the Court never mentioned those specific agencies, it held Plaintiffs either did not (or could not) link that particular form of control to their harms. As explained in the Order, their "system of care" argument falls flat since Plaintiffs "cannot show state control by proving a negative" because, "[u]nder any definition, inaction is not direction." (Dkt. 303 at 56 n.15,

57–58.)  The same is true for their funding of GNETS argument.  (*See id.*

at 74–75 ("The State cannot . . . force local behavioral health service

providers to partner with local school districts or become Medicaid

providers.").)    Put simply, "the power of the purse to compel better

behavior does not amount to the responsibility for that bad behavior in

the first instance."  (*Id.* at 73.)   These recycled arguments have not

changed the Court's mind.  *Bryan*, 246 F. Supp. 2d at 1259 ("[M]otions

for reconsideration may not be used to present the court with arguments

already heard and dismissed or to repackage familiar arguments to test

whether the court will change its mind.").  Plaintiffs thus fail to show any

error.[10]

### 2.    Redressability

"An injury is redressable when 'a decision in a plaintiff's favor

would significantly increase the likelihood that [he or] she would obtain

---

[10] Plaintiffs also argue *Parrales v. Dudek*, 2015 WL 13373978 (N.D. Fla. Dec. 24, 2015) suggests their harms are traceable to at least DBHDD and DCH.  (Dkt. 305-1 at 12, 14.)    Setting aside that *Parrales* was a motion-to-dismiss case, the Court's preceding discussion of their other principal case, *United States v. Florida*, 682 F. Supp. 3d 1172 (S.D. Fla. 2023), suffices because both cases used similar reasoning and reached similar outcomes.

relief.'" *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1186 (N.D. Ga. 2022) (quoting *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019)); *see also Ga. Ass'n of Latino Elected Offs., Inc.*, 36 F.4th at 1116 (it must be "likely," not merely "speculative," that alleged injury will be redressed by a favorable decision).  "[W]hen a plaintiff's theory of redressability depends on the possible future actions of nonparties, '[a]ny persuasive effect a judicial order might have upon . . . absent nonparties who are not under [a defendant's] control, cannot suffice to establish redressability.'" *Berrocal v. Att'y Gen. of United States*, 136 F.4th 1043, 1052 (11th Cir. 2025) (quoting *Jacobson*, 974 F.3d at 1254).  Rather, "it must be the effect of the court's judgment on [a] defendant—not an absent third party—that redresses [a] plaintiff's injury, whether directly or indirectly." *Id.* (citing *Lewis*, 944 F.3d at 1301).  So, in a case against a state official, if the official "lacks the authority to redress the alleged injury, the court cannot enter a judgment that may remedy [a] plaintiff's injury, which means the plaintiff lacks standing." *Fair Fight Action, Inc.*, 634 F. Supp. 3d at 1186; *see, e.g.*, *Haaland v. Brackeen*, 599 U.S. 255, 292–93 (2023) (finding no redressability when parents sued federal parties for injunction but state courts "apply the placement preferences

[for adoptions], and state agencies carry out the court-ordered placements"). The Supreme Court seems to have expanded this somewhat, allowing a plaintiff to establish redressability by showing third parties will likely react to judicial relief in predictable ways that will likely redress the plaintiff's injury. *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2134 (2025).

Regarding redressability, Plaintiffs complain the Court erroneously concluded "both it and Defendants are powerless to impose requirements on local educational agencies." (Dkt. 305-1 at 15–17.) Relying on *United States v. Florida*, 682 F. Supp. 3d 1172 (S.D. Fla. 2023), they expand on this by saying their many proposed modifications "will have a 'predictable effect' on the local education agencies, counties, behavioral health providers, and others responsible for delivering services to Plaintiffs and Putative Class Members." (*Id.*)

This argument falters too. Here again, Plaintiffs—faced with Defendants' redressability contention that no court order could compel the local school boards to act (Dkt. 214-1 at 25–28)—never made this "predictable effects" argument in their summary judgment response or opening brief. Rather, they simply recited that "Defendants could take

[their proposed modifications] and other actions that would directly redress the legal harms Plaintiffs have incurred." (Dkt. 242 at 9.) The time to raise this "predictable effects" argument has passed. *Bally Exp. Corp. v. Balicar, Ltd.*, 804 F.2d 398, 404 (7th Cir. 1986) ("[A] motion for reconsideration is an improper vehicle to . . . tender new legal theories.").

But even if they had made this argument, it would still founder because they never really wrestle with the core issue: the State's lack of authority to compel the action they seek and how that lack of authority precludes a finding that third parties will respond to an order from this court in a predicable way that redresses their alleged injury. Because the local school boards have nearly exclusive authority to take the actions they complain about, Plaintiffs' insistence that "the ADA requires that public entities such as . . . DCH[] and DBHDD take affirmative steps to comply with federal disability antidiscrimination mandates" continues to ring hollow. (Dkt. 307 at 12.)

To be sure, their principal authority—*United States v. Florida*—only illustrates their misstep. In that case, the State of Florida argued plaintiffs lacked standing to bring *Olmstead* claims involving the provision of Medicaid services against it because third parties (managed

30

care plans and nursing homes) provided those services and thus the relief plaintiffs sought would depend "on the actions of [those] third parties." 682 F. Supp. 3d at 1193. The court rejected that argument, noting (1) the state chose to outsource its statutory obligation to comply with the ADA to these third parties; (2) the state's contracts with those third parties were "extremely detailed and demanding—requiring 100% delivery of services," including details like how quickly the third parties had to respond to phone calls; and (3) the plaintiff "presented sufficient evidence at trial that enjoining the [s]tate would have a predictable effect on the decisions of [those] third parties." *Id.* at 1193–94.

Nothing close to that exists here. The State Defendants don't have some primary duty to educate students or provide special education that they willingly delegated away to local education agencies. Those third parties—the local education agencies—have that duty in the first place. And since the State never delegated its authority, it kept no contractual control over the local actors. Indeed, the relationship between the State and the third parties in this case (local education agencies) presents the antithesis of the relationship between the state and the third parties (managed care plans and nursing homes) at issue in *Florida*. And, far

from presenting evidence that judicial relief against the State would have predictable effects on the third-party actors, Plaintiffs cannot overcome Georgia's constitutional and statutory structure on providing special education and the GNETS Rule itself that preclude those predictable effects.  Georgia law limits the State's role in special education to: "(1) operating three schools, not at issue in this litigation; (2) establishing GNETS eligibility criteria; and (3) providing funding to local school districts for GNETS services."  (Dkt. 303 at 37.)  "[L]ocal actors—not Defendants—decide whether to place a student in GNETS and the educational services the student receives in the program." (*Id.* at 44.)  In short, Plaintiffs' insistence that their proposed modifications would have a predictable effect on the local boards of education fails to grapple with this constitutional and statutory structure.

Persisting, Plaintiffs cite *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) and argue their proposed "reasonable modifications" would have a predictable effect on the local actors because they would "necessarily change the system in which [the local actors] operate." (Dkts. 305-1 at 16–17; 307 at 12–13.)  That case stands for no such broad principle.    In *Dep't of Com.*, state and local governments and

non-government entities challenged a decision by the Secretary of Commerce to include a citizenship question on the 2020 census questionnaire, saying the question would cause lower response rates from non-citizen households and that, in turn, would diminish the plaintiffs' political representation and cause them to receive fewer federal funds. *Id.* at 765–67. The United States argued plaintiffs lacked standing because "any harm to [plaintiffs was] not fairly traceable to the Secretary's decision, because such harm depend[ed] on the independent action of third parties choosing to violate their legal duty to respond to the census." *Id.* at 767. The Supreme Court rejected that argument because the plaintiffs' evidence "established that noncitizen households [had] historically responded to the census at lower rates than other groups" and that "the discrepancy [was] likely attributable at least in part to noncitizens' reluctance to answer a citizenship question." *Id.* at 768. So, the Supreme Court concluded the plaintiffs "met their burden of showing that third parties [would] likely react in predictable ways to the citizenship question." *Id.*

In their motion for reconsideration, Plaintiffs insist, without citing any non-conclusory evidence, that local, independent agencies surely

must respond predictably in a new system that the Court could order the State Defendants to implement. (Dkt. 307 at 13). This general statement untethered from some evidence on how the local boards would respond isn't enough. *See Lujan*, 504 U.S. at 562 (When the existence of an element of standing "depends on the unfettered choices made by independent actors and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," it "becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury."); *see also Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024) ("Rather than guesswork, the plaintiffs must *show* that the third-party [actors] 'will likely react in predictable ways' to the defendants' conduct." (emphasis added) (quoting *Dep't of Com.*, 588 U.S. at 768)). And other than that unsupportive citation, they provide no authority supporting or even suggesting their approach is acceptable.

Take the proposed modifications they think the Court could order to redress their harms. Recycling the same evidence and argument found in their summary judgment briefing (Dkt. 242 at 7–9), Plaintiffs say, "Defendants can increase capacity in schools and communities to deliver

services to students with disability-related behaviors, expand Georgia's System of Care to serve all children with disability-related behaviors, and better leverage available resources like Medicaid funding to provide services that would prevent unnecessary segregation for children with disability-related behaviors." (Dkt. 305-1 at 16–17.) They don't explain what these recommendations mean in their briefing. Do they, for example, suggest increasing the capacity of schools by expanding the school's physical size (so that more classrooms or additional classrooms exist)? Or do they mean increasing the number of students in a classroom or in any given school? In any event, it appears all these proposed modifications arise from two premises. To begin, the recommendations suggest that the Court *can* order the State to do these things. But here, the local entities have nearly plenary discretion over the conduct Plaintiffs say leads to their unnecessary segregation and unequal educational opportunities. *Berrocal*, 136 F.4th at 1049–1054 (no traceability or redressability where foreign government prosecuted plaintiff for several crimes after receiving letter from United States explaining it may prosecute him without obtaining any waiver of a treaty rule because, among other things, the "decision to prosecute [plaintiff]

was made by officials of an independent sovereign"). The local boards of education, for example, decide how, when, and for what purpose to use GNETS funding. (*See* Dkt. 303 at 45 ("[O]nce a [GNETS] program receives funding [from the State], nothing in the GNETS Rule nor any other State act requires local officials to exercise their discretion to use those funds to physically separate GNETS students or to use that money in any specific way."), 75 ("[The Court] could not force the local school districts . . . to accept other sources of funding to improve or modify the services the districts currently provide.").) And while they say these modifications would ultimately increase available services in the school districts, the *provision* of services within the GNETS program lies solely with local school boards and entities. Ga. Comp. R. & Regs. 160-4-7-.15(5)(b)(10) (affording local educational agencies the power to "[a]llocate supports and resources, which may include in-kind services to GNETS to facilitate flexible models of service delivery and best practices for equitable educational support as appropriate"); (*see also* Dkt. 303 at 47 ("Because local officials have exclusive authority over which students are referred to GNETS and what services the local school districts provide them—and because no evidence suggests anyone but local actors

referred (or will refer) the named Plaintiffs to GNETS, placed (or will place) them in a segregated setting, and then provided (or will provide) them educational and behavioral services—the State's 'general supervision' of the GNETS program is not enough to show traceability on Plaintiffs' claims."), 74 ("Nor could the State control the educational services the local school boards provide.").)

Recognizing this flaw, Plaintiffs provide a string cite of constitutional and statutory authority and add, "[t]he State can—and must—mandate actions by [local education agencies], monitor their compliance, and create and enforce rules." (Dkt. 307 at 13). Careful attention to their leading citations, however, reveals their position is nothing more than a paper tiger. Consider, for example, their citation to Ga. Const. art. VIII, § 1, ¶ 1. (*Id.*) This provision gives them no aid because it "embodies [Georgia's] fundamental principle of exclusive local control" of K-12 education and vest in "local boards of education [] the exclusive authority to fulfill one of the primary obligations 'primary obligation[s] of the State of Georgia,' namely, '[t]he provision of an adequate public education for the citizens.'" *Gwinnett Cnty. Sch. Dist. v. Cox*, 710 S.E.2d 773, 775, 776 (Ga. 2011) (emphasis added) (discussing

the same constitutional provision). Nor does their citation to Ga. Const. art. VIII, § 5, ¶ VII(a) offer any support for the same reasons the Court previously said: while such constitutional provision allows the Georgia legislature to create "special schools" and set terms for the establishment of such schools with the local boards of education, "[n]one of the statutes cited as authority for the GNETS Rule . . . address 'special schools.'" (Dkt. 303 at 38 n.13.) And the same is true for their citation to O.C.G.A. § 20-2-152, which requires "[*l*]*ocal school systems*" to "provide special education programs," like GNETS. O.C.G.A. § 20-2-152(b) (emphasis added).[11] Besides this vague, unexplained string cite to

---

[11] The Court could—but doesn't—further unpack their string cite to explain why none show some relevant State authority. Plaintiffs make no effort to explain why these examples matter in any relevant way. How, for instance, does O.C.G.A. § 31-2-1 (a statute expressing the legislative intent in creating DCH) show that the State can compel the local actors to implement these modifications? (Dkt. 307 at 13.) And why does the generic reference to O.C.G.A. § 31-2-4 (a dense statute describing DCH's many duties) show that authority? (*Id.* at 13.) The Court will not pick up the slack. *See Cottonham v. Comm'r, SSA*, 2023 WL 3374097, at *1 (10th Cir. May 11, 2023) ("After each of these assertions, [plaintiff] includes a string of citations to cases, statutes, or regulations, without explaining these authorities' relevance. Although we have no obligation to do so, we have examined a sample of the cited authorities and we find them to be relevant, if at all, at a general level only[.]"). Especially not when they must show manifest error. *MacPhee*, 73 F.4th at 1250.

statutes, they cite nothing suggesting these Defendants can order boards of education to increase the capacity of its schools or do any of their recommended modifications.

Moreover, Plaintiffs' recommendations arise from the belief that dedicating more funds or resources for local boards of education will reduce or eliminate unnecessary segregation and will provide equal educational opportunities through GNETS. (*See, e.g.*, 213-1 at 15 (expert report emphasizing that "[b]ecause of the State's policies and practices, local school districts in Georgia do not have the resources needed to prevent students with disability-related behaviors from being segregated in GNETS").) This "throw money at it" approach may sometimes work. In *Florida*, for example, the court noted the plaintiff had presented evidence that requiring the state to pay nurses more money would allow the state to hire more nurses, thus allowing more nursing care (the plaintiff's requested remedy). *See Florida*, 682 F. Supp. 3d at 1194 (finding redressability where the court "heard credible testimony that . . . increasing [private duty] nurses' pay would result in more available nurses to serve the needs of" plaintiffs and limit the institutionalization of plaintiffs). But that relationship was simple—if a

Court orders a state to pay nurses, the state will have more nurses. Yet Plaintiffs haven't pointed to any *evidence* like this in their motion. And it is not self-evident that giving local boards of education more money would cause them to end the inappropriate segregation of students or reduce unequal educational opportunities. How, for example, might these local actors respond to increased "capacity" in a school such that an individual GNETS student would experience less unnecessary segregation or discrimination? Plaintiffs have not shown that greater capacity in a school or a community, expanded services for all children, or better use of Medicaid funds would prevent a school official from placing a child into a segregated environment once that official (in consultation with the student's IEP team) determines that placement is necessary because the child cannot receive an appropriate education in a less restrictive environment. What's more, even if the State has a Medicaid obligation to which it could dedicate more resources or funds (and it's unclear from their motion if Medicaid actually funds GNETS or its services), what would require the local boards to use the funds in the way Plaintiffs want as opposed to the local boards deciding, in their discretion, other purposes for the funding, like improving overall student

40

facilities?  At bottom, the question is whether the requested injunctive or declaratory relief ordering these modifications "significantly increase the likelihood" of the local actors remedying their largely classroom-level harms.  *Lewis*, 944 F.3d at 1301.  Without seriously grappling with the State's lack of authority to mandate these actions on the local boards of education and without evidence that more money would predictably lead to the abandonment of GNETS or the end of or reduction of improper segregation and discrimination, they really cannot answer those types of questions.  So "[a]t best, [Plaintiffs'] proposed version of future events merely makes it possible, instead of significantly more likely, that" such relief would remedy their harms.  *Berrocal*, 136 F.4th at 1053.  Their argument thus fails.

## E.  Ground Five

In three sentences, Plaintiffs next say the Court erred by "incorrectly referenc[ing] and appl[ying] the statutory obligations of the Individuals with Disabilities Education Act." (Dkt. 305-1 at 17.)  Their only claims, according to them, arise from the "entirely separate and distinct law, the broad nondiscrimination requirements of Title II of the ADA." (*Id.* at 18.)  Tellingly, Plaintiffs only cite a fleeting reference in

41

one sentence of the Court's Order, explaining this "case involves the State's obligation to provide Plaintiffs a free and appropriate public education," to support their argument. (*Id.* at 17 (citing Dkt. 303 at 12–13).) Defendants respond the Order "does not conduct any IDEA-based analysis" or "cite to any IDEA statutory provisions (other than those describing IEP teams), regulations, or caselaw." (Dkt. 306 at 23.)

The Court agrees with Defendants. Plaintiffs have made this distinction abundantly clear since the case began. (*E.g.*, Dkt. 1 ¶ 18 ("The Individual Named Plaintiffs and the Class do not seek relief related to any failure to provide them with a free appropriate public education ("FAPE").").) And the Court previously held as much. (*See* Dkt. 77 at 30 ("Since stigmatization is the gravamen of the complaint, Plaintiffs did not have to exhaust their remedies under the IDEA.").) But Plaintiffs overlook the rest of the Court's substantive discussion—focusing on much more than the denial of a free appropriate public education—and application of the correct law, so their argument fails. Indeed, it's quite odd to conclude the Court "may have applied the wrong legal standard in some of its analysis" merely because the Court mentioned terms traditionally associated with the IDEA, like individualized education

program ("IEP") teams, local education agencies, or a FAPE. (Dkt. 307 at 15.) After all, those terms play an important role in how the GNETS Rule and program works. *E.g.*, Ga. Comp. R. & Regs. 160-4-7-.15(2)(f) (discussing an IEP team's assessment "to determine if the student is ready to receive a free appropriate education (FAPE) in the lesser restrictive environment"). Their argument, therefore, fails.

## F.    Ground Six

Finally, citing the Clerk's judgment dismissing the action with prejudice, Plaintiffs say "[t]his was error, whether clerical or otherwise," because dismissal for lack of standing should be without prejudice. (Dkt. 305-1 at 18 (citing Dkt. 304 (Clerk's judgment)).) Defendants essentially agree. (Dkt. 306 at 23–24.) Because the Court dismissed the action for lack of standing, the Court amends the judgment to dismiss this action *without* prejudice. *See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) ("A dismissal for lack of [Article III standing] is not a judgment on the merits and is entered without prejudice.").

## III.   Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs'
Motion for Reconsideration (Dkt. 305).  The Court **VACATES** the prior
entry of judgment and dismissal of all claims (Dkt. 304) and **DIRECTS**
the Clerk to enter judgment in Defendants' favor **without prejudice**.
The Court otherwise stands by all aspects of its Order.

**SO ORDERED** this 19th day of September, 2025.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE